Courtland L. Reichman (SBN: 268873)
  creichman@reichmanjorgensen.com
Brian C. Baran (SBN: 325939)
  bbaran@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

*Attorneys for Plaintiffs Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California*

ADDITIONAL COUNSEL ON FOLLOWING PAGE

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., NORITZ AMERICA CORP., NATIONAL ASSOCIATION OF HOME BUILDERS, CALIFORNIA STATE PIPE TRADES COUNCIL, CALIFORNIA MANUFACTURERS & TECHNOLOGY ASSOCIATION, CALIFORNIA RESTAURANT ASSOCIATION, RESTAURANT LAW CENTER, CALIFORNIANS FOR HOMEOWNERSHIP, INC., CALIFORNIA HOTEL & LODGING ASSOCIATION, CALIFORNIA APARTMENT ASSOCIATION, and PLUMBING-HEATING-COOLING CONTRACTORS OF CALIFORNIA | Civil Action No. 2:24-cv-10482 PA(PDx) **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | |
| Defendant. | |

ADDITIONAL COUNSEL:

Sarah O. Jorgensen (*pro hac vice* forthcoming)
  sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Tel.: (650) 623-1403; Fax: (650) 560-3501

Sean Kneafsey
  skneafsey@kneafseyfirm.com
THE KNEAFSEY FIRM, INC.
707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017
Tel.: (213) 892-1200; Fax: 213-892-1208

*Attorneys for Plaintiffs Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California*

John J. Davis, Jr. (SBN 65594)
  jjdavis@msh.law
MCCRACKEN, STEMERMAN &
  HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
Tel.: (415) 597-7200; Fax: (415) 597-7201

*Attorneys for Plaintiff California State Pipe Trades Council*

Matthew P. Gelfand (SBN 297910)
  matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206; Fax: (213) 480-7724

*Attorney for Plaintiff Californians for Homeownership, Inc.*

Angelo I. Amador (*pro hac vice* forthcoming)
  aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913; Fax: (202) 331-2429

*Attorney for Plaintiff Restaurant Law Center*

**INTRODUCTION**

1.     Plaintiffs seek declaratory and injunctive relief against enforcement of the South Coast Air Quality Management District's rule imposing a zero-$NO_x$ standard on certain categories of natural gas appliances covered by the federal Energy Policy and Conservation Act, 42 U.S.C. §§ 6201-6422 ("EPCA").  By design, the District's zero-$NO_x$ rule will effectively prohibit the manufacture, sale, purchase, or installation of certain natural gas appliances after set dates.  Because $NO_x$ is a byproduct of combustion, banning $NO_x$ emissions bans gas appliances, which operate by combustion.  But such *de facto* bans on gas appliances run afoul of EPCA.  The Ninth Circuit recently held that EPCA would undoubtedly preempt a ban on gas appliances, and it therefore preempts a ban on gas piping that has the effect of banning gas appliances.  So too here: The District cannot do indirectly by banning combustion emissions what it cannot do directly by banning gas appliances.  This Court has federal question jurisdiction under 28 U.S.C. § 1331 to resolve this dispute.

2.     The District's zero-$NO_x$ rule is already harming and will harm many residents and businesses that use natural gas for furnaces and boilers, cooking appliances, water heaters, and other equipment.  Prohibiting the end use of natural gas is at odds with the needs of individuals and businesses in the District for reliable, resilient, and affordable energy.  Banning gas-fired instantaneous (tankless) water heaters, boilers, pool and spa heaters, or other appliances is fundamentally inconsistent with the public interest and consumer choice, will exacerbate California's problem of housing affordability, and will shift energy demand onto already overburdened electric grids.  Plaintiffs support working to improve efficiency and reduce emissions, but banning these natural gas appliances does little to advance those goals—and in all

1

events, the District must comply with federal law and binding Ninth Circuit precedent.

3. Plaintiffs Rinnai America Corporation, Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians For Homeownership, Inc., California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California are manufacturers of gas appliances; affordable housing groups; labor union associations; and associations of manufacturers, builders, owners of commercial and residential buildings, hotel owners and operators, and restaurant chefs and owners. Plaintiffs and their members are harmed by the District's effective ban on certain gas appliances. Plaintiffs face significant costs in having to replace gas appliances with electric appliances in existing buildings, which may also necessitate building modifications, disrupt business operations, or require the temporary relocation of tenants. The increased cost of retrofitting or building for electric appliances will raise the cost of housing and limit supply. Plaintiffs also have members that include plumbers and pipefitters who will see a decrease in the amount of gas plumbing work, affecting their hours, job opportunities, and hiring and training in the industry. In short, the District's rule will impose enormous financial costs and disruption on businesses and individuals, including Plaintiffs.

4. The federal energy policy reflected in EPCA was born out of the oil crisis of the 1970s and reflects concerns with energy independence, domestic supply, and national security. The federal regulatory scheme requires a practical approach to energy regulation that maintains neutrality on energy sources and recognizes the need

for a diverse energy supply.  This is for good reason: A patchwork approach is unworkable, undercuts a coordinated national energy policy, overlooks the public's need for reliable and resilient energy, and denies consumers choice.

5.    EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances.  The thrust of EPCA's appliance provisions is that nationally uniform energy use and energy efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply, and that those standards should use consumption objectives that do not favor one type of energy or appliance over another.  To that end, EPCA's preemption provision for consumer appliances states:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product unless the regulation [falls within certain enumerated exceptions not applicable here].

42 U.S.C. § 6297(c) (emphasis added).  EPCA thus expressly preempts state and local regulations concerning the energy efficiency and energy use of products for which EPCA sets energy conservation standards, leaving only narrow room for concurrent state and local regulations that meet certain stringent statutory conditions.  EPCA's default rule is federal preemption; Congress intended for national policy to control.

