Courtland L. Reichman (SBN: 268873)
  creichman@reichmanjorgensen.com
Brian C. Baran (SBN: 325939)
  bbaran@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

*Attorneys for Plaintiffs Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California*

ADDITIONAL COUNSEL ON FOLLOWING PAGE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al.<br><br>            Plaintiffs,<br><br>       v.<br><br>SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,<br><br>            Defendant,<br><br> and<br><br>PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS,<br><br>            Defendant-Intervenors. | Civil Action No.<br><br>2:24-cv-10482 PA(PDx)<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION**<br><br>Date:  Monday, July 14, 2025<br>Time: 1:30 p.m.<br>Courtroom: 9A<br><br>Honorable Percy Anderson<br>United States District Judge |

1

<u>ADDITIONAL COUNSEL</u>

2

Sarah O. Jorgensen (*pro hac vice*)
  sjorgensen@reichmanjorgensen.com

3

REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP

4

1201 West Peachtree St., Suite 2300
Atlanta, GA 30309

5

Tel.: (650) 623-1403; Fax: (650) 560-3501

6

Sean Kneafsey
  skneafsey@kneafseyfirm.com

7

THE KNEAFSEY FIRM, INC.

8

707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017

9

Tel.: (213) 892-1200; Fax: 213-892-1208

10

*Attorneys for Plaintiffs Rinnai America*

11

*Corp., Noritz America Corp., National*
*Association of Home Builders, California*

12

*Manufacturers & Technology Association,*
*California Restaurant Association,*

13

*California Hotel & Lodging Association,*
*California Apartment Association, and*

14

*Plumbing-Heating-Cooling Contractors of*
*California*

15

16

John J. Davis, Jr. (SBN 65594)
  jjdavis@msh.law

17

MCCRACKEN, STEMERMAN
  & HOLSBERRY LLP

18

475 – 14th Street, Suite 1200
Oakland, CA 94612

19

Tel.: (415) 597-7200; Fax: (415) 597-7201

20

*Attorneys for Plaintiff California State*

21

*Pipe Trades Council*

22

23

24

Matthew P. Gelfand (SBN 297910)
  matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206; Fax: (213) 480-7724

*Attorney for Plaintiff Californians for*
*Homeownership, Inc.*

Angelo I. Amador (*pro hac vice*)
  aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913 Fax: (202) 331-2429

*Attorney for Plaintiff Restaurant Law Center*

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................................... 1

Background ........................................................................................................ 2

    A.   The Federal Energy Policy and Conservation Act ....................... 2

    B.   *California Restaurant Association v. City of Berkeley* (9th Cir. 2024) ...... 4

    C.   The District's Zero-$NO_x$ Rule ..................................................... 5

    D.   Plaintiffs' Facial Challenge to the Zero-$NO_x$ Rule ..................... 8

Argument .......................................................................................................... 10

  I.  Under the Ninth Circuit's Decision in *California Restaurant Ass'n*, the District's Zero-$NO_x$ Rule Is Preempted ............................................ 10

    A.   Under the Ninth Circuit's reading of EPCA's plain text, the zero-$NO_x$ rule is a regulation concerning the energy use of covered appliances. ..... 10

    B.   The Ninth Circuit's analysis of EPCA's structure and purpose confirms that the zero-$NO_x$ rule is preempted. ........................... 12

        1.   The Ninth Circuit's holding that EPCA's broad preemptive scope extends beyond "energy conservation standards" or technical energy measurements easily encompasses the District's rule. ..... 13

        2.   By banning types of appliances, the District's rule upends the statutory scheme in the same way the Ninth Circuit held unlawful. .. 16

    C.   The District's zero-$NO_x$ rule does not qualify for any exception .............. 18

  II.  Plaintiffs Are Entitled to Declaratory and Injunctive Relief. ........................... 19

    A.   The Court should grant a declaratory judgment. ....................... 19

    B.   Plaintiffs are entitled to permanent injunctive relief. ............... 20

Conclusion ........................................................................................................ 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation &*
  *Dev. Comm'n,*
  410 F.3d 492 (9th Cir. 2005) ..................................................................3

*Am. Trucking Ass'ns v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ........................................................22, 23

*Am. Trucking Ass'ns v. City of Los Angeles,*
  569 U.S. 641 (2013)..............................................................................18

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ..............................................................22

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015)..............................................................................20

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council,*
  683 F.3d 1144 (9th Cir. 2012) ..............................................................17

*Cal. Rest. Ass'n v. City of Berkeley,*
  89 F.4th 1094 (9th Cir. 2024)..........................................................*passim*

*Champion Int'l Corp. v. Brown,*
  731 F.2d 1406 (9th Cir. 1984) ..............................................................23

*Coventry Health Care of Mo., Inc. v. Nevils,*
  581 U.S. 87 (2017)................................................................................11

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
  144 S. Ct. 457 (2024)............................................................................15

*eBay Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006)..............................................................................20

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
  541 U.S. 246 (2004)..............................................................................18

*Green v. Mansour*,
    474 U.S. 64 (1985)................................................................19

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ............................................22

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ............................................23

*Lamar, Archer & Cofrin, LLP v. Appling*,
    138 S. Ct. 1752 (2018).........................................................11

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ..............................................23

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)............................................................11

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016)......................................................10, 12

*Pulsifer v. United States*,
    144 S. Ct. 718 (2024).........................................................14

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ............................................23

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008)............................................................13

*Small v. Allianz Life Ins. Co. of N. Am.*,
    122 F.4th 1182 (9th Cir. 2024) ..........................................20

*Sturgeon v. Frost*,
    577 U.S. 424 (2016)............................................................10

*Ysleta Del Sur Pueblo v. Texas*,
    142 S. Ct. 1929 (2022).......................................................15

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2...........................................................19

**Statutes**

28 U.S.C. § 2201(a) .................................................................................................19, 24

Energy Policy and Conservation Act of 1975,
    42 U.S.C. §§ 6201-6422 ...............................................................................................2

    § 6201.....................................................................................................................16

    § 6291(3).................................................................................................................11

    § 6291(4)...........................................................................................................11, 15

