1    MATTHEW D. ZINN (CA Bar No. 214587)
     Zinn@smwlaw.com
2    LAUREN M. TARPEY (CA Bar No. 321775)
     Ltarpey@smwlaw.com
3    RYAN K, GALLAGHER (CA Bar No. 344349)
     Rgallagher@smwlaw.com
4    SHUTE, MIHALY & WEINBERGER LLP
     396 Hayes Street
5    San Francisco, California 94102
     Telephone:  (415) 552-7272
6    Facsimile:   (415) 552-5816

7    Attorneys for Defendant South Coast Air
     Quality Management District
8
     (additional counsel on following page)
9

10            **UNITED STATES DISTRICT COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13    RINNAI AMERICA CORP., et al,      Case No. 2:24-cv-10482 PA (PDx)

14

15          Plaintiffs,      **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

16       v.

17    SOUTH COAST AIR QUALITY      Date:       July 14, 2025
   MANAGEMENT DISTRICT,      Time:       1:30 p.m.
18                         Courtroom:    9A

19          Defendant.      The Hon. Percy Anderson

20

21    and      Trial Date:      September 30, 2025

22    PEOPLE'S COLLECTIVE FOR
   ENVIRONMENTAL JUSTICE,
23    SIERRA CLUB, and INDUSTRIOUS
   LABS,
24

25          Defendant-Intervenors.

26

27

28

BAYRON T. GILCHRIST (CA Bar No. 212393)
General Counsel
BARBARA BAIRD (CA Bar No. 81507)
Chief Deputy District Counsel
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
21865 Copley Drive
Diamond Bar, California 91765
Telephone: (909) 396-3400
Facsimile:    (909) 396-2961
bghilchrist@aqmd.gov

Attorneys for Defendant South Coast Air
Quality Management District

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... 5

INTRODUCTION ...................................................................................................... 9

BACKGROUND ...................................................................................................... 10

   I.     Regulation of air pollution under state and federal law ............................... 10

        A.    The cooperative-federalism structure of air pollution control ........... 10

        B.    The District's ozone predicament ...................................................... 12

   II.    The District's long history of regulating appliance emissions..................... 13

   III.   The challenged amendments to Rule 1146.2 ................................................ 14

        A.    Public review and District approval of the Rule............................... 14

        B.    The Rule's requirements ..................................................................... 15

   IV.   Plaintiffs challenge the Rule ........................................................................ 17

SUMMARY JUDGMENT STANDARD ................................................................. 17

ARGUMENT ........................................................................................................... 17

   I.     Plaintiffs' facial challenge must fail because they cannot show that the
        Rule is invalid in every application.............................................................. 18

   II.    The Rule does not regulate the energy use of covered appliances; it
        regulates their emissions. *California Restaurant Association* did not
        involve such a program. ............................................................................... 19

        A.    Unlike the Berkeley ordinance in *CRA*, the Rule does not
              regulate the quantity of natural gas used by appliances. ................... 20

        B.    EPCA specifically covers building codes. It says nothing about
              air pollution regulation, which instead is subject to the
              exhaustive regime established by the Clean Air Act. ....................... 22

            1.    EPCA is silent about state pollution control regulation. .......... 22

            2.    Congress spoke directly to state air pollution regulation
                in the Clean Air Act and called on states to regulate
                emissions from stationary sources like appliances to
                achieve federal air quality standards. ....................................... 24

        C.    EPCA does not preempt regulations that only incidentally affect
              energy use. ......................................................................................... 25

        D.    EPCA's legislative history shows that Congress was focused on
              energy efficiency and consumption, not appliance emissions............ 26

3

E.    The District reserves its right to argue on appeal that *CRA* was
wrongly decided..................................................................27

III.    Even if *CRA* applied to the Rule, Plaintiffs could not satisfy the facial
challenge standard because they cannot show the Rule is preempted as
to all regulated categories of appliances. .........................................28

A.    The Rule does not preclude the use of natural gas appliances in
every application.................................................................28

B.    The Rule regulates some appliances not subject to federal
standards and thus not subject to preemption under EPCA.............29

IV.    Plaintiffs are not entitled to judgment or relief. ...........................................31

CONCLUSION .................................................................................31

---

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Am. Apparel & Footwear Ass'n, Inc. v. Baden,*
　107 F.4th 934 (9th Cir. 2024) .................................................................. passim

*Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York,*
　No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ................. 28

*Beentjes v. Placer Cnty. Air Pollution Control Dist.,*
　397 F.3d 775, 782 (9th Cir. 2005) ........................................................... 12

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.,*
　904 F.3d 755, 761 (9th Cir. 2018) ........................................................... 27

*Cal. Div. of Labor Stds. Enf't v. Dillingham Constr., N.A., Inc.,*
　519 U.S. 316 (1997) ................................................................ 23, 24, 27

*Cal. Rest. Ass'n v. City of Berkeley,*
　89 F.4th 1094 (9th Cir. 2024) ......................................................... passim

*Cal. Trucking Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
　No. LA-CV21-06341-JAK-MRWX, 2023 WL 9622548 at *17 (C.D Cal.
　Dec. 14, 2023) ................................................................................... 18

*CDK Glob. LLC v. Brnovich,*
　16 F.4th 1266 (9th Cir. 2021) .............................................................. 18

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene,*
　529 F.Supp.2d 1151 (E.D. Cal. 2007) .................................................. 26

*Comm. for a Better Arvin v. EPA,*
　786 F.3d 1169 (9th Cir. 2015) ............................................................. 11

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
　508 F.Supp.2d 295 (D. Vt. 2007) .................................................... 25, 26

*Huron Portland Cement Co. v. City of Detroit,*
　362 U.S. 440 (1960) ............................................................................ 11

*Mont. Med. Ass'n v. Knudsen,*
　119 F.4th 618 (9th Cir. 2024) .............................................................. 18

*Moody v. NetChoice, LLC,*
　603 U.S. 707 (2024) ............................................................................ 18

*Nat'l Broiler Council v. Voss,*
　44 F.3d 740, 748 (9th Cir. 1994) .......................................................... 31

*Pac. Merch. Shipping Ass'n v. Goldstene,*
　639 F.3d 1154 (9th Cir. 2011) .............................................................. 11

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

*Scott v. Harris,*
        550 U.S. 372 (2007)..............................................................................17

*Sprint Telephony PCS, L.P. v. County of San Diego,*
        543 F.3d 571 (9th Cir. 2008) ...........................................................18

*Train v. Nat. Res. Def. Council, Inc.,*
        421 U.S. 60 (1975).............................................................................10

*Union Elec. Co. v. E.P.A.,*
        427 U.S. 246 (1976)...........................................................................12

*United States v. Hernandez-Estrada,*
        749 F.3d 1154 (9th Cir. 2014) ..........................................................28

*United States v. Salerno,*
        481 U.S. 739 (1987).....................................................................18, 30

*Wash. State Grange v. Wash. State Republican Party,*
        552 U.S. 442 (2008)...........................................................................19