6.    Indeed, the Ninth Circuit recently held that EPCA preempted Berkeley's prohibition on gas piping in new buildings because it effectively banned covered gas appliances.  *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). The Ninth Circuit decision emphasizes that "EPCA would no doubt preempt an

ordinance that directly prohibits the use of covered natural gas appliances in new buildings," and that "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Id.* at 1107. Just as EPCA prohibited Berkeley from banning gas appliances indirectly by banning gas piping, so too does it prohibit the District from banning those appliances indirectly by prohibiting their $NO_x$ emissions. Controlling precedent therefore resolves this case.

7. In short, the District's zero-$NO_x$ rule will cause substantial adverse consequences for Plaintiffs and the public. The District's effort to bypass federal law to implement its own energy policy violates EPCA, is contrary to the public interest, and causes irreparable harm to Plaintiffs and their members. Plaintiffs accordingly bring this action seeking a declaration that the District's zero-$NO_x$ rule is preempted by EPCA, as well as an injunction preventing its enforcement.

## JURISDICTION

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

## VENUE

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant South Coast Air Quality Management District is the sole defendant and resides in the Central District of California within the meaning of § 1391(c)(2). Venue is also proper under § 1391(b)(2) because a substantial part of the acts and events giving rise to the claim occurred in the Central District of California, including because the rule at issue will be enforced here.

## PARTIES

10. Plaintiff Rinnai America Corporation is one of the leading manufacturers

and sellers of gas instantaneous (tankless) water heaters in the United States. Rinnai has its headquarters in Peachtree City, Georgia, and in 2022, it opened the first gas tankless water heater manufacturing facility in the United States. Gas tankless water heaters provide greater efficiency and have longer life spans than traditional gas tank water heaters and therefore result in substantial energy savings and emissions reductions across the water heater market. Since their introduction in 2005, gas tankless water heaters have been increasing their share of the water heater market and represent about 10% of all water heater sales in 2022. Rinnai sells roughly 35% of gas tankless water heaters in the United States, and it has significant sales of gas tankless water heaters in California and in the District. Rinnai also sells commercial hybrid tank/tankless water heaters, residential and commercial condensing tankless boilers, residential condensing combination water heaters/boilers, and electric heat pump water heaters. It sells all these products in California and in the District.

11.    Rinnai is experiencing or will imminently experience harm in the form of economic injuries, lost sales, and altered business practices because of the impending ban on its appliances. Its distributors and sales personnel will no longer be able to sell, offer for sale, or install gas tankless water heaters in new buildings in the District or in replacement scenarios in existing buildings after the relevant effective dates. This will also affect Rinnai's long-term investment, manufacturing, marketing, and distribution plans.

12.    Plaintiff Noritz America Corporation is a leading manufacturer and seller of gas instantaneous (tankless) water heaters in the United States. Noritz has its headquarters in Fountain Valley, California, and is a wholly owned subsidiary of Noritz Corporation (Japan). Noritz's product line incorporates condensing and non-

condensing instantaneous water heaters, condensing combination gas boilers, and integrated hybrid electric heat pump water heaters.  It started doing business in the United States selling gas tankless water heaters in 2002.  Noritz sells roughly 10% of gas tankless water heaters in the United States, and it has significant sales of gas tankless water heaters in California and in the District.

13.    Noritz is experiencing or will imminently experience harm in the form of economic injuries, lost sales, and altered business practices because of the impending ban on its appliances.  Its distributors and sales personnel will no longer be able to sell, offer for sale, or install gas water heaters or boilers in new buildings in the District or in replacement scenarios in existing buildings after the relevant effective dates.  This will also affect Noritz's long-term investment, manufacturing, marketing, and distribution plans.  Additionally, as Noritz has its headquarters in California, Noritz may be forced to consider leaving the state if its primary business is not allowed to be conducted in the largest existing market for its products.

14.    Plaintiff National Association of Home Builders ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C.  It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states, including Plaintiff Rinnai.  About one-third of NAHB's members are home builders and remodelers, both single family and multifamily.  The rest work in closely related specialties such as sales and marketing, housing finance, manufacturing, and building materials supply.  The NAHB is affiliated with 11 local organizations in California, and NAHB and its local organizations have members in the District or who conduct business and operations in the District (including Rinnai).  The NAHB's mission is to protect and provide housing

opportunities for the American public while promoting the business interests of its members.

15.    The NAHB has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues, business operations, and compliance burdens as a result of the zero-$NO_x$ rule.  Because of the zero-$NO_x$ rule, some NAHB members in the District will lose the option of installing certain gas appliances, and some members that own multifamily buildings will be forced to replace certain gas equipment with electric equipment, which will require enormously extensive remodeling to incorporate electric service.    Moverover, NAHB's manufacturer members will lose sales and be forced to alter their business practices because of the rule.  Members of NAHB accordingly are experiencing or imminently will experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the District's zero-$NO_x$ rule.

16.    Plaintiff California State Pipe Trades Council ("Council") is a statewide labor organization comprised of District Councils and Local Unions representing 35,000 plumbers, pipefitters, steamfitters, welders, refrigeration fitters, HVAC technicians, and sprinkler fitters throughout California.  The Council is a chartered affiliate of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO CLC.  The Council's principal office is in Sacramento, California.  The workers represented by the Council help build California's homes, schools, hospitals, wastewater and water treatment plants, and industrial facilities to the highest standards of safety and efficiency.