    § 6291(4)-(6)..........................................................................................................15

    § 6292(a)(4)............................................................................................................11

    § 6292(a)(11)..........................................................................................................11

    § 6293.....................................................................................................................11

    § 6295.......................................................................................................................4

    § 6295(o)(4)............................................................................................................16

    § 6297(a)(2)(A).......................................................................................................10

    § 6297(c) ..........................................................................................................passim

    § 6297(d)(1)............................................................................................................14

    § 6297(d)(1)(A).......................................................................................................15

    § 6297(d)(3) ..........................................................................................5, 15, 17, 19

    § 6297(d)(4) ......................................................................................................passim

    § 6297(f)..............................................................................................................4, 5

    § 6297(f)(3).........................................................................................................4, 13

    § 6297(f)(3)(A).......................................................................................................14

    § 6297(f)(3)(B).......................................................................................................14

    § 6297(f)(3)(C).......................................................................................................14

§ 6297(f)(3)(D)-(E) .................................................................... 14

§ 6297(f)(3)(F) .......................................................................... 14

§ 6297(f)(3)(G) ......................................................................... 14

§ 6311(4) ................................................................................... 11

§ 6311(7) ................................................................................... 11

§ 6313(a)(4)-(5) ........................................................................ 11

§ 6314 ........................................................................................ 11

§ 6316(b)(2)(A) ......................................................................... 11

§ 6316(b)(2)(B) ......................................................................... 13

**Rules**

Fed. R. Civ. P. 56(a) ................................................................. 10

**Regulations**

S. Coast AQMD R. 1121 ............................................................. 6

S. Coast AQMD R. 1146.2 .................................................... *passim*

S. Coast AQMD R. 1146.2(b) ..................................................... 6

S. Coast AQMD R. 1146.2(c)(1) ................................................. 6

S. Coast AQMD R. 1146.2(c)(18) ............................................... 6

S. Coast AQMD R. 1146.2(c)(24)-(25) ....................................... 7

S. Coast AQMD R. 1146.2(c)(28) ............................................... 6

S. Coast AQMD R. 1146.2(c)(29) ............................................... 6

S. Coast AQMD R. 1146.2(c)(30) ............................................... 6

S. Coast AQMD R. 1146.2(c)(31) ............................................... 6

S. Coast AQMD R. 1146.2(d)(1) ................................................. 6

S. Coast AQMD R. 1146.2(d)(2) .............................................. 6, 7

S. Coast AQMD R. 1146.2(d)(3) .......................................................................7

S. Coast AQMD R. 1146.2(e)(1) .......................................................................7

S. Coast AQMD R. 1146.2(j)(9) .......................................................................7

S. Coast AQMD R. 1146.2(k)(1)(B) ..................................................................6

S. Coast AQMD R. 1146.2(k)(4)-(5) ................................................................7

**Other Authorities**

S. Rep. No. 100-6 (1987) ...................................................................3, 14, 16, 17

Subcomm. on Nitrogen Oxides, Nat'l Acad. of Scis., EPA-600/1-77-013,
    Nitrogen Oxides 1-1 (1977), https://nepis.epa.gov/Exe/ZyPURL
    .cgi?Dockey=2000XWPA.TXT .................................................................5

# INTRODUCTION

The federal Energy Policy and Conservation Act ("EPCA") expressly preempts state and local "regulations concerning" certain covered appliances' "energy use." Under the statute's plain text, banning an appliance from using any energy—and thus setting its maximum energy use to zero—concerns that appliance's energy use and is therefore preempted.  Last year, the Ninth Circuit held just that.  It ruled that EPCA preempted Berkeley, California's ordinance banning gas piping because it effectively prohibited covered appliances from using gas as an energy source.  *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).  That Berkeley "took a more circuitous route" rather than directly banning the appliances made no difference; "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*."  *Id.* at 1098, 1107.

Plaintiffs in this case challenge the South Coast Air Quality Management District's effective ban on several types of gas appliances, implemented via its zero-$NO_x$ rule, as preempted by EPCA.  The Ninth Circuit's decision controls the outcome here.  The District wanted to require consumers to use electric appliances, so it promulgated a rule prohibiting the manufacture, sale, or installation of certain types of natural gas appliances whenever their $NO_x$ emissions exceed zero.  Because $NO_x$ emissions are an inevitable byproduct of combustion, the District's zero-$NO_x$ rule effectively bans the covered gas appliances, which cannot operate without combustion. The District's Final Staff Report acknowledges as much.  As a result, the District's rule is functionally indistinguishable from Berkeley's preempted ban on gas piping.  That the rule prohibits gas appliances that produce $NO_x$ emissions as opposed to banning gas appliances outright does not allow it to escape preemption; by effectively banning

1

gas appliances, the District is doing indirectly what it cannot do directly. *Cal. Rest.*, 89 F.4th at 1098, 1107.  The Ninth Circuit's holding forecloses that result.

Plaintiffs include manufacturers and sellers of gas appliances; affordable housing groups; plumbing and pipefitting labor unions; and trade associations representing the apartment industry, the lodging industry, the manufacturing and technology sector, the restaurant industry, and the residential construction, heating, and plumbing industries.  Plaintiffs and their members are significantly harmed by the District's rule, which will have widespread and devastating consequences for sales, installation, and servicing of gas appliances; work hours, wages, and job training programs; and housing affordability for both owners and renters.  Businesses will be disrupted both by required retrofits and in their planning for capital investments.  In short, Plaintiffs' and their members' livelihoods depend on the continued ability to manufacture, sell, and install gas appliances.  The District's unlawful rule is harming them now, and that harm will be exacerbated when the rule takes effect.

This Court should put a stop to that harm by enforcing controlling Ninth Circuit precedent and Congress's decision to regulate energy use at the federal level.  It should therefore grant summary judgment for Plaintiffs and award declaratory relief and a permanent injunction barring the rule's enforcement.