**CALIFORNIA CASES**

*Am. Coatings Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
        54 Cal.4th 446 (2012)........................................................................29


**FEDERAL STATUTES**

15 U.S.C. § 2075(a) ....................................................................................18

15 U.S.C. § 1261 .........................................................................................18

42 U.S.C. § 6291 ...................................................................................13, 25

42 U.S.C. § 6291 *et seq.*..............................................................................9

42 U.S.C. § 6292 .........................................................................................30

42 U.S.C. § 6295(a) ....................................................................................17

42 U.S.C. § 6297(c) ........................................................................9, 17, 30

42 U.S.C. § 6297(f) ...............................................................................19, 23

42 U.S.C. § 6311 ...................................................................................13, 30

42 U.S.C. § 6316(b)(2)(A) ..........................................................................30

42 U.S.C. § 7401(a)(3) ...............................................................................11

42 U.S.C. § 7408 ...................................................................................11, 12

6

42 U.S.C. § 7410 ...................................................................................................11, 24

42 U.S.C. § 7509(b) .............................................................................................13, 24

42 U.S.C. § 7543(a), (e) .............................................................................................12

49 U.S.C. § 32919(a) ..................................................................................................25

84 Stat. 1676 (1970) ...................................................................................................11

91 Stat. 685 (1977) .....................................................................................................11

104 Stat. 2399 (1990) .................................................................................................11


**CALIFORNIA STATUTES**

1947 Cal. Stat. ch. 632 ...............................................................................................11

1976 Cal. Stat. ch. 324 ...............................................................................................11

Cal. Health & Safety Code § 39002 ...........................................................................12

Cal. Health & Safety Code § 40000 ...........................................................................12

Cal. Health & Safety Code § 40001 .....................................................................12, 24

Cal. Health & Safety Code § 40440 ...........................................................................12

Cal. Health & Safety Code § 40460 .....................................................................12, 24

Cal. Health & Safety Code § 40702 ...........................................................................12

Cal. Health & Safety Code § 40716 ...........................................................................12

Cal. Health & Safety Code § 42321(a) ........................................................................11


**RULES**

Fed. R. Civ. P. 56(a) ...................................................................................................17


**REGULATIONS**

10 C.F.R. § 431.87(a) ..................................................................................................21

10 C.F.R. Part 430 ......................................................................................................30

10 C.F.R. Part 431 ......................................................................................................30

40 C.F.R. Part 50 ..................................................................................................11, 12

7

**LEGISLATIVE MATERIALS**

H.R. 7014, at 556 (1975) ...................................................................................27

H.R. Rep. No. 100-11, at 23-24 (1987) ...........................................................27

H.R. Rep. No. 94-700, at 116-117 (1975) .........................................................27

S. Rep. No. 100-6, at 4 (1987) ...........................................................................27

S. Rep. No. 94-516, at 173 (1975) .....................................................................27

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

# INTRODUCTION

The Los Angeles region suffers from some of the worst air quality in the nation. For decades, the South Coast Air Quality Management District has worked to reduce emissions of air pollutants in the South Coast Air Basin, which includes portions of Los Angeles, Orange, Riverside and San Bernadino Counties. It has made substantial progress through innovative and effective regulations but faces a daunting path forward. To tackle the Basin's "extreme" nonattainment of federal air quality standards for ozone—also known as smog—the District must reduce emissions of one of its precursor pollutants, nitrogen oxide ("NOx"), by a staggering 67 percent. So the District took a logical step: it further tightened longstanding emission standards for appliances that collectively generate tons of NOx pollution each day.

Plaintiffs ask this Court to invalidate Rule 1146.2 as preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6291 *et seq*. Plaintiffs' argument is based on a misreading of the Ninth Circuit's "very narrow" decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) ("*CRA*"). But this case is nothing like *CRA*. There, a building code ordinance prohibited natural gas infrastructure in new buildings, explicitly regulating the quantity of gas that appliances could use. Here, by contrast, the District regulates only the NOx emissions that appliances release. The Rule says nothing about how much gas an appliance can use; it addresses only what comes out the other side.

Plaintiffs' facial challenge fails for multiple reasons. First, EPCA preempts only regulations that "concern[ ] energy use." 42 U.S.C. § 6297(c). A zero-NOx emission standard no more concerns energy use than the District's previous 20 parts per million standard, which Plaintiffs concede is not preempted. The Ninth Circuit took pains to emphasize the "very narrow" scope of its *CRA* holding, precisely to avoid threatening emissions regulations like those at issue here. Indeed, earlier in that case, Plaintiff California Restaurant Association assured the trial court that "regulations of nitrogen oxide emissions. . . do not 'concern energy use'" and thus are not preempted by EPCA.

9

Second, the District adopted the Rule in a legal context completely different from that of the Berkeley ordinance. The Rule implements Congress's mandate in the Clean Air Act ("CAA") that states and local air districts adopt all measures to reduce emissions as necessary to attain air quality standards set by the United States Environmental Protection Agency ("EPA"). The CAA's cooperative federalism scheme explicitly reserves to states the "primary responsibility" for controlling air pollution from stationary sources. Congress would not have silently preempted in one statute the very pollution controls it demanded in another.

Third, even if *CRA* applied, Plaintiffs' facial challenge would still fail because under the stringent standard applicable to such claims, they cannot show the Rule is invalid in *all* applications. The Rule regulates "process heaters" that are not subject to federal standards and thus cannot be preempted. The Rule also allows for compliance through non-combustion natural gas technologies, such as fuel cells, that have the potential to operate with zero NOx emissions.

The District, like ten other California air districts and at least four other states, has regulated appliance emissions for decades—a testament to states' essential role in protecting public health through air pollution control. If Plaintiffs prevail, they would not just invalidate this Rule; they would jeopardize numerous state and local air pollution regulations that have never before been thought to implicate federal energy efficiency law.

This Court should reject Plaintiffs' attempt to expand EPCA preemption into a field that both common sense and Congress recognize as distinct. It should therefore deny their motion for summary judgment.

## BACKGROUND

I.    **Regulation of air pollution under state and federal law**

A.    **The cooperative-federalism structure of air pollution control**

In the 1960s, the federal government began to address the problem of air pollution. *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 63 (1975). Congress then established the modern federal air pollution control program in the Clean Air Act of 1970, Pub. L. No. 91-

604, 84 Stat. 1676 (1970), with major amendments in 1977, Pub. L. No. 95-95, 91 Stat. 685 (1977), and 1990, Pub. L. No. 101-549, 104 Stat. 2399 (1990) (collectively "CAA").

As "[e]nvironmental regulation traditionally has been a matter of state authority," *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000), "Congress itself contemplated that the states would retain leading roles in regulating air quality when it passed the Clean Air Act," *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011). Indeed, Congress concluded that "air pollution control at its source is the *primary responsibility* of States and local governments." 42 U.S.C. § 7401(a)(3) (emphasis added).