17.    The Council's affiliates include Pipe Trades District Council No. 36, which includes six Local Unions that represent more than 10,000 Union members who

work throughout the District.  Their members provide sophisticated piping systems, and their work spans from underground installations to final connections of fixtures and equipment.  District Council 36, the Local Unions, their signatory contractors, and their Joint Apprenticeship and Training Committees spend tens of millions of dollars annually in training apprentices and educating their members in work skills, plumbing codes, jobsite hazards, safety practices, theory, and certification of all installations. Their mission is to educate, train, and represent highly skilled journey workers and apprentices; to support the working conditions and environment of their members; and to protect the health of California residents by providing quality plumbing and pipe fitting services.

18.     The impending zero-$NO_x$ rule is causing current and imminent harm to the Council, District Council 16, its Local Union affiliates, and the workers they represent.  Union plumbers and pipefitters are losing work and wages as a result of the gas ban.  Members have already lost work and wages because residential construction projects traditionally built with gas service for gas heating and appliances are now being designed and built without gas service or appliances, and often without gas infrastructure at all, in preparation for compliance with the District's rule.  With the gas plumbing work reduced or eliminated from many building projects, the projects will involve substantially less plumbing work overall and therefore will employ fewer plumbers.  The loss of work on gas infrastructure will cost some of the Council's members their jobs, reduce the need for their services, result in lower hours worked and wages earned by members, or lead to hiring freezes.

19.     Plaintiff California Manufacturers & Technology Association ("CMTA") is a nonprofit organization organized under California law and headquartered in

Sacramento, California.  Its members comprise 400 businesses from the manufacturing community.  The CMTA works to improve and enhance a strong business climate for California's 30,000 manufacturing, processing, and technology-based companies, and it has worked with the California state government since 1918 to develop balanced laws, effective regulations, and sound public policies to stimulate economic growth and create new jobs while safeguarding the state's environmental resources.  It advocates for California policies that assist manufacturers and their employees.  As the leading voice for California manufacturers, the CMTA promotes industry interests that allow the sector to remain competitive.

20.    The District's zero-$NO_x$ rule is causing current and imminent harm to the CMTA's members.  One or more members are suffering, or are imminently facing, increased costs, disruption to business, compliance burdens, and harm to profits and operations from the zero-$NO_x$ rule.  At least one member has expressed concern about the negative financial effects of the rule, which would result in significant business disruption because of the size of the California market for the banned products.

21.    Plaintiff California Restaurant Association ("CRA") is a nonprofit mutual benefit corporation organized under California law with its principal office in the County of Sacramento, California.  It has over 18,000 members across California, including both restaurant owners and chefs.  It has members that own or operate restaurants or work as chefs in the District whose interests will be directly affected by the District's zero-$NO_x$ rule.

22.    The California Restaurant Association has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations along with compliance burdens as a result of the

District's zero-$NO_x$ rule.  Under the rule, CRA members who want to open a restaurant in a new building may pay higher costs to own or lease a building for which certain appliances must be electric.  Restaurant owners and chefs will also be denied the use of gas appliances subject to the rule in existing restaurants that require appliance replacements, which may require electric panel upgrades, space reconfigurations, and new venting or condensate management.  This will impose significant costs on members who own or lease buildings and will also disrupt business operations and deprive restaurants of affordable and reliable energy.

23.     Plaintiff the Restaurant Law Center ("RLC"), is a nonprofit, tax-exempt organization incorporated in Washington, D.C. and with its principal office also in Washington, D.C.  The RLC was established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States.  While the RLC is an independent organization with its own board of directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC.  As such, the RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 15.7 million employees, or approximately 10% of the workforce in the United States.  In California, the industry is the largest private employer in the state, with approximately 85,000 restaurant locations and $152.1 billion in sales.  Despite the industry's size, 96% of restaurants in California have fewer than 50 employees.  The RLC's member restaurants include thousands located across the District whose interests will be directly affected by the District's zero-$NO_x$ rule.

24.     The RLC has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations

along with compliance burdens as a result of the District's zero-$NO_x$ rule. Under the rule, RLC members who want to open a restaurant in a new building may pay higher costs to own or lease a building for which certain appliances must be electric. Restaurant owners and chefs will also be denied the use of gas appliances subject to the rule in existing restaurants that require appliance replacements, which may require electric panel upgrades, space reconfigurations, and new venting or condensate management. This will impose significant costs on members who own or lease buildings and will also disrupt business operations and deprive restaurants of affordable and reliable energy. Many RLC members run on thin margins, making any increase in costs significant. And many RLC members in the District are already struggling due to a variety of unfavorable economic conditions. California restaurant owners still have not fully recovered from the pandemic, and the rule will further exacerbate these unfavorable economic conditions.

25.    Plaintiff Californians For Homeownership, Inc. ("CFH") is a California nonprofit public benefit corporation and a § 501(c)(3) public charity. Its mission is to address California's housing crisis through litigation in support of the production of housing affordable to families at all income levels.

26.    CFH is an I.R.C. § 509(a)(3) supporting organization of the California Association of REALTORS ("C.A.R."), is organized for the benefit of C.A.R. and its members, and receives the majority of its organizational and financial support from C.A.R. C.A.R. is a voluntary trade association whose membership consists of approximately 200,000 persons licensed by the State of California as real estate brokers and salespersons and the local Associations of REALTORS to which those members belong. Members of C.A.R. assist the public in buying, selling, leasing, financing, and

managing residential and commercial real estate.  C.A.R.'s members are and will be harmed by the District's zero-$NO_x$ rule in several ways.  First, the rule will increase the cost to construct, own, and operate residential developments, reducing the development of new residential dwellings and reducing the financial viability of for-sale developments and conversions in particular, limiting residential transactions.  Second, concerns about appliance replacement are likely to disrupt real estate transactions.  Third, many of C.A.R.'s members own and operate multifamily residential properties and under the District's rule will unnecessarily bear increased costs and experience disruptions associated with the replacement of appliances.