## BACKGROUND

### A. The Federal Energy Policy and Conservation Act

Responding to the early 1970s oil crisis, Congress enacted the Energy Policy and Conservation Act of 1975, 42 U.S.C. §§ 6201-6422,[1] to create a "comprehensive

---

[1] All further statutory references are to Title 42 of the U.S. Code unless otherwise noted.

energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005). To that end, EPCA both encouraged domestic supply and promoted energy conservation. One component of Congress's national policy is EPCA's regulation of many appliances' energy efficiency and energy use.

EPCA's appliance provisions originally focused on labeling, on the theory that well-informed consumers would choose more efficient appliances. *Air Conditioning*, 410 F.3d at 498-99. But over time, Congress shifted toward mandating federal standards while limiting state and local governments' role. *Id.* at 499. In 1978, Congress amended EPCA to require the Department of Energy to prescribe federal standards, while also strengthening preemption. *Id.* The Department refused, instead "initiat[ing] a general policy of granting petitions from States requesting waivers from preemption." *Id.* (attribution omitted).

So Congress amended EPCA again in 1987, prescribing standards for many appliances and adopting the preemption provision at issue here. *Air Conditioning*, 410 F.3d at 499-500. The Department's abdication of its standard-setting responsibility and its freewheeling waiver policy had created "a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Congress thus bolstered preemption and restricted waivers, including by barring waivers "likely to result in the unavailability in the State of a product type or of products of a particular performance class." *Id.* at 2; § 6297(d)(4). The preemption provision now reads:

[E]ffective on the effective date of an energy conservation standard established

3

in or prescribed under [§ 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product . . . .

§ 6297(c) (emphasis added).  That provision is subject to several narrow exceptions, including one for regulations "contained in a State or local building code for new construction" that comply with strict requirements, § 6297(f)(3).

## B. *California Restaurant Association v. City of Berkeley* (9th Cir. 2024)

The Ninth Circuit held last year that EPCA's "plain text and structure" preempted Berkeley's ordinance "prohibit[ing] natural gas *piping* in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless." *Cal. Rest.*, 89 F.4th at 1098.  The Ninth Circuit explained that EPCA's plain text preempts regulations relating to the energy use of appliances at the point of use.  *Id.* at 1101-02. It did not matter that Berkeley took a "more circuitous route" to banning gas appliances by prohibiting gas infrastructure in new buildings.  *Id.* at 1098.  EPCA's preemption provision necessarily encompasses more than direct regulations of appliances themselves, given the well-established meaning of "concerning," which has a "broadening" and "expansive" effect.  *Id.* at 1103 (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018)).

The Ninth Circuit also held that the preemption provision's context and EPCA's structure confirm the provision's broad scope.  "Of critical importance here is that the structure of the statute indicates that 'a regulation concerning the . . . energy use' can include 'building code requirements.'"  *Cal. Rest.*, 89 F.4th at 1101 (alteration in original) (quoting § 6297(c), (f)).  That regulations in building codes can be preempted confirms that preemption is not limited to design requirements that operate on the

equipment manufacturer's factory floor.  *Id.*  Similarly, EPCA's waiver provision "shows the extensive scope of the preemption clause"; it prohibits the federal government from waiving preemption if a regulation "will significantly burden manufacturing, marketing, distribution, sale, or servicing" of products, § 6297(d)(3), confirming that EPCA is concerned with regulations that burden any part of the distribution chain.  *Id.* at 1103-04.  Confining preemption to the factory floor, the Ninth Circuit ruled, would impermissibly engraft a "limiting component" onto the statute—an approach the Supreme Court has rejected.  *Id.* at 1106-07 (collecting cases); *see also id.* at 1100-07 (rejecting narrower readings of § 6297(c)).

### C. The District's Zero-NO$_x$ Rule

Despite the Ninth Circuit's decision, the District within months adopted amendments to its Rule 1146.2, titled "Emissions of Oxides of Nitrogen from Large Water Heaters and Small Boilers and Process Heaters."  Although the rule had long imposed emissions limitations that gas appliances could meet, the District's amended rule imposed zero-NO$_x$ emission limits for gas appliances within its scope.  S. Coast AQMD R. 1146.2 (attached as Exhibit 1); Pls.' L.R. 56-1 Statement of Uncontroverted Facts ("SUF") ¶¶ 1-2.  Because NO$_x$ is an inevitable byproduct of combustion, no gas appliance can operate without producing some NO$_x$.  *See, e.g.*, Subcomm. on Nitrogen Oxides, Nat'l Acad. of Scis., EPA-600/1-77-013, Nitrogen Oxides 1-1 (1977), https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000XWPA.TXT  ("Nitrogen oxide formation is an inherent consequence of fossil fuel combustion."); SUF ¶ 3.  As a result, gas appliances subject to the zero-NO$_x$ rule are effectively banned.  The District's own analysis of the zero-NO$_x$ rule acknowledges that reality.  *See* SUF ¶¶ 4-5; Ex. 2 at 28; *infra* pp. 7-8.

5

As amended, Rule 1146.2 applies to "manufacturers, distributors, retailers, Resellers, Installers, owners, and operators of Units fired with, or designed to be fired with, natural gas that have a Rated Heat Input Capacity less than or equal to 2,000,000 British Thermal Units (Btu) per hour."  Rule 1146.2(b).  A "Unit" is defined as "any Boiler, Water Heater, or Process Heater," except gas tank water heaters addressed by Rule 1121.  *See* Rule 1146.2(c)(28), (c)(30), (k)(1)(B); *see also* Rule 1146.2(c)(1), (18), (31) (defining "Boiler," "Process Heater," and "Water Heater"); S. Coast AQMD R. 1121(a), (b)(14).  These appliances include all gas tankless water heaters, larger commercial tank water heaters, boilers used to heat residential and commercial buildings, and pool and spa heaters used in homes, gyms, apartment complexes, and hotels.  By the District's own count, "Rule 1146.2 applies to more than one million units."  Ex. 2 at 29.

Rule 1146.2 sets schedules for the rollout of zero-$NO_x$ limits depending on the type of natural gas appliance and whether it is in a new or existing building.  Rule 1146.2(d)(1)-(2); *see* Ex. 2 attach. G at 1-1.   The first zero-$NO_x$ limits for appliances in new buildings will take effect January 1, 2026.  Those limits cover gas tankless water heaters and most "Type 1 Units" (those with a rated heat input capacity less than or equal to 400,000 Btu/hr).  Rule 1146.2(d)(1)-(2).  These Phase I limits will be applied to existing buildings in 2029.