Under the CAA's "cooperative federalism regime," *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015), EPA must set national ambient air quality standards for "criteria" pollutants: six specified pollutants known to endanger public health and welfare. 42 U.S.C. § 7408(a)(1); 40 C.F.R. Part 50. States must then develop State Implementation Plans detailing the measures to reduce pollutant emissions to bring regions such as the Basin into attainment of the national standards by statutory deadlines. 42 U.S.C. § 7410.

The CAA thus explicitly relies on states exercising their police powers to enact laws to protect and govern their citizens. This police power encompasses "the power to protect the health of citizens in the state," including "air pollution prevention." *Exxon Mobil*, 217 F.3d at 1255. Indeed, "[l]egislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of . . . the police power." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960).

California's longstanding efforts to control air pollution have made it a global leader in cleaning the air. *See* Cal. Health & Safety Code ("HSC") § 42321(a). In response to the Basin's notorious smog, in 1947 the California Legislature authorized the Los Angeles County Air Pollution Control District, the first air pollution regulatory agency in the nation and predecessor to the District. 1947 Cal. Stat. ch. 632. When it created the District in 1976, the Legislature recognized that the Basin had "the most critical air pollution problem in the nation." 1976 Cal. Stat. ch. 324, § 5 at 893.

11

California law grants the District "the primary responsibility for control of air pollution from all sources[,] other than vehicular sources," in the Basin. *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 782 (9th Cir. 2005) (quoting HSC §§ 39002, 40000). To allow the District to fulfill this responsibility, the Legislature delegated to the District broad authority to adopt and enforce rules to reduce pollutant emissions to attain state and federal air quality standards. HSC §§ 40001, 40440, 40702, 40716. It also required the District to develop a plan to attain those standards for the Basin, *id.* § 40460(a), and adopt regulations to implement the plan, *id.* § 40001(a). The District thus has primary responsibility for ensuring that the Basin attains the federal air quality standards.

Reflecting the states' primary role in air pollution control, the CAA gives states "virtually absolute power in allocating emission limitations so long as the national standards are met." *Union Elec. Co. v. EPA*, 427 U.S. 246, 267 (1976). Thus, except for specific mobile emission sources not at issue here, the CAA directs that "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." 42 U.S.C. § 7416; *see also id.* § 7543(a), (e) (narrowly preempting state regulation of vehicle emissions).

**B.    The District's ozone predicament**

Ozone is a criteria pollutant for which the EPA sets national ambient standards. *See* 42 U.S.C. § 7408(a); 40 C.F.R. Part 50. Ozone forms in the atmosphere from a reaction of NOx with volatile organic compounds in the presence of sunlight. Defendant's Additional Material Facts ("AMF") 40. NOx are toxic, reactive gases that also directly endanger human health and the environment. AMF 41.

For decades the District has worked to bring the Basin into compliance with federal standards. However, the Basin continues to suffer from some of the worst air quality in the nation. AMF 42. In fact, the Basin is in "extreme" nonattainment for several federal ozone standards and has the highest ozone levels nationwide. *Id.*

The Basin cannot achieve the current federal ozone standard without enormous additional reductions in NOx emissions. The District must bring the Basin into attainment of the 2015 8-hour ozone standard by 2038.[1] AMF 43. To meet that deadline, NOx emissions must decline by 124 tons per day from the 2037 baseline level of 184 tons per day, or about 67 percent beyond the reductions that will be achieved by previously adopted rules. AMF 44. The District targeted those additional reductions in its 2022 Air Quality Management Plan ("2022 Plan"). AMF 45. The 2022 Plan found that "there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technology across all . . . stationary sources, large and small." AMF 46. In other words, to realize the sharp decline in ozone pollution that federal law demands, the District must reduce emissions from a panoply of emission sources that include individually small but collectively significant sources.

## II. The District's long history of regulating appliance emissions

Those small-but-significant sources include appliances, which include domestic devices or industrial equipment that consume energy, such as water heaters, furnaces, boilers, and the like. *See, e.g.*, 42 U.S.C. §§ 6291, 6311. Appliances emit NOx when they burn fossil fuels. AMF 47. Fossil fuel appliances collectively generate massive emissions—the sources covered by Rule 1146.2 generate approximately 5.6 tons of NOx per day in the Basin. AMF 48. Appliances account for almost 20 percent of all emissions from residential and commercial combustion stationary sources regulated by the District. AMF 49.

The District began regulating NOx emissions from appliances in the 1970s and has continued to tighten those standards and apply them to new appliances. In 1978, it adopted Rules 1111 and 1121, which apply to small central furnaces and water heaters. AMF 50. The rules' original NOx emission limit of 40 nanograms per joule ("ng/J") was later

---

[1] Failure to attain the standards could lead to severe sanctions on the Basin economy, including the loss of billions of dollars in federal transportation funds and draconian restrictions on new emission sources. *See* 42 U.S.C. § 7509(b).

lowered to 14 ng/J for furnaces, and to 10 ng/J for water heaters.[2] AMF 52. Ten years after adopting Rules 1111 and 1121, the District adopted Rule 1146, which limits NOx emissions from large boilers, steam generators, and process heaters with rated heat input capacities between 5 million Btu per hour ("MMBtu/hr") and 75 MMBtu/hr.[3] AMF 54. The emission limits for these equipment types vary depending on equipment size and type. AMF 55. In 1990, the District adopted Rule 1146.1, which limits NOx emissions from industrial, institutional, and commercial boilers, steam generators, and process heaters with rated heat input between 2 and 5 MMBtu/hr. AMF 56. Like Rule 1146, emissions limits for the equipment types governed by Rule 1146.1 vary depending on their size and type. AMF 57.

The District adopted the first iteration of Rule 1146.2 in 1998. AMF 58. The Rule applies to large water heaters, small boilers, and process heaters with a rated heat input capacity of up to 2 MMBtu/hr, but it does not regulate residential water heaters with a rated heat input capacity less than 75 kBtu/hr, which are regulated under Rule 1121. AMF 59. In 1998, the Rule imposed a NOx limit of 30 ppm on most appliances. AMF 60. The Rule was amended in 2005, 2006, and 2018 to expand the covered equipment subject to the NOx limit and to tighten the limit for most appliances to 20 ppm. AMF 61.

## III.    The challenged amendments to Rule 1146.2

### A.    Public review and District approval of the Rule

Despite the District's prior efforts to limit NOx emissions from appliances, it must reduce emissions further to achieve the stringent 2015 8-hour ozone standard. AMF 62. The 2022 Plan thus seeks more emission reductions by requiring zero-emission commercial water heaters. AMF 63. To implement the Plan, the District developed the 2024

---

[2] Emissions limits are stated in nanograms of a pollutant per joule of heat ("ng/J") or in parts per million ("ppm") or parts per million by volume ("ppmv"). AMF 51. The terms ppm and ppmv are interchangeable. *Id.* We will use ppm here.