27.    CFH's purpose includes representing the interests of the future residents of residential units in litigation.  Because these individuals do not reside in the residential units or potential residential units whose affordability or creation is affected by a governmental decision, these individuals often do not receive advance notice of the decisionmaking process, and they lack political recourse against the government actors responsible for the decision.  These individuals are and will be harmed by the District's zero-$NO_x$ rule because it will increase construction and renovation costs, reducing the likelihood of development and availability of homes they can afford.

28.    Plaintiff California Apartment Association ("CAA") is a § 501(c)(6) nonprofit California corporation with its headquarters in Sacramento, California.  CAA is the largest statewide rental housing trade association in the country, representing more than 50,000 property owners and housing operators who are responsible for nearly two million rental housing units throughout California, including approximately 1,460 members within the District.  It provides its membership with support, information, and educational resources relevant to all aspects of California's rental

housing industry.  CAA members are businesspeople, employers and landlords who are subject to strict business, employment, and housing legal standards in California.

29.     The CAA has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations as a result of the zero-$NO_x$ rule.  The impending zero-$NO_x$ rule is causing or will imminently cause at least one member of CAA to unnecessarily bear increased costs associated with residential construction, ownership, and maintenance arising from the prohibition of effective, available, and affordable fuel gas appliances subject to the rule. The rule will impose serious disruption, as forced replacements may require electric panel upgrades, new transformers, space reconfigurations, new supporting infrastructure, new venting or condensate management, and potential tenant relocations while compliance is achieved.  For example, individual water heaters are often located in rental units occupied by tenants.  Replacing these appliances with compliant appliances can require significant structural changes to the premises, such as installation of additional ducting and venting necessary for heat pump systems to operate properly and the addition of sound suppression materials to compensate for the increased noise created by such systems.  In older rental properties, this type of construction activity carries with it the additional requirement to follow specific work practices to prevent danger posed by hazardous materials such as lead-based paint and asbestos.  In addition to being costly, this type of construction activity is disruptive to tenants, who may be unable to access significant portions of their home or may need to vacate the premises temporarily.  Accordingly, members of the CAA are experiencing or will imminently experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the zero-$NO_x$ rule.

30.    Plaintiff California Hotel & Lodging Association ("CHLA") is a § 501(c)(6) nonprofit California corporation with its headquarters in Sacramento, California.  CHLA is the largest state lodging industry association in the country, representing more than 3,000 hotel owners and operators who directly and indirectly facilitate more than $150.4 billion in travel-related spending across the state annually. California's hospitality industry is a diverse cross-section of the state and includes independent owner-operators, family businesspeople, first- and second-generation immigrant entrepreneurs, large-scale operators, and many more.  CHLA regularly represents its members' interests in governmental advocacy as well as legal affairs and provides its membership with educational and operational resources relevant to all aspects of California's hotel industry.

31.    CHLA has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations as a result of the zero-$NO_x$ rule.  The impending zero-$NO_x$ rule is causing or will imminently cause at least one member of CHLA to unnecessarily bear increased costs associated with hotel construction, ownership, and maintenance arising from the prohibition of effective, available, and affordable fuel gas appliances subject to the District's rule. Within the District, hotels dating to the 1920s are still in operation and were constructed with materials and structural plans that never contemplated such significant modifications.  Due to the size and use cases of the affected equipment, the rule will significantly affect essential parts of hotel operations and may necessitate meaningful reductions in or absolute cancellations of guest stays to provide space and time to retrofit electric panel upgrades, install new transformers, reconfigure spaces, obtain and install new supporting infrastructure, design and construct new venting or

14

condensate management, implement other ancillary modifications, and demolish existing infrastructure.  In some cases, retrofitting new systems to comply with the District's rule may not be readily feasible and, particularly in currently depreciated markets, could force complete overhaul or abandonment of the existing structure. These cost pressures and revenue impacts come during a period of economic vulnerability resulting from latent and persistent effects of COVID-19 travel restrictions, digital telecommuting technologies, and the materializing evolution of localized travel demands.  Accordingly, CHLA members are experiencing or will imminently experience harm in the form of significant economic injuries, altered business practices, and compliance burdens because of the zero-$NO_x$ rule.

32.    The Plumbing-Heating-Cooling Contractors Association is the nation's oldest trade association, founded in 1883 by plumbing craftsmen seeking to distinguish themselves as experts and share best practices to improve the industry and protect the health and safety of the public. The Plumbing-Heating-Cooling Contractors of California ("PHCC of California") chapter was founded in 1900, and for the past 124 years has been instrumental in training the workforce, elevating the industry, and connecting plumbing-heating-cooling professionals. PHCC of California is a 501 (c)(6) nonprofit California corporation with its headquarters in Sacramento, California. Our motto is 'Best People. Best Practices', representing contractors ranging from single truck owner / operators to large commercial contractors, all committed to furthering PHCC's mission statement: The Plumbing-Heating-Cooling Contractors Association is dedicated to the advancement and education of the plumbing and HVACR industry for the health, safety, and comfort of society and the protection of the environment.

33.    The PHCC of California has one or more members conducting business

15

within the District who are currently experiencing or will imminently experience financial harm to their revenues and business operations due to the implementation of the zero-NOx regulation. This impending zero-NOx rule will obligate at least one member operating its business within the District to incur unnecessary increased expenses related to residential construction, ownership, and maintenance.   The impending rule will also impact the work opportunities of one or more members operating in the District.

34.    Plaintiff associations each have standing to bring this action because the interests they seek to address are germane to their fundamental purposes; each Plaintiff association has one or more members that are being injured as a result of the rule and would independently have standing; and the claims asserted seek only declaratory and injunctive relief and therefore do not require individual members' participation.