The second phase of appliances subject to zero-$NO_x$ limits are pool heaters and most "Type 2 units" (those with a rated heat input capacity greater than 400,000 Btu/hr).  Rule 1146.2(d)(2); *see* Rule 1146.2(c)(29) (defining "Type 2 Unit").  The Phase II limits take effect in 2028 for new buildings and 2031 for existing buildings.  Rule 1146.2(d)(2) tbl.3.  The third phase covers Type 1 and Type 2 High Temperature

Units and takes effect in 2029 for new buildings and 2033 for existing buildings. Rule 1146.2(d)(2).

Once a zero-NO$_x$ limit takes effect, Rule 1146.2(d)(2) provides that "[n]o person shall manufacture, supply, sell, offer for sale, or Install, for use in the South Coast AQMD" any appliance exceeding that limit. The rule also mandates the scheduled replacement of existing gas appliances with zero-NO$_x$ alternatives once the appliances are 15 or 25 years old, depending on the type of appliance. Rule 1146.2(d)(3); *see* Rule 1146.2(d)(2) tbl.2 (listing maximum unit ages); Rule 1146.2(e)(1) (unit age calculation). This means, for example, that a hotel pool or spa heater that was installed new in 2020 must be replaced with an electric alternative by 2035, regardless whether such a replacement is necessary or even practical. While there is an exemption from the scheduled replacements for "Residential Structure[s]" and "Small Business[es]" (with 10 or fewer employees and annual receipts of $500,000 or less), those owners and operators must still comply with the zero-NO$_x$ limits whenever they choose (or are forced by a breakdown) to replace their appliances. Rule 1146.2(k)(4)-(5); *see* Rule 1146.2(c)(24)-(25); *see also* Rule 1146.2(j)(9) (recordkeeping and reporting requirements for the small business exemption). In practice, this means that gas appliances ordinary homeowners, renters, and businesses rely on to meet basic needs like taking a hot shower, heating an office, or keeping a pool usable year-round must all be replaced with electric appliances.

The District's Final Staff Report acknowledges that the rule effectively bans gas appliances and requires replacement with electric appliances. Ex. 2 attach. G. For example, the report contends "that there is a range of heat pump and electric resistance units available to replace gas units subject to this rule." *Id.* at 2-8; *see also id.* at 2-11.

Similarly, the report's cost-effectiveness analysis assumes that the rule would require gas appliances to be replaced with electric appliances. *See, e.g.*, *id.* at 2-14 (considering the increased installation costs for heat pumps relative to gas appliances); *id.* at 2-15 (comparing "[h]eat pump pool heaters" with "natural gas-fired pool heaters"). In particular, the report "considered the cost impacts of transitions from conventional combustion heating that uses natural gas to zero-emission technologies that use electricity." *Id.* at 2-16 ("Estimating Fuel Switching Cost"); *id.* at 2-17 (determining utility costs for "existing" gas unit compared to "the electric unit which will be replacing" it). Likewise, the Final Socioeconomic Impact Assessment acknowledges that the rule will force a "transition[] from natural gas to zero-emission water heating technologies that use electricity." Ex. 2 attach. H at ES-2.

In sum, Rule 1146.2's zero-NO$_x$ limit effectively bans the regulated gas appliances, including by forcing replacement of gas with electric appliances.

### D. Plaintiffs' Facial Challenge to the Zero-NO$_x$ Rule

Plaintiffs are manufacturers and sellers of gas appliances, trade associations, affordable housing groups, and labor union groups that collectively represent or employ thousands of residents, business owners, employers, and employees who live or work in the District. Plaintiffs' and their members' livelihoods rely on the availability of natural gas appliances and systems. *See* SUF ¶¶ 6-39. The District's zero-NO$_x$ rule is already harming Plaintiffs and their members. It is causing them to lose sales, business opportunities, customer and business relationships, work hours, wages, and jobs; to suffer disruption to their business practices, planning, infrastructure investments, hiring and training decisions, and job opportunities; and to face compliance costs. *Id.* And once the zero-NO$_x$ rule's effective date arrives, it will

exacerbate those injuries, including by outlawing some of Plaintiffs' businesses or lines of business or causing their demise or departure from the South Coast area. *Id.*

For example, a family-owned plumbing company that is a member of Plumbing-Heating-Cooling Contractors of California estimates that 60% or more of its business comes from selling and installing gas appliances; the associated service and repair business will also decline over time after the rule takes effect. SUF ¶¶ 38-39. Two of the plaintiffs, Rinnai America Corp. and Noritz America Corp., sell gas tankless water heaters and boilers in the District and will have those sales eliminated completely after the rule takes effect. SUF ¶¶ 6-18. This will also affect their sales and distribution networks, as well as relationships with contractors who provide sales and service. *Id.* Union members who provide plumbing and pipefitting services in all settings throughout the District will also be adversely affected by the District's rule because the loss of gas appliance sales and related plumbing work will harm their work hours and wages, job opportunities, and hiring and training programs. SUF ¶¶ 22-23. The hotel industry in the District, with many older structures, will face major renovations, imposing substantial cost and disruption including potentially having to remove rooms from service or reduce amenities. SUF ¶¶ 36-37. And homebuilders, homeowners, landlords, and renters will be harmed by the increased cost and compliance burdens imposed on building, renting, maintaining, or selling housing units, leading to fewer affordable and available housing units in the District. SUF ¶¶ 19-21, 29-35. In short, Plaintiffs are suffering and will suffer wide-ranging and serious—and in some cases devastating—harms from the District's zero-NO$_x$ rule.

To put a stop to the irreparable harms caused by the District's preempted zero-NO$_x$ rule, Plaintiffs brought this suit for declaratory and injunctive relief. Dkts. 1, 12.

**ARGUMENT**

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## I.    Under the Ninth Circuit's Decision in *California Restaurant Ass'n*, the District's Zero-NO$_x$ Rule Is Preempted.