[3] An appliance's rated heat input capacity represents the maximum amount of heat it can generate, in British thermal units per hour. AMF 53.

14

amendments to Rule 1146.2 in a 14-month-long public process. AMF 64. This process included five Working Group Meetings, involving representatives from manufacturers, trade organizations, businesses, environmental groups, and other interested parties. *Id.* The District held multiple public meetings, and the Stationary Source Committee of the District's Governing Board reviewed the Rule on three occasions. *Id.* The District then held a public hearing and adopted the Rule on June 7, 2024. AMF 65. In its resolution adopting the Rule, the District Governing Board found there were no "control options that meet . . . the air quality objectives," other than those in the proposed amended rule. AMF 66.

### B. The Rule's requirements

Rule 1146.2 applies to large water heaters, small boilers, and process heaters.[4] AMF 67 (Rule 1146.2(a)). Before the June 2024 amendments, the Rule generally required these appliances to achieve a NOx emission limit of 20 ppm. AMF 69. As amended, the Rule prohibits the manufacture, sale, supply, offer for sale, or installation for use of large water heaters, small boilers, and process heaters that emit more than zero NOx, subject to staggered future compliance deadlines. AMF 70 (Rule 1146.2(b), (d)(2)). Until the zero-emission limits go into effect, the current 20 ppm emission limits apply. AMF 71 (Rule 1146.2(d)(1)). The units subject to the Rule's emission limits are categorized based on their rated heat input capacity: "Type 1 Units" have a rated heat input capacity less than or equal to 400 thousand Btu per hour ("kBtu/hr"), whereas "Type 2 Units" have a rated heat input capacity between 400 kBtu/hr and 2 MMBtu/hr. AMF 72 (Rule 1146.2(c)(28), (29)). The Rule does not apply to water heaters that are subject to District Rule 1121 (those with rated heat input capacities less than 75 kBtu/hr). AMF 73 (Rule 1146.2(c)(28)).

---

[4] The Rule defines "water heaters" as equipment used solely to heat water for use external to the equipment, including pool heaters and instantaneous water heaters; "boilers" as equipment used to produce steam or to heat water, but not used exclusively to produce electricity; and "process heaters" as equipment that transfers heat from combustion gases to water or process streams. AMF 68 (Rule 1146(c)(1), (12), (17), (18), (31)).

15

The Rule establishes future compliance deadlines that differ by the type and capacity of the appliance and whether it will be installed in a new or existing building. Many appliances installed in newly constructed buildings must comply with the Rule starting in 2026, but appliances installed in existing buildings need not comply until 2029 at the earliest and in many cases not until a decade or more thereafter. For example, a Type 1 water heater installed in an existing building need not comply until January 2029. AMF 74 (Rule 1146.2(d)(2)). A non-compliant appliance in an existing building need not be replaced immediately in January 2029 but rather may remain in use until it reaches an age of either 15 or 25 years. AMF 75 (Rule 1146.2(d)(2)). The Rule's rolling compliance deadlines allow time for additional compliant technologies to be developed. AMF 76. The Rule also exempts residential structures and small businesses from complying with the requirement to replace appliances at a defined unit age; they may instead replace appliances at the end of their lives. AMF 77 (Rule 1146.2(k)(4), (5)).

The Rule includes alternative compliance options to delay the replacement deadline for existing appliances. These include extensions of (1) up to five years if utility upgrades are necessary to operate the zero-emission units; (2) up to three years if a facility must replace multiple units within two consecutive years; and (3) up to seven years if both (1) and (2) are satisfied. AMF 78 (Rule 1146.2(i)(1) – (7)). The Rule also allows continued operation of low-use units installed before the Rule was adopted. AMF 79 (Rule 1146.2(k)(3), (4)). Finally, to ease compliance, there are several federal, state, and local incentive programs to offset some upfront costs of zero-emission units. AMF 80.

The Rule will achieve 5.6 tons of NOx emissions reductions per day by full implementation in 2057. AMF 81. It will reduce emissions by 2.44 tons per day by the attainment date of 2037. AMF 82. By 2037, the Rule is estimated to prevent approximately 374 premature deaths, along with many other adverse health impacts. AMF 83.

The Rule's zero-NOx emission standard is aimed at bringing the Basin into compliance with the federal ozone air quality standard. AMF 84. Accordingly, the District Governing Board directed the Executive Officer to forward the Rule to the California Air

16

1  Resources Board ("CARB") for approval and submittal to EPA for inclusion in the State

2  Implemental Plan.[5] *Id.*

3  **IV.    Plaintiffs challenge the Rule**

4        On December 5, 2024, about six months after the District adopted the Rule, Plaintiffs

5  filed their complaint with a single claim asserting a facial challenge to the Rule. Dkt. 1.

6  They amended their complaint on December 17, 2024. Dkt. 12. Plaintiffs contend that

7  EPCA preempts the Rule. *Id.* at 1, 4, 29.

8                              **SUMMARY JUDGMENT STANDARD**

9        Plaintiffs must show "there is no genuine dispute as to any material fact and the

10  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views

11  all facts in the light most favorable to the opposing party and draws all reasonable infer-

12  ences in its favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

13                                    **ARGUMENT**

14        EPCA authorizes the Department of Energy ("DOE") to promulgate energy conser-

15  vation standards for certain appliances, referred to as "covered products." 42 U.S.C.

16  § 6295(a). Once a federal standard is in place for a covered product, EPCA preempts state

17  and local regulation "concerning . . . energy use" of that covered product. *Id.* § 6297(c).

18        Plaintiffs' facial challenge to the Rule relies exclusively on *CRA* to contend that

19  EPCA preempts the Rule. There, the Ninth Circuit issued a "very narrow" decision holding

20  that a ban on natural gas piping in buildings concerned the energy use of covered products.

21  89 F.4th at 1101. The narrow decision in *CRA* does not apply to an emission standard like

22  that imposed by the Rule. The Rule is thus not preempted in any respect. Even if *CRA* did

23  apply, Plaintiffs' facial challenge would fail because they cannot show that the Rule is

24  preempted *in its entirety* as is required of a facial claim. The Court should therefore deny

25  Plaintiffs' motion.

26  _____

27  [5] The Rule is not the first zero-emission regulation for appliances. In 2023, the Bay Area
    Air Quality Management District ("BAAQMD") adopted zero-NOx emission rules for fur-

28  naces, boilers, and water heaters. AMF 90.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

## I.    Plaintiffs' facial challenge must fail because they cannot show that the Rule is invalid in every application.

Plaintiffs assert only a facial challenge to the Rule. Doc. 50-1, Pls.' Mem. P. & A. In Supp. of Mot. Summ. J. ("Mot.") 8. Their decision to do so "comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Under the exacting standard governing such challenges, Plaintiffs must show the Rule is invalid in all of its potential applications. *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938-39 (9th Cir. 2024) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021) (challenged regulation must be preempted in "every possible application"). This standard applies with "full force" in preemption cases. *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 624 (9th Cir. 2024) (quoting *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en banc)); *see also Cal. Trucking Ass'n v. S. Coast Air Quality Mgmt. Dist.*, No. LA-CV21-06341-JAK-MRWX, 2023 WL 9622548 at *17 (C.D Cal. Dec. 14, 2023) (rejecting preemption challenges to District rule regulating emissions associated with warehouses).