35.    Defendant South Coast Air Quality Management District is a public entity existing under the laws of the State of California with the capacity to sue and be sued. Cal. Health & Safety Code §§ 40410, 40412, 40700, 40701(b); *see Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 777-86 (9th Cir. 2005).

36.    An actual and substantial controversy has arisen and now exists between Plaintiffs and the District concerning the validity of the District's zero-NO$_x$ rule. Plaintiffs contend that the rule's effective ban on certain gas appliances is preempted by EPCA.  Plaintiffs are informed and believe, and on that basis allege, that the District disagrees with Plaintiffs' contentions and asserts that its rule is lawful and enforceable.

37.    Enforcement of the rule will injure Plaintiffs or their members.  Those injuries will likely be redressed by a favorable ruling from this Court.

38.    Plaintiffs challenge the facial validity of the District's zero-NO$_x$ rule.

16

There is no set of circumstances under which the rule can be valid under federal law.

## ALLEGATIONS

### The District's Zero-NO$_x$ Rule

39.    This case involves the District's Rule 1146.2, titled "Emissions of Oxides of Nitrogen from Large Water Heaters and Small Boilers and Process Heaters."  In June 2024, the District amended the rule to phase in zero-NO$_x$ emission limits for appliances within the rule's scope.  The amended rule is attached as Exhibit 1.

40.    As amended, the rule applies to "manufacturers, distributors, retailers, Resellers, Installers, owners, and operators of Units fired with, or designed to be fired with, natural gas that have a Rated Heat Input Capacity less than or equal to 2,000,000 British Thermal Units (Btu) per hour."  S. Coast AQMD R. 1146.2(b).  A "Unit" is defined as "any Boiler, Water Heater, or Process Heater," except "Water Heaters subject to the limits of Rule 1121," which governs some residential storage (tank) water heaters.  *See* S. Coast AQMD R. 1146.2(c)(28), (c)(30), (k)(1)(B); *see also* S. Coast AQMD R. 1146.2(c)(1), (18), (31) (defining "Boiler," "Process Heater," and "Water Heater").

41.    Rule 1121 applies to tank-type natural gas water heaters with heat input rates below 75,000 Btu per hour.  S. Coast AQMD R. 1121(a), (b)(14); *see* Ex. 2 at 2.  Residential tankless water heaters are not covered by Rule 1121 and thus are covered by Rule 1146.2.

42.    According to the District, "Rule 1146.2 applies to more than one million units."  Ex. 2 at 2.

43.    The amendments to Rule 1146.2, which set limits on NO$_x$ emissions for regulated appliances, set a schedule for phasing in zero-NO$_x$ limits depending on the

type of appliance and whether it is in a new or existing building.  S. Coast AQMD R. 1146.2(d)(1)-(2); *see* Ex. 2 attach. G at 1-1.

44.    The first zero-NO$_x$ limits for appliances in new buildings will take effect January 1, 2026.  Those limits cover natural gas tankless water heaters with a rated heat input capacity of 200,000 Btu per hour or less, along with all other "Type 1 Units" (those with a rated heat input capacity less than or equal to 400,000 Btu per hour) except pool heaters and "High Temperature Unit(s)."    S. Coast AQMD R. 1146.2(d)(1)-(2); *see id.* 1146.2(c)(8) (defining "High Temperature Unit" as "any Unit that is designed and used to produce steam or to heat water above 180 degrees Fahrenheit"); *id.* 1146.2(c)(12) (defining "Instantaneous Water Heater" as "a tankless Water Heater with a Rated Heat Input Capacity less than or equal to 2,000,000 Btu per hour that heats water only on-demand when it flows through a heat exchanger, which is a device used to transfer heat between two or more mediums of different temperatures").  These limits will be applied to existing buildings in 2029.

45.    The second phase of appliances subject to zero-NO$_x$ limits are pool heaters (whether Type 1 or Type 2) and all other Type 2 units (those with a rated heat input capacity greater than 400,000 Btu per hour) except Type 2 High Temperature Units.  S. Coast AQMD R. 1146.2(d)(2); *see id.* 1146.2(c)(29) (defining "Type 2 Unit").  The Phase II limits take effect in 2028 for new buildings and 2031 for existing buildings.  *Id.* 1146.2(d)(2) tbl.3.

46.    The third phase covers Type 1 and Type 2 High Temperature Units.  S. Coast AQMD R. 1146.2(d)(2).  Zero-NO$_x$ limits for those appliances take effect in 2029 for new buildings and 2033 for existing buildings.  *Id.*

47.    Once a zero-NO$_x$ limit takes effect, Rule 1146.2(d)(2) provides that "[n]o

18

person shall manufacture, supply, sell, offer for sale, or Install, for use in the South Coast AQMD" any appliance exceeding that limit.

48.    The rule is not limited to new appliances; it also mandates the eventual scheduled replacement of existing appliances with new ones that satisfy the zero-$NO_x$ limit.  In general, once a zero-$NO_x$ limit takes effect, appliances in existing buildings must be replaced with zero-$NO_x$ appliances after the appliances are 15 years old (for Type 1 appliances except tankless water heaters and High Temperature Units) or 25 years old (for all other appliances).   S. Coast AQMD R. 1146.2(d)(3); *see id.* 1146.2(d)(2) tbl.2 (listing maximum unit ages); *id.* 1146.2(e)(1) (unit age calculation).