Express preemption is analyzed just like any question of statutory interpretation: by beginning with the text—and ending there if the text is unambiguous.  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *see also Cal. Rest.*, 89 F.4th at 1101.  That is because the statute's plain meaning "necessarily contains the best evidence of Congress' pre-emptive intent."  *Franklin Cal.*, 579 U.S. at 125 (attribution omitted).  And as the Ninth Circuit recognized, courts do not invoke a presumption against preemption when interpreting express preemption provisions.  *Cal. Rest.*, 89 F.4th at 1101.  Like any other statutory text, preemption provisions must be read in light of the statutory structure and context.  *Id.*; *see also Sturgeon v. Frost*, 577 U.S. 424, 438 (2016).

### A. Under the Ninth Circuit's reading of EPCA's plain text, the zero-NO$_x$ rule is a regulation concerning the energy use of covered appliances.

The Ninth Circuit held that Berkeley's ban on gas piping was preempted under the plain text of § 6297(c) because it was a regulation concerning the energy use of covered appliances at the point of use.  Its reasoning controls the outcome here.

To see how the District's rule, like Berkeley's ban, fits within the scope of preemption, take the statutory terms step by step.  The District's zero-NO$_x$ rule is a "State regulation."  § 6297(a)(2)(A) (defining "State regulation" to include "a law,

10

regulation, or other requirement of a State or its political subdivisions"). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." § 6291(4). "[E]nergy" includes "fossil fuels," such as natural gas. § 6291(3). And "covered products" include water heaters, boilers, and process heaters such as pool heaters. § 6292(a)(4), (11); § 6313(a)(4)-(5).[2]

But perhaps the most important statutory term is "concerning," which carries a well-established meaning in preemption provisions. "[B]y using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Cal. Rest.*, 89 F.4th at 1103. "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (cleaned up). And such terms "express[] a broad pre-emptive purpose." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) (attribution omitted); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (describing "relating to" as "broad," "deliberately expansive" language, "conspicuous for its breadth"). Congress could have preempted regulation of appliances' energy use, but instead it preempted regulation "concerning" appliances' energy use.

---

[2] EPCA's industrial appliance provisions work the same way. The industrial provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which" there is a federal standard. § 6316(b)(2)(A). "[E]nergy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use, determined in accordance with test procedures established under section 6314." § 6311(4). And "energy" is defined in the same way as for consumer products. §§ 6311(7), 6291(3). Because there is no relevant distinction in the consumer and industrial provisions' application to this case, this brief cites only the consumer provisions.

"[P]utting these terms together, EPCA preempts regulations . . . that relate to the quantity of natural gas directly consumed by certain consumer appliances at the place where those products are used." *Cal. Rest.*, 89 F.4th at 1101 (cleaned up). The District's zero-$NO_x$ rule fits comfortably within this preemptive scope: It is a "State regulation" concerning the quantity of natural gas directly consumed by "covered products" because, by banning gas appliances that emit $NO_x$, it effectively prohibits gas appliances from consuming any gas and thus bans their use. Said another way, the District's rule allows only gas appliances with zero energy use. *See id.* at 1102-03 (ban on gas piping is preempted because it prevents the use of energy by gas appliances).

There is no daylight between Berkeley's ban on gas piping and the District's zero-$NO_x$ rule. Just as a ban on gas piping "necessarily regulates" how much energy gas appliances consume, *Cal. Rest.*, 89 F.4th at 1102, so too does a zero-$NO_x$ rule. By prohibiting any $NO_x$ emissions—an inevitable byproduct of combustion—the District's rule prohibits combustion and thus prohibits gas appliances from consuming any energy. *See id.* ("[A] building code regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.' In other words, a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source."). Banning gas appliances is, after all, the point of the rule. *See supra* p. 8. The District's zero-$NO_x$ rule therefore is no different from Berkeley's ban in any meaningful way and is preempted by EPCA.

## B. The Ninth Circuit's analysis of EPCA's structure and purpose confirms that the zero-$NO_x$ rule is preempted.

Because the statutory text resolves this case, there is no need to go further. *Franklin Cal.*, 579 U.S. at 125. But were there any doubt that the District's rule is

12

functionally indistinguishable from Berkeley's ban, the Ninth Circuit's analysis of EPCA's structure and purpose extinguishes it. Just as with Berkeley's ban on gas piping, the District's zero-$NO_x$ rule is incompatible with the statutory structure and purpose and would create the very patchwork of regulations that Congress sought to prevent. The District cannot end-run EPCA or the Ninth Circuit's decision by expressing its ban on gas appliances' energy use in terms of $NO_x$ rather than a particular quantity of energy.

### 1. The Ninth Circuit's holding that EPCA's broad preemptive scope extends beyond "energy conservation standards" or technical energy measurements easily encompasses the District's rule.

The Ninth Circuit explained the broad scope of EPCA's preemption provision and why narrower readings of § 6297(c) advanced in support of Berkeley's ban were incompatible with the statutory text and structure. *Cal. Rest.*, 89 F.4th at 1100-07. EPCA begins with a broad rule of preemption, § 6297(c), and then offers specific exceptions to that rule. When, as here, Congress "explicitly lists a set of exceptions" to preemption, those exceptions help determine Congress's intent as to the scope of preemption. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008).