In *American Apparel*, the Ninth Circuit rejected a similar facial preemption challenge to a state law and regulations that the appellants had not shown to be "invalid in all their applications." 107 F.4th at 936. Two federal statutes expressly preempted state regulation of any harmful substance once a federal regulation of that substance was in effect. *Id.* at 939 (quoting 15 U.S.C. §§ 1261, 2075(a)). The appellants argued that Oregon's regulations of 73 chemicals were facially preempted. *Id.* at 940. The court rejected this argument, explaining that while federal agencies had regulated some chemicals on Oregon's list, they had not regulated all 73. *Id.* at 941. The appellants accordingly had not met their burden of showing that "'no set of circumstances exists under which the Act would be valid.'" *Id.* at 943 (quoting *Salerno*, 481 U.S. at 745).

Similarly, in bringing only a facial challenge to the Rule, Plaintiffs must show EPCA preempts the Rule's emission standards for each category of appliances regulated by the Rule. *See id.* at 939. Plaintiffs have failed to carry that burden. As explained in the next

18

1  sections, EPCA does not preempt the Rule in any respect because the Rule does not "con-

2  cern[ ] energy use." Instead, because it regulates emissions in an effort to achieve federal

3  air standards, it has a "plainly legitimate sweep." *Wash. State Grange v. Wash. State Re-*

4  *publican Party*, 552 U.S. 442, 449 (2008). But even if the Court were to conclude that

5  EPCA's preemption provision does cover the Rule, Plaintiffs have failed to carry their bur-

6  den of showing that the Rule is preempted as to every category of appliances regulated by

7  the Rule. *See Am. Apparel*, 107 F.4th at 938.

8  **II.    The Rule does not regulate the energy use of covered appliances; it regulates
9         their emissions. *California Restaurant Association* did not involve such a
        program.**

10  In *CRA*, the City of Berkeley had adopted a building code ordinance that prohibited

11  installation of natural gas piping in new buildings. The Ninth Circuit held that EPCA

12  preempted the ordinance because it "concern[ed ]energy use." 89 F.4th at 1101-02. Be-

13  cause "energy use" is defined as "the quantity of energy" an appliance uses, and "energy"

14  is defined to include fossil fuels, such as natural gas, the Ninth Circuit explained that EPCA

15  "preempts regulations . . . that relate to 'the quantity of [natural gas] directly consumed

16  by'" covered products at the point of use. *Id.* at 1101. (quoting 42 U.S.C. § 6297(f)). Berke-

17  ley's building code required appliances to use a quantity of "zero" natural gas and thus fit

18  squarely within EPCA's preemption provision. *Id.* at 1102.

19  Plaintiffs' facial challenge relies entirely on *CRA* to contend that EPCA preempts

20  the Rule. Their argument ignores the decision's rationale and limits. The court took unusual

21  pains to emphasize that its decision was sharply limited. *Id.* at 1101 ("Our holding here is

22  limited."); *id.* at 1103 ("We only decide that EPCA's preemptive scope applies to building

23  codes that regulate the gas usage of covered appliances . . . ."); *id.* at 1106 ("This is a

24  narrow opinion about Berkeley's building codes."); *id.* ("Our holding is very narrow . . .

25  ."); *id.* (referring to "our limited decision today" in which the court "only hold[s] that EPCA

26  prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping

27  within their buildings"). The court did not suggest that EPCA preempts state regulation of

28  air pollutant emissions from appliances. *CRA*'s narrow holding does not apply here.

### A.    Unlike the Berkeley ordinance in *CRA*, the Rule does not regulate the quantity of natural gas used by appliances.

According to the *CRA* court, EPCA preempted Berkeley's ordinance because, on its face, it regulated the quantity of natural gas appliances could use. *Id.* at 1101-02. EPCA preempts regulations that "relate to the quantity of [natural gas]'" used by an appliance. *Id.* at 1101. Berkeley conceded its prohibition on natural gas infrastructure "ban[ned] natural gas" and "reduce[d] the energy consumed by natural gas appliances in new buildings to 'zero.'" *Id.* at 1102. By prohibiting all natural gas infrastructure in new buildings, the ordinance inherently controlled the quantity of gas used by appliances therein.

By contrast, the District's NOx emissions standard does not concern the "energy use" of appliances because it has nothing to do with the "quantity" of natural gas or any other fuel an appliance uses. *Id.* at 1101. The Rule is aimed only at eliminating appliance NOx emissions to help bring the Basin into attainment with the federal air quality standard for ozone.

Trying to tie the Rule to Berkeley's ordinance, Plaintiffs ignore the Rule's simple NOx-emissions limit and spin the Rule as controlling the quantity of energy used by regulated appliances. They contend that the Rule "allows only gas appliances with zero energy use" and "prohibits gas appliances from consuming any gas." Mot. 12. Not so. The Rule allows gas appliances *with zero NOx emissions* and prohibits gas appliances *from generating any NOx emissions*. It says nothing about the quantity of gas an appliance may use.

Indeed, in adopting the Rule, the District merely further tightened NOx emission standards for appliances that had been in place since 1978. *See* Background § II, *supra*. Plaintiffs acknowledge that the District has "long imposed emissions limitations" but disclaim any intent to invalidate those rules, on the theory that a zero-NOx emission standard is qualitatively different from the previous greater-than-zero standards. Mot. 13. This argument is squarely contrary to *CRA*'s holding and irreconcilable with the statutory text.

Plaintiffs' position would mean that an emission standard does not "concern[] . . . energy use" at 100 or 1 or 0.001 ppmv, but at 0 ppmv it suddenly begins to "concern[] . . .

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

energy use." Each of those standards sets a NOx emissions limit at a specified quantity. Indeed, in rejecting a similar argument, the *CRA* court held, "'zero' is a 'quantity'" like any other number because it is "'a property or attribute that can be expressed in numerical terms.'" 89 F.4th at 1102. Nothing in the ordinary meaning of "concerning . . . energy use" supports a distinction between zero emissions and any other number—because the phrase refers to quantities of *energy*, not quantities of emissions.

The District has regulated the quantity of emissions from appliances for decades along a continuing declining trajectory without those regulations "concerning . . . energy use." Those same regulations do not now "concern[ ]energy use" simply because the District has proceeded further along that trajectory in reducing the allowable quantity of emissions from a non-zero number to zero.