49.    Appliances installed in "Residential Structures" or "Small Business[es]" are exempt from these scheduled replacements, but owners and operators must still comply with the zero-$NO_x$ limits whenever they choose (or are forced by a breakdown) to replace their appliances.   *Id.* 1146.2(k)(4)-(5); *see also id.* 1146.2(j)(9) (recordkeeping and reporting requirements for the small business exemption).   A "Residential Structure" is "any structure which is designed exclusively as a dwelling for not more than four families, and where [the covered] equipment is used by the owner or occupant of such a dwelling."  *Id.* 1146.2(c)(24).  A "Small Business" is "a business which is independently owned and operated" that has 10 or fewer employees and either is a "not-for-profit training center" or has "total gross annual receipts [of] $500,000 or less."   S. Coast AQMD R. 102 at 10; *see* S. Coast AQMD R. 1146.2(c)(25).

50.    In certain limited circumstances, the rule allows appliance owners or operators to apply for extended compliance deadlines.  For example, appliance owners or operators may receive an extension if they "will encounter delays beyond [their]

reasonable control" in meeting zero-$NO_x$ limits "because a utility upgrade is required and the applicable utility company is unable to provide the necessary power to operate the Unit."  *See* S. Coast AQMD R. 1146.2(i)(1), (i)(2)(C); *see also id.* 1146.2(i)(2) (extension for owners or operators of five or more appliances that must all meet zero-$NO_x$ limits within a two-year period); *id.* 1146.2(i)(4) (extension for certain "short-term replacement[s] due to sudden Unit failure" where "an electrical upgrade is required to increase the power supply capacity to operate a" zero-$NO_x$ replacement); *id.* 1146.2(i)(5) (alternative compliance date for certain tankless water heaters in mobile homes); *id.* 1146.2(i)(6) (extension for tenants of leased property facing installation delays beyond their reasonable control); *id.* 1146.2(i)(7) (extension for delays caused by the need for construction to accommodate a zero-$NO_x$ unit).

51.   The District's Final Staff Report regarding the zero-$NO_x$ rule, Ex. 2 attach. G, repeatedly acknowledges that the effect of zero-$NO_x$ limits is to prohibit gas appliances subject to the rule and that the rule will require the replacement of existing gas appliances with electric appliances.  For example, the report contends "that there is a range of heat pump and electric resistance units available to replace gas units subject to this rule" and predicts that "manufacturers will continue development to improve and expand zero-emission products."  Ex. 2 attach. G at 2-8; *see also id.* at 2-11 (suggesting that "fuel cell technology has the potential to replace existing units to meet the zero-emission limits" while recognizing that "[n]atural gas fuel cells produce some NOx emissions").  Similarly, its cost-effectiveness analysis assumes that the rule would require natural gas appliances to be replaced with electric appliances.  *See, e.g.*, *id.* at 2-14 (considering the increased installation costs for heat pumps relative to the gas appliances that could be installed absent the rule); *id.* (considering the costs of

upgrading electrical panels); *id.* at 2-15 (comparing "[h]eat pump pool heaters" with "natural gas-fired pool heaters"). In particular, the report "considered the cost impacts of transitions from conventional combustion heating that uses natural gas to zero-emission technologies that use electricity as part of the cost-effectiveness assessment." *Id.* at 2-16; *see id.* at 2-16 to -17 ("Estimating Fuel Switching Cost"); *id.* at 2-17 (describing a methodology that involves determining the gas costs for "the existing natural gas fired unit" compared to the electricity costs for "the electric unit which will be replacing" it).

52.     Similarly, the Final Socioeconomic Impact Assessment for the zero-$NO_x$ rule acknowledges that the rule will force a "transition[] from natural gas to zero-emission water heating technologies that use electricity." Ex. 2 attach. H at ES-2.

53.     In sum, the intent and effect of Rule 1146.2's zero-$NO_x$ limit is to ban natural gas appliances in the covered categories, including by forcing their replacement with electric appliances in existing buildings.

54.     The District is considering similar rules for other appliances. The District has proposed amendments to Rule 1111 covering gas residential and commercial furnaces and to Rule 1121 covering gas tank water heaters that, if approved, would phase in similar zero-$NO_x$ emission limits. *See Proposed Amended Rules (PAR) 1111 and 1121*, S. Coast AQMD, https://www.aqmd.gov/home/rules-compliance/rules/scaqmd-rule-book/proposed-rules/rule-1111-and-rule-1121.

**Federal Energy Policy and Regulation**

55.     Born out of the oil crisis the United States faced in the early 1970s, the Energy Policy and Conservation Act of 1975, 42 U.S.C. §§ 6201-6422, establishes a "comprehensive energy policy" designed to address "the serious economic and national

security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005), *abrogated in other part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016). Among other topics, EPCA regulates the energy efficiency and energy use of covered appliances and equipment.

56.    Congress has amended EPCA several times since it was first enacted in 1975, progressively moving away from a laissez-faire approach to appliance efficiency, which relied on consumers to choose more efficient appliances, and toward binding federal standards. Each amendment to EPCA further emphasized the government's intent to regulate appliance energy use and energy efficiency at the federal level and to limit further state and local government authority in this area.

57.    EPCA's original provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Air Conditioning*, 410 F.3d at 499. The legislative history memorializes Congress's intent at the time: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H. Rep. No. 94-340, at 95 (1975).

58.    In that early form, EPCA permitted significant state involvement,

allowing "state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning*, 410 F.3d at 499.

59.    In 1977, President Carter created the federal Department of Energy to coordinate a federal response to the nation's energy problems.  And the next year, Congress passed a range of statutes known as the National Energy Act, which gave the federal government broader authority over energy policy and sought to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth.

60.    As part of that 1978 effort, Congress amended EPCA.  Rather than relying exclusively on labeling, the new approach "required the [Department of Energy] to prescribe minimum energy efficiency standards" for certain products.  *Air Conditioning*, 410 F.3d at 499.  The amendment also strengthened EPCA's preemption, allowing state regulations "*only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Id.* at 499.