In rejecting Berkeley's claim that EPCA preemption covers only "regulations that impose standards on the design and manufacture of appliances," the Ninth Circuit pointed first to the building code exception. *Cal. Rest.*, 89 F.4th at 1100-01. That exception applies to regulations contained in building codes for new construction that meet certain strict requirements. § 6297(f)(3) (consumer products); *see also* § 6316(b)(2)(B) (industrial products). The thrust of these requirements is that a building code must set a general energy conservation objective, allow builders the freedom to choose a mix of products to meet that objective, and treat products

13

evenhandedly without requiring them to exceed federal regulations. *See, e.g.,*
§ 6297(f)(3)(A) (must "permit[] a builder to meet an energy consumption or
conservation objective for a building by selecting items whose combined energy
efficiencies meet the objective"); § 6297(f)(3)(C) (must provide credits "on a one-for-
one equivalent energy use or equivalent cost basis" for products that exceed the
applicable standards); § 6297(f)(3)(F) (must specify an "energy consumption or
conservation objective . . . in terms of an estimated total consumption of energy"). *See
also* § 6297(f)(3)(B), (D)-(E), (G); S. Rep. No. 100-6, at 10-11 (explaining that
Congress meant to allow only "performance-based codes" that "authorize builders to
adjust or trade off the efficiencies of the various building components so long as an
energy objective is met"). Congress's decision to include an exception for some
building code provisions indicates that Congress intended that EPCA's preemptive
scope would reach beyond direct regulation of appliances to at least include state and
local building codes. *Cal. Rest.*, 89 F.4th at 1101. Otherwise, there would be no reason
to exempt building code provisions from preemption in the first place. Indeed,
Berkeley's narrow reading of § 6297(c) would have made the entire building code
exemption surplusage. *See Pulsifer v. United States*, 144 S. Ct. 718, 721-22 (2024)
("When a statutory construction renders an entire subparagraph meaningless, . . . the
canon against surplusage applies with special force." (cleaned up)).

     The Ninth Circuit also pointed to the waiver provision, which "likewise shows
the extensive scope of the preemption clause." *Cal. Rest.*, 89 F.4th at 1103. Congress
allowed the Department to waive preemption in certain circumstances, § 6297(d)(1),
but prohibited waivers when the "State regulation will significantly burden
manufacturing, marketing, distribution, sale, or servicing of the covered product on a

national basis," § 6297(d)(3).  "So the federal government must consider the complete lifecycle of an appliance—from manufacturing to servicing—in reviewing a waiver petition.  Such a provision would make little sense if the scope of EPCA's preemption ends with the design or manufacture of the product."  *Cal. Rest.*, 89 F.4th at 1104.  The government also is barred from waiving preemption where a regulation would make unavailable, for any covered product type, performance characteristics or features that were generally available before the regulation, § 6297(d)(4), demonstrating that Congress was concerned with protecting consumer choice.

Next, the Ninth Circuit rejected the view that EPCA preempts only "regulations that are the equivalent of 'energy conservation standards.'"  *Cal. Rest.*, 89 F.4th at 1098, 1104-05.  That view hinges on giving different phrases—"energy conservation standard" and "regulation concerning [appliances'] energy use"—the same meaning. In the very sentence at issue, EPCA uses "energy conservation standard" as the trigger for preemption, while using "regulation concerning the . . . energy use" to describe what is preempted.  § 6297(c); *see also* § 6297(d)(1)(A).  And Congress gave the terms "energy efficiency," "energy use," and "energy conservation standard" distinct statutory definitions, indicating that, though related, they are not identical.  *Cal. Rest.*, 89 F.4th at 1105 (citing § 6291(4)-(6)); *see Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (courts usually presume that "differences in language like this convey differences in meaning" (attribution omitted)).  Congress easily could have used "energy conservation standard" to define what is preempted, but it did not.  *Cal. Rest.*, 89 F.4th at 1105; *accord Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 474 (2024) (courts' "role is to apply the law, not rewrite it").  And for

those reasons, the reference in § 6297(c)'s heading to "energy conservation standards" "cannot supersede its plain text." *Cal. Rest.*, 89 F.4th at 1105.

The Ninth Circuit's explanation of EPCA's broad preemptive scope makes clear that this is not a close case. Just like Berkeley's gas ban, the District's zero-$NO_x$ rule "cuts to the heart of what Congress sought to prevent" because its effect (and intent) is to prohibit covered gas appliances' energy use and therefore ban gas appliances. *See Cal. Rest.*, 89 F.4th at 1119; SUF ¶¶ 1-5.

### 2. By banning types of appliances, the District's rule upends the statutory scheme in the same way the Ninth Circuit held unlawful.

Taken as a whole, EPCA is a sweeping national energy policy that includes a policy regarding appliances. *See supra* pp. 2-4; § 6201 (listing purposes). As one part of its policy to help achieve the nation's energy independence goals, Congress created uniform energy conservation standards for appliances. *E.g.*, S. Rep. No. 100-6, at 4.

But in doing so, Congress paid careful attention to preserving consumer choice. Rather than sacrificing choice for maximum conservation, Congress chose not to allow any standards that would "result in the unavailability in the United States in any covered product type (or class) of performance characteristics, such as size or capacity." *Id.* at 8-9; *accord* §§ 6295(o)(4), 6297(d)(4).[3] Said another way, Congress chose to reduce the energy use of existing appliances, not eliminate appliances. As the Ninth Circuit put it, "Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Cal.*

_____

[3] *See also* S. Rep. No. 100-6, at 4, 8-9 ("[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product.").

1   *Rest.*, 89 F.4th at 1103; *see also Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code*

2   *Council*, 683 F.3d 1144, 1153 (9th Cir. 2012) (regulations cannot discriminate among

3   or favor "particular products or methods" (citing § 6297(f)(3)(C)).  Likewise, Congress

4   addressed the burdens placed on manufacturers by a growing patchwork of varying

5   state and local regulations, including by barring the Department from waiving

6   preemption for any regulations that would burden "manufacturing, marketing,

7   distribution, sale, or servicing" of covered products.  § 6297(d)(3)-(4); *see* S. Rep.

8   No. 100-6, at 4 (1987) (stating concern with "a growing patchwork of differing State

9   regulations which would increasingly complicate [appliance manufacturers'] design,

10  production and marketing plans").  Congress thus opted for uniform federal regulation

11  with only a limited scope allowed for state and local regulation.

12      Allowing individual states or state agencies to effectively ban gas appliances

13  would undercut these exact goals.  EPCA reflects Congress's judgment that such

14  decisions should be made at the federal level so that appliance manufacturers will be

15  governed by one uniform set of standards and so that consumers nationwide will have

16  access to the same types of products.  The District's zero-NO$_x$ rule does exactly what

17  Congress wanted to prevent:  It bans entire categories of appliances, depriving builders

18  and consumers of choice and leading to a patchwork approach in which certain

19  appliances are unavailable in certain areas.