Plaintiffs argue the Rule's emission limit "concern[s ]energy use" solely because gas appliances cannot meet it. Mot. 12; *but see infra* Section III.A. This sweeping argument threatens more than *zero*-NOx emission standards. The District has long imposed non-zero emissions standards on industrial equipment that may effectively prohibit the use of fuel oil, despite federal standards that allow the use of oil. *See* AMF 85 (District Rules 1146 and 1146.1 apply to industrial, institutional, and commercial boilers, steam generators, and process heaters); 10 C.F.R. § 431.87(a) (contemplating the use of oil-fired hot water and steam commercial packaged boilers). If this Court were to accept Plaintiffs' position, EPCA would invalidate a swath of appliance non-zero emission regulations never before thought to trigger preemption.

Moreover, beyond the multiple, decades-old District rules controlling NOx emissions from appliances (*see* Background § II, *supra*), 10 other California air districts and at least four other states and out-of-state air districts have imposed similar emissions regulations on appliances with a rated heat input capacity less than or equal to 2 MMBtu/hour. AMF 86. The Ventura County Air Pollution Control District sets a 20 ppm NOx limit. AMF 87. The Yolo-Solano Air Quality Management District's standards range from a 15 ppm limit for small water heaters to a 55 ppm limit for large water heaters. AMF 88. Texas

21

1  caps NOx emissions at 55 ppm. AMF 89. These regulations are not qualitatively different

2  from Rule 1146.2; they are simply less stringent. And a year before the District adopted

3  the Rule, the Bay Area Air Quality Management District adopted its own zero-NOx emis-

4  sion standards for appliances. AMF 90. Holding that EPCA preempts Rule 1146.2 would

5  jeopardize all of these regulations.

6     In trial court briefing in the *CRA* case, the California Restaurant Association ("the

7  Association") conceded that EPCA would not preempt these NOx emission limits. The

8  Association, which is also a plaintiff in this case, reassured the court that finding Berkeley's

9  building code to be preempted would not affect "all sorts of ordinary local regulations" of

10 covered products. AMF 91 (Cal. Rest. Ass'n Opp. to Mot. to Dismiss First Amend. Compl.,

11 *Cal. Rest. Ass'n v. City of Berkeley*, Case No. 4:19-cv-07668-YGR (N.D. Cal. 2021). The

12 Association stated that "regulations of nitrogen oxide emissions" were not at risk because

13 "[t]he express preemption clause in the EPCA does not bar *all* local regulations that affect

14 EPCA-covered appliances. It bars only local regulations that 'concern[] energy use.' Local

15 regulations . . . limiting the emissions of nitro[gen] oxide may affect EPCA-covered appli-

16 ances, but they do not 'concern energy use.'"[6] *Id.* The Association was correct the first

17 time.

18     **B. EPCA specifically covers building codes. It says nothing about air**
           **pollution regulation, which instead is subject to the exhaustive regime**
19         **established by the Clean Air Act.**

20         **1.    EPCA is silent about state pollution control regulation.**

21     Plaintiffs ignore another key distinction between this case and *CRA*: EPCA *explicitly*

22 covers building codes regulating energy efficiency. *E.g.*, 89 F.4th at 1101 ("We conclude

23 only that EPCA applies to building codes and that Berkeley's ordinance falls with[in] the

24 Act's preemptive scope."). The court emphasized that, while EPCA preempts regulation

25 concerning appliances' energy use, it includes a limited exemption for such regulations in

26

27 ─────────────────────────────
   [6] The District anticipates Plaintiffs will argue that this concession was limited to non-zero
28 NOx standards. As explained above, however, EPCA's text does not support that theory,
   and it is foreclosed by *CRA* itself. *See supra*.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

qualifying state or local building codes. 42 U.S.C. § 6297(f). Although Berkeley's ordinance did not qualify for the exemption, this exemption was "of critical importance" to the court's analysis because it shows that EPCA generally preempts building codes concerning energy use. 89 F.4th at 1101.

Judge Baker's concurrence reiterated that the decision turned on Congress's express inclusion of building codes. He observed that whereas EPCA "has everything to say about 'State or local building code[s]," the statute has "little, if anything, to say" about regulating a utility's distribution of natural gas, for example. *Id.* at 1119 (Baker, J., concurring). As a result, while EPCA would preempt non-exempt building codes, it likely would not preempt regulation of a utility's distribution of natural gas. *Id.* at 1117-18. As Judge Baker recognized, EPCA's silence about local regulations that only incidentally impact the energy use of covered appliances means they are not preempted.

The same is true of the District's regulation of appliances' NOx emissions. In contrast to EPCA's in-depth treatment of building codes, it says nothing about regulation of air pollution from appliances. And unlike Berkeley's ordinance, the Rule targets appliances, not construction standards for new buildings.

There is no reason to believe Congress intended EPCA to preempt emission regulations like the Rule. The Ninth Circuit emphasized that "the breadth of EPCA's preemption provision 'does not mean the sky is the limit.'" *Id.* at 1103 (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)). Indeed, "applying the 'relate to' provision [in preemption provisions] according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Id.* at 1117 (Baker, J., concurring) (quoting *Cal. Div. of Labor Stds. Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring)).[7] Judge Baker concluded that a pollution control policy with some similarities to an emission standard—a carbon

---

[7] In *CRA*, the Ninth Circuit interpreted the phrases "relate to" and "concerning" interchangeably. 89 F.4th at 1103.

tax—would not be preempted. "[A]s far as EPCA is concerned, states and local governments are likely free to impose carbon taxes designed to discourage such [natural gas] consumption." *Id*. Concluding that Congress intended to preempt air districts' air pollution regulations would sweep far beyond the *CRA* court's holding.

### 2. Congress spoke directly to state air pollution regulation in the Clean Air Act and called on states to regulate emissions from stationary sources like appliances to achieve federal air quality standards.

Pollution control regulation is not merely absent from EPCA; it is instead the subject of a distinct and detailed federal program that expressly and uniquely relies on state regulation to achieve federal legislative goals. Unlike Berkeley, the District is implementing Congress's directive in the federal CAA to achieve the federal air quality standards. The CAA directs EPA to set national air quality standards for six pollutants, including ozone. Background § I.A, *supra*. The CAA and California law task the District with adopting all measures necessary to attain the federal air quality standards within the Basin by EPA's deadlines. *See* 42 U.S.C. § 7410(a); HSC §§ 40001(a), 40460. If the District fails to adopt or enforce strategies that achieve the national air quality standards, it risks federal enforcement actions and severe sanctions, including the loss of federal transportation funding and restrictions on new development. *See* 42 U.S.C. §§ 7410(k)(5), 7413, 7509(b).