61.    Despite these new requirements, the Department of Energy did not adopt federal minimum energy standards.  Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption.  As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

62.    Congress responded in 1987 by again amending EPCA.  Among other

23

changes, Congress added the preemption provision at issue here. *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 7, 101 Stat. 103, 117-22.

63. The purpose of the 1987 amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 2. As Congress recognized, varying state standards created "the problem of a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Id*. at 4; *see also* H.R. Rep. No. 100-11, at 24 (1987) ("Section 7 is designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements.").

64. EPCA now broadly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, while allowing narrow exceptions for state and local governments to regulate. States can still seek permission to establish their own standards, but "achieving the waiver is difficult." S. Rep. No. 100-6 at 2. The statute requires showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*; *see* 42 U.S.C. § 6297(d)(4).

65. In 1992, Congress again amended EPCA, expanding its federal appliance program to include commercial and industrial appliances.

66. Congress has made a handful of minor amendments to EPCA's preemption provisions since 1987, none of which are relevant here.

24

**EPCA's Express Preemption Provisions**

67.    EPCA expressly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, subject to a few narrow exceptions.  State and local regulations that do not satisfy the exceptions' detailed conditions are preempted.

68.    EPCA regulates the energy efficiency and energy use of a variety of consumer and industrial products, which the statute calls "covered product[s]."  Its standards for "consumer product[s]" cover a range of appliances, including water heaters, furnaces, dishwashers, pool and spa equipment, and stoves.  42 U.S.C. §§ 6291(1)-(2), 6292(a).  It also contains standards for "industrial equipment," including furnaces and water heaters. *Id.* § 6311(2)(A).  Those definitions are not tied to who is using the product.  A product qualifying as a "consumer product" but used in a commercial enterprise is still a "consumer product."  *See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).

69.    The express preemption provision in EPCA's consumer product regulations states that "effective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c).

70.    "State regulation" is defined to include "a law, regulation, or other requirement of a State or its political subdivisions."  42 U.S.C. § 6297(a)(2)(A).

71.    "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use."  42 U.S.C. § 6291(4).  "Energy" is defined as

"electricity, or fossil fuels." *Id.* § 6291(3).

72.    Putting these definitions together, EPCA preempts regulations relating to "the quantity of [fossil fuel] directly consumed by" covered consumer appliances at the point of use. *Cal. Rest.*, 89 F.4th at 1101.

73.    Similarly, EPCA's industrial equipment provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. 42 U.S.C. § 6316(b)(2)(A). In the industrial product standards, "energy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use." *Id.* § 6311(4). And "energy" is defined in the same way as for the consumer product standards. *Id.* §§ 6311(7), 6291(3).

74.    EPCA thus preempts regulations relating to the "quantity of [fossil fuel] directly consumed by" covered industrial equipment at the point of use.

**The District's Zero-NO$_x$ Rule Is Preempted by EPCA**

75.    The District's zero-NO$_x$ rule is preempted by EPCA's express preemption provisions. The rule concerns the energy use of appliances covered by EPCA in that it "prevent[s] the operation of natural gas appliances" by prohibiting them from using any gas. *Cal. Rest.*, 89 F.4th at 1106.

76.    As the Ninth Circuit recently held, EPCA's "plain text and structure" preempted Berkeley's ordinance that, instead of banning covered gas appliances outright, "prohibit[ed] natural gas *piping* in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless." *Cal. Rest.*, 89 F.4th at 1098. The Ninth Circuit recognized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Id.* at

26

1107. "And a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* at 1103.

77.     As the Ninth Circuit explained, "a building code that prohibits consumers from using natural gas-powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Cal. Rest.*, 89 F.4th at 1102 (alteration in original) (quoting 42 U.S.C. § 6297(c)). Berkeley's gas ban thus was preempted by EPCA "because it prohibit[ed] the installation of necessary natural gas infrastructure on premises where covered appliances are used." *Id.* That Berkeley's ban regulated gas piping instead of gas appliances themselves was of no matter; "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly.*" *Id.* at 1107.

78.     The District's zero-$NO_x$ rule is functionally indistinguishable from Berkeley's preempted ordinance. Instead of banning gas piping as an indirect route to banning gas appliances, the District banned gas appliances from emitting any $NO_x$—a byproduct of the combustion needed to run those appliances—which has the intent and effect of prohibiting their use. On information and belief, no existing gas appliance can satisfy the District's rule. And while the Final Staff Report gestures at the possibility that in the future such gas appliances theoretically could be developed (which would then potentially make the rule fuel neutral), the District's own analysis acknowledges that complying with the rule involves replacing natural gas appliances with electric alternatives. By effectively banning gas appliances covered by EPCA,

the zero-$NO_x$ rule does exactly what the Ninth Circuit held that EPCA preempts.

79.    The rule does not qualify for any of EPCA's narrow exceptions to preemption.

80.    On information and belief, neither the District nor the State of California has applied for a waiver from the Secretary of Energy, as would be required for § 6297(d)'s exception.  Nor could it lawfully obtain such a waiver.  The Secretary is authorized to grant waivers only where the "regulation is needed to meet unusual and compelling State or local energy . . . interests."  42 U.S.C. § 6297(d)(1)(B); *see id.* § 6297(d)(1)(C)(i) (interests must be "substantially different in nature or magnitude than those prevailing in the United States generally").  Even then, EPCA prohibits the Secretary from granting waivers that would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," *id.* § 6297(d)(3), or where "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver, *id.* § 6297(d)(4).