20      It follows that the District cannot evade preemption by framing its rule as an

21  emissions standard rather than an energy conservation standard.  Regardless of the

22  framing, the effect of the rule is to ban EPCA-covered natural gas appliances.  *Cal.*

23  *Rest.*, 89 F.4th at 1107 ("EPCA thus preempts the Ordinance's effect on covered

24  products."); *see also id.* (allowing Berkeley to ban gas appliances indirectly would

17

make the ability to use covered products "meaningless"); *id.* at 1102 ("a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source"). And a patchwork of banned products is just as disruptive to national uniformity as a patchwork of different energy efficiency standards—after all, standards work by banning products that do not meet them.

Nothing in EPCA's text, structure, or purpose suggests that preemption is so easy to evade. To the contrary, as the Ninth Circuit explained, "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases rejecting states' attempts to end-run preemption provisions); *see also Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (Congress had every reason to expect it would not "make[] any difference" for preemption purposes if a state were to "select[] an indirect but wholly effective means" of achieving a prohibited purpose) (collecting cases); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253-55 (2004) (rejecting an interpretation that "would undo Congress's carefully calibrated regulatory scheme"). Just as Berkeley "can't evade preemption by merely moving up one step in the energy chain and banning natural gas piping," *Cal. Rest.*, 89 F.4th at 1107, the District can't evade preemption by moving one step down the energy chain and banning gas emissions.

### C. The District's zero-NO$_x$ rule does not qualify for any exception.

The District's zero-NO$_x$ rule cannot qualify for any of the statutory exceptions to preemption. The District admits that it has not applied for a waiver from the Secretary of Energy. Dkt. 23 ¶ 80. Nor could it or the state lawfully obtain one because the District's rule would make appliances unavailable and would burden

"manufacturing, marketing, distribution, sale, or servicing" of the regulated products. § 6297(d)(3)-(4).  And the District concedes that its zero-$NO_x$ rule cannot qualify for the building code exception.  Dkt. 23 ¶ 81.

*   *   *

In sum, there is no basis for distinguishing the zero-$NO_x$ rule in this case from the gas piping ban that the Ninth Circuit held was preempted by EPCA.  *Cal. Rest.*, 89 F.4th at 1099.  That makes this case easy to resolve:  The zero-$NO_x$ rule concerns the energy use of covered appliances because its prohibition on $NO_x$ emissions prevents the regulated appliances from using any gas, and it is therefore preempted.

## II.    Plaintiffs Are Entitled to Declaratory and Injunctive Relief.

Once it is established that the District's zero-$NO_x$ rule is preempted, there can be no serious dispute that Plaintiffs are entitled to declaratory and injunctive relief.  Federal courts' power "to end a continuing violation of federal law" by granting prospective relief against state officials is what "gives life to the Supremacy Clause." *Green v. Mansour*, 474 U.S. 64, 68 (1985); *see* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

### A. The Court should grant a declaratory judgment.

The Court should grant a declaratory judgment that the District's zero-$NO_x$ rule is preempted by federal law and thus unenforceable.  *See* 28 U.S.C. § 2201(a).  This dispute is an ongoing, substantial controversy.  The District asserts its authority to prohibit by rule the manufacture, sale, or installation of certain natural gas appliances, while Plaintiffs assert their right under federal law to be free from the challenged rule.

A declaratory judgment thus "will serve a useful purpose in clarifying and settling the legal relations at issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1201 (9th Cir. 2024).

## B. Plaintiffs are entitled to permanent injunctive relief.

Plaintiffs are entitled to an injunction preventing the District from enforcing the zero-$NO_x$ rule. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (courts "may issue an injunction" against state officials "upon finding the [challenged] state regulatory actions preempted"). A permanent injunction is appropriate when a plaintiff shows that (i) "it has suffered an irreparable injury;" (ii) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury;" (iii) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted;" and (iv) "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs satisfy all four requirements here.

First, Plaintiffs and their members have already begun to suffer irreparable harm in response to the District's amended Rule 1146.2 imposing zero-$NO_x$ emissions limits, and the upcoming compliance deadlines will only further exacerbate Plaintiffs' harm. *See supra* at pp. 8-9. As illustration:

- Residential construction projects traditionally built with natural gas service are now being designed and built or will be designed and built without gas service or appliances, and often without gas infrastructure at all. With gas work reduced or eliminated, there will be substantially less plumbing and pipefitting work, which will reduce the need for the services

20

of plumbers and pipefitters and thus cost many their jobs or work hours. SUF ¶¶ 22-23.

- Plaintiffs who sell tankless gas heaters or gas boilers will no longer be able to sell or install their products in new buildings or in replacement scenarios in existing buildings in the District.  Losses also will be incurred by the ancillary businesses and contractors that distribute, install, service, and repair those products.  Given the size of the California market for the banned products, the resulting magnitude of business disruption will be significant.  For one plaintiff headquartered in the District, being prohibited from conducting its primary business in the largest existing market for its products will force it to consider closing facilities and eliminating its 120 employee positions in the District or moving them out of the District.  SUF ¶¶ 6-18.

- For the residential building industry, being forced to replace certain gas equipment requires intrusive and expensive remodeling to incorporate electrical service.  These increased costs will be passed along to potential buyers or renters.  The ban on certain gas appliances may even cause potential new developments to no longer attain financial feasibility, meaning they will not be built or will be built with fewer units, which will in turn result in rent and sales price increases.   SUF ¶¶ 19-21, 29-30.

- The rule also harms owners and operators of commercial properties, rental properties, hotels, and restaurants.  The forced retrofits may require new transformers, electric panel upgrades, reconfiguration, reengineering, venting or condensate management, and ancillary equipment investments,

21

as well as relocation of tenants, reductions or cancellation of hotel stays, or disruption of business operations. Manufacturing and industrial facilities may also have to retrofit systems at great expense and disruption. Many buildings in the District are decades old, which not only drastically increases the costs, difficulties, and disruption associated with forced retrofitting, but also means that achieving compliance may not be physically feasible or financially viable. SUF ¶¶ 24-28, 33-37.