When the District began developing the Rule amendments in 2023, the Basin was not in attainment of multiple federal standards for ozone. The District could not possibly attain those standards by relying on the regulations in effect at the time. AMF 42 (describing the Basin's "extreme" nonattainment). Indeed, the District calculated that it would need to reduce NOx emissions by at least an additional 67 percent relative to baseline conditions in 2037 to meet the federal ozone standards. AMF 44. To achieve this staggering reduction, the District concluded that the *only* "viable pathway" would be to negate NOx emissions from "*all* stationary sources of pollutants, large and small, where feasible." AMF 46 (emphasis added). Fossil-fuel-burning appliances are a significant source of pollution in the Basin; they collectively account for 20 percent of all emissions

24

from stationary sources regulated by the District. AMF 49. Thus, as it has many times before (*see* Background § II., *supra*), the District amended an existing rule to further reduce the NOx emissions from appliances. In doing so, it expressly found that no other regulatory approach could achieve the Basin's air quality objectives. AMF 66. In sum, the CAA and its ambient air quality mandates left the District no choice but to adopt the challenged Rule.

Despite the critical role the CAA played in the District's adoption of the Rule, Plaintiffs never once mention it. They do not acknowledge its demanding air quality standards or the District's legal obligation to meet them. But the District, unlike Plaintiffs, is not at liberty to ignore the CAA. Faced with persistent nonattainment and the threat of federal sanctions, the District took the needed steps to improve air quality by reducing ozone emissions at the source. The resulting Rule is not an end-run around EPCA's national standards. It is the CAA's cooperative federalism working as intended.

### C.    EPCA does not preempt regulations that only incidentally affect energy use.

At most, the Rule is one of a "a host of state and local regulations that incidentally impact" the quantity of natural gas consumed by covered products, but do not regulate the quantity of natural gas appliances use. *CRA,* 89 F.4th at 1117 (Baker, J., concurring) (quoting 42 U.S.C. § 6291(4)). EPCA does not prohibit such regulations. *Id.* at 1103.

Courts have refused to find that the incidental effects of emission regulation on energy use trigger EPCA's analogous preemption provision for vehicle fuel economy standards. Similar to the preemption provisions at issue here, section 32919(a) of EPCA forbids states from "adopt[ing] or enforc[ing] a law or regulation related to fuel economy standards or average fuel economy standards" for those automobiles for which the federal government has set a national standard. 49 U.S.C. § 32919(a).

In *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F.Supp.2d 295 (D. Vt. 2007) ("*Green Mountain*"), the court held that EPCA did not preempt Vermont regulations limiting greenhouse gas ("GHG") emissions from new vehicles "as part of a comprehensive strategy to reduce" statewide GHG emissions. *Id.* at 339, 351-54. It held

25

the regulations were not a "de facto" fuel economy standard, as they were concerned primarily with reducing GHG emissions. They only *incidentally* prompted manufacturers to improve fuel economy. *Id.* at 352. The court also concluded that the regulations did not "relate to" a fuel economy standard under section 32919(a). *Id.* It held that Vermont's rules could only be interpreted as "'relat[ing] to' fuel economy within the meaning intended by Congress" if the court were to disregard "decades of EPA-issued and approved [state] regulations that also can be said to 'relate to' fuel economy" to a similar extent. *Id.* at 354; *see also Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F.Supp.2d 1151, 1175 (E.D. Cal. 2007) ("*Central Valley*") (rejecting manufacturers' argument that California vehicle emissions regulations "related to" a fuel efficiency standard simply because they would need to improve their vehicles' fuel economy to comply). The court declined to treat Vermont's regulations differently from any of the many other regulations that may indirectly affect fuel economy, but which had never been challenged as preempted by EPCA. *Green Mtn.*, 508 F.Supp.2d at 354.

These cases provide the only viable reading of EPCA's preemption provisions: a regulation that directly targets pollutant emissions cannot "relate to" or "concern[]" energy use simply because it may incidentally affect the type or amount of energy a product consumes. *See Green Mtn.*, 508 F.Supp.2d at 352; *Cent. Valley*, 529 F.Supp.2d at 1176. As in *Green Mountain* and *Central Valley*, reading EPCA to preempt the Rule's emissions limits would jeopardize dozens of longstanding public health regulations across the country. *See* 508 F.Supp.2d at 354; 529 F.Supp.2d at 1175-76; Argument § II.A, *supra*. EPCA's preemption provisions can and must be interpreted to avoid that result.

### D. EPCA's legislative history shows that Congress was focused on energy efficiency and consumption, not appliance emissions.

Plaintiffs also distort EPCA's history to imply that Congress would have rejected the District's emission standards. Mot. 13-15. The opposite is true. By the time Congress enacted EPCA in 1975 and amended it in 1987, the CAA's cooperative federalism scheme for addressing air pollution had been in place for years. *See* Background § I.A, *supra*.

26

Indeed, by 1987, state and local governments—including the District—had long been using the powers guaranteed to them under the CAA to strictly regulate emissions from appliances in an effort to satisfy the federal air quality standards. *See id.*; *see also* AMF 86.

Nothing in EPCA's legislative history indicates that Congress meant to reel back in the very state and local pollution regulations that it had "previously sought to foster." *Dillingham*, 519 U.S. at 331 n.7. Rather, congressmembers' remarks on EPCA's preemption provisions focused exclusively on state regulation of the "*energy* consumption" and "*energy* efficiency" of covered products. *See* S. Rep. No. 94-516, at 173 (1975); H.R. Rep. No. 94-700, at 116-117 (1975); H.R. 7014, at 556 (1975); H.R. Rep. No. 100-11, at 23-24 (1987) (emphasis added). Had Congress intended to "reverse course" by using EPCA to preempt the state *emissions* regulations that it had relied on in the CAA, one would have "expect[ed] Congress to have said so." *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 761 (9th Cir. 2018). But it was silent.

Moreover, to the extent EPCA's legislative history suggests Congress was concerned about a "patchwork" of disparate appliance standards (*see* S. Rep. No. 100-6, at 4 (1987)), the Rule does not aggravate that problem. *Contra* Mot. 13, 17-18. As discussed above, there is already a wide range of *non-zero* emissions standards for appliances across the state and country. *See* Argument § II.A, *supra*. It is surely just as "disruptive to national uniformity," Mot. 18, for Ventura County to cap appliance NOx emissions at 20 ppm and Texas to allow up to 55 ppm, as it is for the District and the Bay Area District to set a zero-NOx limit. Yet Plaintiffs apparently concede that EPCA does not preempt the many varying non-zero emissions standards. *See* AMF 91. Accordingly, the Rule does not cause or worsen any regulatory "patchwork" with which EPCA's drafters may have been concerned.

**E.    The District reserves its right to argue on appeal that *CRA* was wrongly decided.**

The District recognizes that *CRA* is binding precedent. In an abundance of caution, however, the District reserves its right to argue to the Ninth Circuit that *CRA* should be

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

overruled as wrongly decided. *See United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160 (9th Cir. 2014). The District adopts the explanation provided in the dissent from denial of rehearing en banc in *CRA*. *See* 89 F.4th at 1119-26 (Friedland, J., dissenting from denial of reh'g en banc). A New York district court recently refused to follow *CRA* for the same reasons. *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *1 (S.D.N.Y. Mar. 18, 2025).