81.    Nor can the rule satisfy the exception for certain building code requirements for new construction.  The rule is not "contained in a State or local building code" and, in any event, could not meet the exception's seven narrow requirements.  42 U.S.C. § 6297(f)(3).

82.    Similar to the consumer product provisions, EPCA contains only limited exceptions to the default rule of preemption of state regulations concerning the energy use of industrial appliances.  42 U.S.C. § 6316(b)(2).  The District's gas ban does not

qualify for any exception because it is not in a building code (and, in any event, could not meet the building code exception's requirements), *id.* § 6316(b)(2)(B); is not enumerated in § 6316(b)(2)(C); and has not received and is ineligible for a waiver, *id.* § 6316(b)(2)(D).

**CAUSE OF ACTION:**
**FEDERAL PREEMPTION BY THE**
**ENERGY POLICY AND CONSERVATION ACT**

83.    Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

84.    The District's zero-$NO_x$ rule is preempted by EPCA.

85.    The zero-$NO_x$ rule concerns the energy use of EPCA-covered gas appliances by subjecting some of those appliances to zero-$NO_x$ emission limits and thus preventing them from using any energy.

86.    The rule does not qualify for any of EPCA's exemptions from preemption because:

    a.    The rule has not received—and is not eligible for—a waiver of preemption;

    b.    It is not in a building code for new construction and would not qualify for the building code exception even if it were;

    c.    It bans gas appliances even when those appliances meet federal standards.

87.    Plaintiffs and their members will be irreparably harmed if the zero-$NO_x$ rule is enforced.  Plaintiffs and their members are already experiencing and will continue to face economic injuries, including lost sales, lost work hours or jobs, the cost to replace appliances and make associated building upgrades and modifications,

and the cost of business disruptions or interruptions; their business planning, infrastructure investments, and hiring decisions and job opportunities are and will be affected; and they face compliance burdens associated with the rule.

88.   Plaintiffs and their members have no adequate remedy at law for these irreparable harms.  Unless the District is enjoined from enforcing the zero-$NO_x$ rule, Plaintiffs and their members will continue to be denied their legal rights.

89.   There will be no significant harm to the District from an injunction because it has no legitimate interest in enforcing invalid regulations.  The balance of harms thus favors injunctive relief.

90.   An injunction is also in the public interest.  The public interest is not served by enforcing invalid regulations.  Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, ensuring energy security, and protecting consumer choice, all of which is undermined by conflicting local regulations of appliances, including the District's rule.

91.   Plaintiffs therefore request that the Court (i) declare that the zero-$NO_x$ rule is preempted by EPCA and (ii) enjoin the District from enforcing the rule.

## REQUESTED RELIEF

92.   Plaintiffs therefore request that the Court award the following relief:

a.   a declaratory judgment under 28 U.S.C. § 2201(a) that the District's Rule 1146.2 is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

b.   a permanent injunction enjoining the District from enforcing or

1    attempting to enforce Rule 1146.2's zero-$NO_x$ emissions limits;

2    c.   costs of this suit, including reasonable attorneys' fees; and

3    d.   such other and further relief as the Court may deem just and proper.

4    Dated: December 17, 2024                    Respectfully submitted,

5                                                /s/ Courtland L. Reichman

6    John J. Davis, Jr. (SBN 65594)             Courtland L. Reichman (SBN 268873)
       jjdavis@msh.law                            creichman@reichmanjorgensen.com
7    MCCRACKEN, STEMERMAN &                     Brian C. Baran (SBN 325939)
       HOLSBERRY LLP                              bbaran@reichmanjorgensen.com
8    475 – 14th Street, Suite 1200              REICHMAN JORGENSEN
     Oakland, CA 94612                            LEHMAN & FELDBERG LLP
9    Tel.: (415) 597-7200; Fax: (415) 597-7201 100 Marine Parkway, Suite 300
                                                Redwood Shores, CA 94065
10   Attorneys for Plaintiff California State   Tel.: (650) 623-1401; Fax: (650) 560-3501
     Pipe Trades Council
11                                              Sarah O. Jorgensen (pro hac vice
     Matthew P. Gelfand (SBN 297910)              forthcoming)
12     matt@caforhomes.org                        sjorgensen@reichmanjorgensen.com
     CALIFORNIANS FOR HOMEOWNERSHIP, INC.       REICHMAN JORGENSEN
13   525 S. Virgil Ave.                           LEHMAN & FELDBERG LLP
     Los Angeles, California 90020              1201 West Peachtree St., Suite 2300
14   Tel.: (213) 739-8206; Fax: (213) 480-7724 Atlanta, GA 30309
                                                Tel.: (404) 609-1040; Fax: (650) 560-3501
15
     Attorney for Plaintiff Californians for    Sean M. Kneafsey (SBN 180863)
16   Homeownership, Inc.                          skneafsey@kneafseyfirm.com
                                                THE KNEAFSEY FIRM, INC.
17   Angelo I. Amador (pro hac vice             707 Wilshire Blvd., Suite 3700
       forthcoming)                             Los Angeles, CA 90017
18     aamador@restaurant.org                   Tel.: (213) 892-1200; Fax: (213) 892-1208
19   RESTAURANT LAW CENTER
     2055 L Street, NW, Suite 700               Attorneys for Plaintiffs Rinnai America
20   Washington, DC 20036                       Corp., Noritz America Corp., National
     Tel.: (202) 331-5913 Fax: (202) 331-2429   Association of Home Builders, California
21                                              Manufacturers & Technology Association,
                                                California Restaurant Association,
22   Attorney for Plaintiff Restaurant Law      California Hotel & Lodging Association,
     Center                                     California Apartment Association, and
23                                              Plumbing-Heating-Cooling Contractors of
                                                California
24