Second, there is no adequate remedy at law for these irreparable injuries, many of which are difficult if not impossible to measure and compensate in monetary terms. Injuries such as the loss of a business or lines of business, the opportunity to pursue a profession, customer or business relationships, and training or job opportunities are the types of injuries that are normally considered irreparable. *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (recognizing that "intangible injuries generally lack an adequate legal remedy" and holding that the "loss of opportunity to pursue Plaintiffs' chosen professions constitutes irreparable harm" (cleaned up)); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("The threat of being driven out of business is sufficient to establish irreparable harm. . . . What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." (cleaned up)); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009) (plaintiffs will be "forced to incur large costs which, if [they] manage[] to survive those, will disrupt and change the whole nature of [their] business[es] in ways that most likely cannot be compensated with damages alone."). Moreover, being forced to comply with "conditions which are likely unconstitutional because they are preempted" is a harm in itself. *Am. Trucking*, 559 F.3d at 1058-59.

22

1    Stated differently, "an alleged constitutional infringement will often alone constitute

2    irreparable harm."  *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997)

3    (cleaned up); *accord Am. Trucking*, 559 F.3d at 1058-59.  Here, unless the District is

4    enjoined from enforcing the zero-$NO_x$ rule, Plaintiffs and their members will continue

5    to be denied their right to operate and conduct their professions and businesses

6    unburdened by a preempted, unconstitutional law.

7         Third, the balance of harms tips decidedly in Plaintiffs' favor.  Plaintiffs are

8    suffering and will continue to suffer real harm, whereas there is no harm at all on the

9    District's side of the scale.  That is because the District has no legitimate interest in

10   enforcing a preempted law.  *See, e.g.*, *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th

11   Cir. 2013) (government "cannot suffer harm from an injunction that merely ends an

12   unlawful practice"); *Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1409 (9th Cir.

13   1984) (state "has no cognizable state interest in enforcing . . . laws that are preempted

14   by federal law").

15        Finally, for the same reason, an injunction is in the public interest.  The public

16   interest is not served by the enforcement of invalid laws or rules.  *See Klein v. City of

17   San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (public interest is advanced by

18   halting the "enforcement of the potentially unconstitutional regulations" because those

19   regulations would infringe not only on the plaintiffs' constitutional rights but also those

20   of the rest of the public subject to the same regulation).  Moreover, EPCA embodies a

21   strong public interest in a uniform national energy policy and in particular one that

22   encourages a diverse domestic supply of energy and protects consumer choice—all of

23   which the District's zero-$NO_x$ rule undermines.

24

## CONCLUSION

For these reasons, the Court should grant summary judgment for Plaintiffs; enter a declaratory judgment under 28 U.S.C. § 2201(a) that the District's zero-$NO_x$ rule, Rule 1146.2, is preempted by EPCA and therefore unenforceable; and permanently enjoin the District from enforcing or attempting to enforce its zero-$NO_x$ rule.

1    Dated: April 14, 2025                      Respectfully submitted,

2    */s/ John J. Davis, Jr.*                   */s/ Courtland L. Reichman*

3    John J. Davis, Jr. SBN 65594               Courtland L. Reichman (SBN 268873)
     jjdavis@msh.law                              creichman@reichmanjorgensen.com
4    MCCRACKEN, STEMERMAN                       Brian C. Baran (SBN 325939)
       & HOLSBERRY LLP                            bbaran@reichmanjorgensen.com
5    475 – 14th Street, Suite 1200             REICHMAN JORGENSEN
     Oakland, CA 94612                           LEHMAN & FELDBERG LLP
6    Tel.: (415) 597-7200; Fax: (415) 597-7201  100 Marine Parkway, Suite 300
                                                Redwood Shores, CA 94065
7    *Attorneys for Plaintiff California State*  Tel.: (650) 623-1401; Fax: (650) 560-3501
     *Pipe Trades Council*
8                                               Sarah O. Jorgensen (*pro hac vice*)
     */s/ Matthew P. Gelfand*                     sjorgensen@reichmanjorgensen.com
9    Matthew P. Gelfand (SBN 297910)           REICHMAN JORGENSEN
       matt@caforhomes.org                        LEHMAN & FELDBERG LLP
10   CALIFORNIANS FOR HOMEOWNERSHIP, INC.      1201 West Peachtree St., Suite 2300
     525 S. Virgil Ave.                         Atlanta, GA 30309
11   Los Angeles, California 90020             Tel.: (404) 609-1040; Fax: (650) 560-3501
     Tel.: (213) 739-8206; Fax: (213) 480-7724
12                                              */s/ Sean M. Kneafsey*
     *Attorney for Californians for*            Sean M. Kneafsey (SBN 180863)
13   *Homeownership, Inc.*                        skneafsey@kneafseyfirm.com
                                                THE KNEAFSEY FIRM, INC.
14   */s/ Angelo I. Amador*                     707 Wilshire Blvd., Suite 3700
     Angelo I. Amador (*pro hac vice*)          Los Angeles, CA 90017
15     aamador@restaurant.org                   Tel.: (213) 892-1200; Fax: (213) 892-1208
     RESTAURANT LAW CENTER
16   2055 L Street, NW, Suite 700              *Attorneys for Plaintiffs Rinnai America*
     Washington, DC 20036                      *Corp., Noritz America Corp., National*
17   Tel.: (202) 331-5913 Fax: (202) 331-2429  *Association of Home Builders, California*
                                               *Manufacturers & Technology Association,*
18   *Attorneys for Plaintiff Restaurant Law*   *California Restaurant Association,*
     *Center*                                   *California Hotel & Lodging Association,*
19                                             *California Apartment Association, and*
                                               *Plumbing-Heating-Cooling Contractors of*
20                                             *California*

21

22

23

24

                              25

**<u>Certificate of Compliance</u>**

The undersigned, counsel of record for Plaintiffs Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California, certifies this brief contains 6,705 words, which complies with the word limit of L.R. 11-6.1.

Dated: April 14, 2025                    Respectfully submitted,

*/s/ Courtland L. Reichman*
Courtland L. Reichman (SBN 268873)