**III.    Even if *CRA* applied to the Rule, Plaintiffs could not satisfy the facial challenge standard because they cannot show the Rule is preempted as to all regulated categories of appliances.**

Plaintiffs have failed to meet the burden to show that the Rule is preempted in every application. Like the plaintiffs in *American Apparel*, they have not shown that the Rule is preempted as to every appliance it regulates. *See Am. Apparel*, 107 F.4th at 938.

**A.    The Rule does not preclude the use of natural gas appliances in every application.**

Plaintiffs' assertion that the Rule's emission standard acts as a de facto ban on every type of gas appliance ignores gas appliances that operate without combustion. According to Plaintiffs, because the Rule prohibits NOx emissions, which are an inevitable byproduct of combustion, the Rule prohibits combustion, "and thus prohibits gas appliances from consuming any energy." Mot. 12. But not all gas appliances operate through combustion. AMF 92.

In the Staff Report, the District discussed the potential for compliant natural gas fuel cell technology. AMF 93. Fuel cells use but do not combust natural gas, so their operation results in negligible NOx emissions. AMF 94. Such technology is already in use in Japan and Europe. AMF 95 (over 100,000 fuel cells are in use in Europe, and over 300,000 units have been deployed in Japan).

A specific type of natural gas fuel cell called a Combined Heat and Power system generates both electricity and waste heat, which can be used to heat water. AMF 96. The District has previously found that analogous equipment satisfies a zero-NOx emission standard when the regulated equipment heated by the waste heat generates no NOx. AMF

28

97. Because it can be reasonably anticipated that compliant natural gas fuel cell technology could be developed by most of the Rule's compliance deadlines, Plaintiffs have not shown that the Rule bans natural gas appliances in all its applications.

Furthermore, the Rule's rolling compliance deadlines are designed to provide the additional time to develop compliant technology for some equipment categories. AMF 76. This structure is common for the District, which promulgates "technology-forcing" stand-ards based on technologies that do not yet exist, but which are reasonably anticipated to exist by the compliance deadline. *Am. Coatings Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 54 Cal.4th 446, 452 (2012). In this case, the District projected that manufacturers will con-tinue to improve and expand zero-emission products. AMF 98. These products may include additional compliant natural gas products.

Ignoring the potential for compliant gas technology, Plaintiffs focus solely on the District's cost-effectiveness analysis. Mot. 8. That analysis estimated the cost of electric appliances as replacements for natural gas appliances covered by the Rule. *Id.* (citing Dkt. 50-2, Ex. 2 at 102-105, 291). They claim this analysis showed the Rule required gas appli-ances to be replaced with electric appliances. *Id.* But this analysis was just an estimate of the relative cost effectiveness of the Rule using assumptions about how most regulated entities might choose to comply. Dkt. 50-2, Ex. 2 at 100. The cost-effectiveness analysis neither replaces the Rule's requirements nor demonstrates that compliant gas appliances are unavailable. Dkt. 50-2, Ex. 2 at 099. Because the Rule does not dictate that only electric appliances may comply with its emissions standard, Plaintiffs' attempt to turn the emis-sions limit into a gas appliance ban fails.

**B.    The Rule regulates some appliances not subject to federal standards and thus not subject to preemption under EPCA.**

To prevail in their facial challenge, Plaintiffs must show the Rule is invalid in "all of its applications"—that EPCA preempts each appliance emission standard in the Rule. *Am. Apparel*, 107 F.4th at 938-39. But EPCA only preempts state regulation of covered products for which DOE has promulgated a federal efficiency standard. 42 U.S.C. §§

29

6297(c), 6316(b)(2)(A). Thus even if the Court finds that the Rule "concern[s ]energy use" of appliances, if the Rule regulates an appliance that is not a covered product with a federal standard in place, then EPCA does not preempt the Rule as to that appliance. *Id.*

Plaintiffs' facial challenge fails because the Rule regulates emissions from "process heaters" (Dkt. 50-2, Ex. 1 at 006 (Rule 1146.2(c)(18)), which are not federal covered products. The Rule defines a "process heater" as any equipment designed to be fired with natural gas that "transfers heat from combustion gases to water or process streams." *Id.* Process heaters are not on the statutory lists of covered products, and DOE has not issued any federal standards for them. *See* 42 U.S.C. §§ 6292, 6311; 10 C.F.R. Parts 430, 431.

The Ninth Circuit recently rejected a facial preemption challenge where the plaintiffs had not shown that there were corresponding federal standards for each challenged state standard. *Am. Apparel*, 107 F.4th at 936. Oregon authorized a state agency to designate and ban chemicals deemed dangerous to children. *Id.* at 936. Two federal statutes expressly preempted state regulation of chemicals covered by federal standards. *Id.* at 939. Most of the 73 chemicals on Oregon's list were absent from the federal agencies' lists. *Id.* at 936, 940-41. Because there were no federal standards in place to preempt each of the state standards, the court held the plaintiffs had not met their burden in a facial challenge to show "all 73" of the State's designated chemicals were preempted. *Id.* at 939, 942-43 (plaintiffs could not prove that "'no set of circumstances exists under which the Act would be valid'" (quoting *Salerno*, 481 U.S. at 745)).

Similarly here, without a federal standard in place for each of the appliance types regulated under the Rule, Plaintiffs' facial preemption challenge fails. *Id.* at 942-43. Plaintiffs try to dodge this problem by inaccurately asserting that pool or spa heaters—which are covered products—are a type of process heater, and therefore that process heaters are covered products. Mot. 11; Bohn Decl. ¶ 3. That is not the case. The Rule defines pool heaters as a type of water heater, not as a type of process heater. Dkt. 50-2, Ex. 1 at 006 (Rule 1146.2(c)(17)). Because process heaters are not federally regulated, the Rule's

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

1  standards for them cannot be preempted, and Plaintiffs' facial challenge must fail. *CRA*, 89
2  F.4th at 1104; *Am. Apparel*, 107 F.4th at 942-43.

3  **IV.    Plaintiffs are not entitled to judgment or relief.**

4          Plaintiffs fail to show the Rule is preempted in any, let alone in every, application.
5  The Court thus cannot give them judgment or any relief. Even if the Court concludes that
6  Plaintiffs can mount a successful facial challenge to the Rule despite being unable to show
7  it is preempted as to all regulated appliances, the Court should nevertheless not grant Plain-
8  tiffs any relief at this stage. In that event, the Court should hold further proceedings to
9  evaluate whether non-preempted portions of the Rule are severable from the remainder.
10 *See Nat'l Broiler Council v. Voss*, 44 F.3d 740, 748 (9th Cir. 1994).

11                                   **CONCLUSION**

12          For the foregoing reasons the Court should deny the motion.

13 DATED:  May 12, 2025                 SHUTE, MIHALY & WEINBERGER LLP

14

15                                 By:  ___/s/Matthew D. Zinn_____
16                                      MATTHEW D. ZINN
17                                      LAUREN M. TARPEY
                                        RYAN K. GALLAGHER
18
19                                      Attorneys for Defendant South Coast Air
                                        Quality Management District
20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)