ADRIANO L. MARTINEZ (SBN 237152)
CANDICE L. YOUNGBLOOD (SBN 328843)
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
amartinez@earthjustice.org
cyoungblood@earthjustice.org
Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for Defendant-Intervenors*
*People's Collective for Environmental Justice,*
*Sierra Club, and Industrious Labs*

(List of Counsel continued on next page)

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| RINNAI AMERICA CORP., et al.,<br>        Plaintiff,<br><br>    v.<br><br>SOUTH COAST AIR QUALITY<br>MANAGEMENT DISTRICT,<br>        Defendant,<br><br>    and<br><br>PEOPLE'S COLLECTIVE FOR<br>ENVIRONMENTAL JUSTICE, et al.,<br>        Defendant-Intervenors. | Civ. No. 2:24-cv-10482 PA (PDx)<br><br>**DEFENDANT-INTERVENORS'<br>OPPOSITION TO<br>PLAINTIFFS' MOTION FOR<br>SUMMARY JUDGMENT**<br><br>Date: July 14, 2025<br>Time: 1:30 p.m.<br>Courtroom: 9A<br><br>Honorable Percy Anderson<br>United States District Judge |

NIHAL SHRINATH (SBN 327921)
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
nihal.shrinath@sierraclub.org
Tel: (415) 977-5566

JAMES A. DENNISON (*Pro Hac Vice*)
Sierra Club
1650 38th St., Suite 103W
Boulder, CO 80301
jim.dennison@sierraclub.org
Tel: (435) 232-5784

*Counsel for Defendant-Intervenor*
*Sierra Club*

SEAN H. DONAHUE (SBN 264284)
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
sean@donahuegoldberg.com
Tel: (202) 277-7085

*Counsel for Defendant-Intervenor*
*Industrious Labs*

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

1

## <u>TABLE OF CONTENTS</u>

2

INTRODUCTION ....................................................................................9

3

BACKGROUND ...................................................................................11

4

I.      THE SOUTH COAST'S AIR QUALITY PROBLEM...............................11

5

II.     APPLICABLE FEDERAL LAWS.....................................................12

6

III.    THE BOILER RULE.....................................................................14

7

8

STANDARD OF REVIEW .....................................................................15

9

ARGUMENT ........................................................................................16

10

I.      CONGRESS DID NOT INTEND EPCA TO PREEMPT PUBLIC
        HEALTH PROTECTIONS LIKE THE BOILER RULE, WHICH ARE
        CRITICAL TO MEET FEDERAL AIR QUALITY STANDARDS............16

11

12

II.     THE BOILER RULE IS AN EMISSION STANDARD THAT
        CONGRESS INTENDED STATE AND LOCAL AGENCIES TO
        PURSUE, NOT AN "EFFECTIVE BAN" ON GAS CONSUMPTION......20

13

14

III.    EPCA DOES NOT DISABLE THE CORE HEALTH AND SAFETY
        POWERS THAT CONGRESS HAS AFFIRMED AND REQUIRED
        THE DISTRICT TO EXERCISE UNDER THE FEDERAL CAA.............23

15

16

IV.     PLAINTIFFS' RELIANCE ON *CALIFORNIA RESTAURANT
        ASSOCIATION* IS UNAVAILING. ................................................27

17

18

V.      PLAINTIFFS ARE NOT ENTITLED TO DECLARATORY OR
        INJUNCTIVE RELIEF. ................................................................30

19

20

CONCLUSION.....................................................................................32

21

22

23

24

25

26

27

28

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

5

*Agensys, Inc. v. Regents of the Univ. of Cal.*,
   2024 WL 5679166 (C.D. Cal. Oct. 22, 2024) (unpublished) ............................30

6

7

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation &*
   *Dev. Comm'n*,
   410 F.3d 492 (9th Cir. 2005) ........................................................19, 26

8

9

*Altria Grp. v. Good*,
   555 U.S. 70 (2008) ............................................................................16

10

11

*American Apparel & Footwear Association, Inc. v. Baden*,
   107 F.4th 934 (9th Cir. 2024) ............................................................16

12

13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..........................................................................15

14

15

*Ass'n of Am. R.R. v. SCAQMD*,
   622 F.3d 1094 (9th Cir. 2010) ............................................................25

16

17

*Bankhurst v. Wolf Appliance, Inc.*,
   2024 WL 3273322, at *3 (W.D. Wisc. July 2, 2024)..............................20

18

19

*Beentjes v. Placer Cnty. Air Pollution Control Dist.*,
   397 F.3d 775 (9th Cir. 2005) ..............................................................24

20

21

*California Restaurant Association v. City of Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ..................... 10, 11, 17, 20, 21, 22, 27, 28, 29, 30

22

23

*CDK Glob. LLC v. Brnovich*,
   16 F.4th 1266 (9th Cir. 2021) ........................................................15, 16

24

25

*In re Clean Water Act Rulemaking*,
   640 F.4th 583 (9th Cir. 2023) ............................................................17

26

27

*Committee for a Better Arvin v. U.S. EPA*,
   786 F.3d 1169 (9th Cir. 2015) ............................................................18

28

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

*Drake v. Haier US Appliance Solutions Inc.*,
   2024 WL 590597 (N.D. Cal. Feb. 13, 2024) (unpublished)................................20

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ........................................................................30, 31

*Exxon Mobil Corp. v. U.S. EPA*,
   217 F.3d 1246 (9th Cir. 2000) ....................................................................24, 25

*Floyd v. American Honda Motor Co., Inc.*,
   966 F.3d 1027 (9th Cir. 2020) ....................................................................24, 25

*Hall v. USDA*,
   984 F.3d 825 (9th Cir. 2020) ......................................................................26, 27

*Hendrick v. BSH Home Appliances Corp.*,
   2024 WL 2190984 (C.D. Cal. May 14, 2024)................................................20

*Huron Portland Cement Co. v. City of Detroit, Mich.*,
   362 U.S. 440 (1960)............................................................................................24

*League of Wilderness Def./Blue Mountains Biodiversity Project v.*
   *Connaughton*,
   752 F.3d 755 (9th Cir. 2014) ......................................................................31, 32

*Maslenjak v. United States*,
   582 U.S. 335 (2017)............................................................................................10

*Mass. v. EPA*,
   549 U.S. 497 (2007)............................................................................................19

*MetroPCS Cal., LLC v. Picker*,
   970 F.3d 1106 (9th Cir. 2020) ..........................................................................23

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution*
   *Control Dist.*,
   627 F.3d 730 (9th Cir. 2010) ............................................................................13

*Nat'l R.R. Passenger Corp. v. Su*,
   41 F.4th 1147 (9th Cir. 2022) ..........................................................................16

*Pac. Merch. Shipping Ass'n v. Goldstene*,
   639 F.3d 1154 (9th Cir. 2011) ..........................................................................25

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

*Pit River Tribe v. BLM*,
    939 F.3d 962 (9th Cir. 2019) ...................................................................26

*Puente Ariz. v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) ..................................................................15

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016)...................................................................................16

*Sackett v. EPA*,
    598 U.S. 651 (2023)...................................................................................24

*SCAQMD v. EPA*,
    472 F.3d 882 (D.C. Cir. 2006)..................................................................13

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981)..................................................................23

*Sturgeon v. Frost*,
    577 U.S. 424 (2016)............................................................................17, 18

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976)............................................................................12, 25

*United States v. Salerno*,
    481 U.S. 739 (1987)............................................................................15, 23

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and
    Products Liability Litigation*,
    959 F.3d 1201 (9th Cir. 2020) ..................................................................25

**Statutes and Legislative History**

15 U.S.C. § 717(b) .........................................................................................30

42 U.S.C. § 6297(c) ...................................................................................9, 16

42 U.S.C. § 6297(d) .......................................................................................17

42 U.S.C. § 6297(e) .......................................................................................17

42 U.S.C. § 6297(f) ........................................................................................17

42 U.S.C. § 7401(a) .......................................................................................12

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

42 U.S.C. § 7401(a)(3) ............................................................................25

42 U.S.C. § 7407(a) ...........................................................................12, 25

42 U.S.C. § 7410 ....................................................................................30

42 U.S.C. § 7410(a) ................................................................................12

42 U.S.C § 7410(a)(1) .............................................................................25

42 U.S.C. § 7416 ...............................................................................26, 30

42 U.S.C. §§ 7501–15 .............................................................................12

42 U.S.C. § 7502(c)(1) ............................................................................13

42 U.S.C. § 7511(a)(1) ............................................................................13

42 U.S.C. § 7511a(e) ...............................................................................28

42 U.S.C. § 7511a(f)(1) ...........................................................................13

42 U.S.C. § 7511d ..............................................................................27, 28

42 U.S.C. §§ 7511d(a)–(b) ..................................................................13, 27

Cal. Health & Safety Code § 39002 .........................................................14

Cal. Health & Safety Code § 40000 .........................................................14

Cal. Health & Safety Code § 40460 .........................................................14

Cal. Health & Safety Code § 40461 .........................................................14

Cal. Health & Safety Code § 40462 .........................................................14

Pub. L. No. 101-549, §§ 102(b), 103, 301, 104 Stat. 2399 (1990).............13

S. Rep. No. 100-6, at 4 (1987) .................................................................18

Cal. Gov't Code § 11350 .........................................................................23

Cal. Health & Safety Code §40406 ..........................................................14

Cal. Stat. Chapter 324, § 5 ......................................................................24

7

Cal. Stat. Chapter 632 ........................................................................................24

**Rules**

Fed. R. Civ. P. 56(a)...........................................................................................15

**Regulations**

40 C.F.R. § 81.305 .......................................................................................12, 27

47 Fed. Reg. 29,231 (Jan. 7, 1986) ....................................................................26

69 Fed. Reg. 23,858 (April 30, 2004) .................................................................12

70 Fed. Reg. 65,984 (Nov. 1, 2005)....................................................................12

73 Fed. Reg. 73,562 (Dec. 3, 2008) ....................................................................26

75 Fed. Reg. 20,112, 20,132–33 (Apr. 16, 2010) ...............................................19

82 Fed. Reg. 17,136 (Apr. 10, 2017) ..................................................................26

85 Fed. Reg. 57,733 (Sep. 16, 2020) ..................................................................12

89 Fed. Reg. 40,198 (May 9, 2024) ....................................................................21

89 Fed. Reg. 54,358 (July 1, 2024).....................................................................26

89 Fed. Reg. 55,684, 55,696 (July 5, 2024)........................................................21

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

**INTRODUCTION**

Despite significant progress over the last seventy years, the South Coast Air Basin ("South Coast") remains the most smog-filled region in the country. For more than a hundred days every summer, blankets of ozone, commonly referred to as "smog," envelop large portions of the region and make it unsafe to breathe for millions of people. This has led the Environmental Protection Agency ("EPA") to designate the South Coast as an "extreme" nonattainment area for federal air quality standards that the state is required to satisfy under the Clean Air Act ("CAA"). Recognizing the continued need to reduce health-harming pollution, and in order to comply with federal ozone standards, the South Coast Air Quality Management District ("District" or "SCAQMD") adopted an amendment to its longstanding Rule 1146.2 ("Boiler Rule" or "Rule") to further reduce ozone-forming nitrogen oxide ("NOx") emissions from certain types of water heaters and boilers. This update was hardly unprecedented; the District has regulated emissions from these types of equipment since 1998 and has amended the Boiler Rule on three prior occasions. As did its precursors, this amendment gradually phases in more stringent emission limits, which the District has determined are cost-effective, technically feasible, and necessary to attain federal air quality standards and protect public health. As a result, the Boiler Rule will eliminate half the total amount of NOx pollution emitted by the region's millions of cars each day.

Plaintiffs Rinnai America Corp. *et. al* ("Plaintiffs") claim that Congress has overridden the District's longstanding authority to reduce emissions and protect public health and preempted the rule via the Energy Policy and Conservation Act ("EPCA"). They are incorrect.

Plaintiffs' reading of EPCA is fundamentally wrong as a matter of text, structure, and purpose. EPCA preempts state regulations "concerning the energy efficiency [or] energy use" of equipment covered by federal energy efficiency standards, 42 U.S.C. § 6297(c)—not state *emission* regulations like the Boiler Rule.

9

Congress understood that emission regulations do not implicate EPCA's interest in nationally uniform efficiency standards, and there is no indication that Congress intended for EPCA to interfere with emissions control. Indeed, in the CAA, Congress not only expressly affirms states' and subdivisions' historic authority to limit harmful emissions but *requires* the District—as the regulator for a region with extreme air quality issues—to exercise that authority, on penalty of severe sanctions for nonattainment. The regime Plaintiffs posit would perversely extinguish regulation of local emissions based on efficiency regulators setting an *efficiency* standard under a statutory process that makes no provision for pollution control or public health. Plaintiffs' problematic reading thus "opens the door to a world of disquieting consequences—which [this Court] would need far stronger textual support to believe Congress intended." *Maslenjak v. United States*, 582 U.S. 335, 346 (2017).

Plaintiffs' arguments to the contrary all fail. Far from "effectively banning gas use," as Plaintiffs assert, the Rule does not concern energy use at all. It is focused on emissions, without respect to how much energy equipment may consume. And Plaintiffs are tellingly silent as to whether and how, on their "plain meaning interpretation," EPCA does or does not disable rules, like the District's current regime (and laws in effect in many other parts of the country), which impose emission limits above zero. An affirmative answer would produce drastic legal and practical disruptions. And even if EPCA could be read as "only" prohibiting "effective" gas equipment "bans," their facial challenge would still fail because there exists both gas equipment subject to the zero-NOx amendment that are not EPCA-covered and covered equipment that could comply. Plaintiffs are unable to show that *no* gas equipment could be permitted to operate under the Boiler Rule and thus cannot meet the burden required by their facial challenge to show that *every possible application* of the Rule conflicts with federal law.

Nor can the Ninth Circuit's decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), do the work Plaintiffs claim for it.

That "narrow" decision was avowedly limited to the distinctive facts of the local
ordinance before the court, and it did not involve an emission standard nor a discharge
of a regional authority's state- and federally imposed responsibility to reduce air
pollution. Indeed, the *California Restaurant Association* decision is best read as
supporting the proposition that EPCA does not displace exercises of local pollution-
control authority to satisfy obligations under other federal statutes, even if those have
the effect of reducing covered appliances' natural gas use.

Finally, Plaintiffs have also failed to justify their requested relief, including a
showing that the balance of equities and the public interest tip in their favor. Thus, this
Court should deny Plaintiffs' motion for summary judgment and grant Defendant's
motion for summary judgment.

## BACKGROUND

## I.    The South Coast's Air Quality Problem

More than 17 million people—roughly half of California's population—live
within the South Coast, which consists of all of Orange County and the urban portions
of Los Angeles, Riverside, and San Bernardino counties. Decl. of Adriano L. Martinez
in Supp. of NGOs' Mot. to Intervene, ECF No. 27-2 at 33–35. South Coast residents
suffer from the worst smog in the country. *Id.* at 16, 117. Moreover, the health harms
from South Coast air pollution disproportionately fall on low-income communities
and communities of color. *See id.* at 36, 253, 255–56, 263.

 Boilers and water heaters are a significant source of smog-forming NOx
emissions and deadly particulate matter ("PM2.5") in the region. *See* Compl. Ex. 2,
ECF No. 1-2 at 118, 121. These boilers and water heaters are used in a variety of
industrial processes and to heat swimming pools and spas. *See id.* at 119. People
living in the vicinity of industrial facilities that operate boilers and water heaters are
subject to greater health risks from exposure to health-harming pollution, *see* ECF No.
27-2 at 88–90, 253, 258–59, 263, as are residents of inland communities such as San

Bernardino and Riverside, who, as a result of wind patterns, face the highest ozone concentrations in the South Coast, *id.* at 58, 263.

The South Coast has been classified by EPA as an "extreme" nonattainment area for all federal ozone pollution standards—the highest level that federal law provides. 40 C.F.R. § 81.305. The region is also in nonattainment of California's state-level ozone standards. ECF No. 27-2 at 243. Ground-level ozone, or smog, is formed by the reaction of volatile organic compounds ("VOCs") and NOx in the atmosphere in the presence of sunlight. 69 Fed. Reg. 23,858, 23,859 (April 30, 2004). Short- and long-term exposure to ozone is a significant health concern, particularly for children and people with asthma and other respiratory diseases, and it is associated with school and work absences, decreased productivity, and increased hospital and emergency room visits. *Id.*

The South Coast also violates federal and state air quality standards for fine particulate matter. 40 CFR § 81.305; 85 Fed. Reg. 57,733 (Sep. 16, 2020). These particles can be inhaled into the lungs and even pass into the bloodstream. ECF No. 27-2 at 3, ¶ 5. PM2.5 exposure can aggravate respiratory and cardiovascular disease and cause lung disease, asthma attacks, heart attacks, and premature death. *See* 70 Fed. Reg. 65,984, 65,988 (Nov. 1, 2005).

## II.    Applicable Federal Laws

Five years before EPCA was enacted, Congress passed the Clean Air Act of 1970 as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976); *see also* 42 U.S.C. § 7401(a). EPA issues national air quality standards, and states are legally obligated to adopt regulations to meet those standards. *See* 42 U.S.C. § 7407(a) (states have "primary responsibility" for assuring air quality and requiring state implementation plans to meet national standards); *id.* §§ 7410(a), 7501–15 (outlining requirements for state implementation plans). Under the Act, the states have authority over stationary sources of air pollution such as water heaters and boilers.

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 733 (9th Cir. 2010). The Act requires nonattainment areas like the South Coast to regulate stationary sources by implementing control measures "as expeditiously as practicable." 42 U.S.C. § 7502(c)(1).

Following insufficient progress, Congress overhauled the CAA in 1990 to mandate increasingly prescriptive requirements for nonattainment areas. *See SCAQMD v. EPA*, 472 F.3d 882, 886–87 (D.C. Cir. 2006). That overhaul was three years after Congress amended EPCA to strengthen federal regulation of energy efficiency and add the preemption provision disputed here. The 1990 CAA Amendments added new, detailed requirements for ozone state implementation plans along with a new classification scheme that assigned different attainment deadlines depending on the pollution levels in the area. *See* 42 U.S.C. §§ 7511(a)(1) (ranking areas from least to most polluted as "marginal," "moderate," "serious," "severe" and "extreme"), 7511a (prescribing escalating control requirements according to classification). For "extreme" ozone nonattainment areas—a classification that, at the time, applied exclusively to Los Angeles—Congress mandated the most stringent controls but provided more time to attain the ozone standard. *See generally id.* §§ 7511a–7511f; Pub. L. No. 101-549, §§ 102(b), 103, 301, 104 Stat. 2399 (1990). The 1990 Amendments also strengthened enforcement; if a "severe" or "extreme" ozone nonattainment area cannot meet an applicable standard by the prescribed deadline, a jurisdiction must require all major stationary sources (*i.e.*, all large industrial polluters) either to drastically curtail their emissions or to pay a substantial fee for every ton of ozone precursor pollutants emitted over a specified baseline. 42 U.S.C. §§ 7511d(a)–(b), 7511a(f)(1). Pursuant to these obligations, the District has imposed and begun to collect steep fines from major polluters of NOx and VOCs in the South Coast. Decl. of Candice L. Youngblood in Supp. of Opp'n to Pls.' Mot. for Summ. J. Ex. 1.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    The Boiler Rule

The District is responsible for improving air quality in the South Coast, and its primary authority is over stationary sources. Cal. Health & Safety Code §§ 39002, 40000; ECF No. 27-2 at 31. By law, the District's air quality management plan ("AQMP") and its subsequent revisions serve as the federally required state implementation plan for the South Coast to improve air quality and meet federal and state standards. Cal. Health & Safety Code §§ 40460–40462; *id.* at §40406 (California Clean Air Act provision enhancing stringency requirements in plans for nonattainment areas).

Defendant-Intervenors engaged in the three-year administrative process that culminated in the District's adopting the AQMP in December 2022. ECF No. 27-2 at 276. The AQMP acknowledged that the South Coast must reduce to zero emissions from many stationary sources in order to meet federal and state clean air standards. *Id.* at 131, 137. The AQMP includes a control measure that seeks NOx emission reductions from the equipment covered by the Boiler Rule. *Id.* at 145.

Originally adopted in 1998, the Boiler Rule's purpose is "to reduce NOx emissions," ECF No. 1-2 at 100, from various classes of equipment—initially large water heaters, small boilers, and process heaters, *id.* at 3, and later, residential instantaneous water heaters and pool heaters, *id.* The District has revisited the Boiler Rule three times before the amendment challenged here, to reflect changes in both the South Coast's air pollution problems and major advances in technology. *See id.* at 56–57. In January 2022, staff completed a technology assessment that determined that the Boiler Rule's NOx emission limits should be lowered to satisfy state and federal air quality requirements. *Id.* at 57.

After over two years of thorough deliberation, the District amended the Boiler Rule on June 7, 2024, finding that stricter emission standards were technologically feasible and "needed . . . in order to meet the National Ambient Air Quality Standards for ozone." *Id.* at 123. The Rule will gradually phase in zero-emission equipment over

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

nearly a decade—first for new buildings and eventually for all buildings based on the type of facility and the commercial availability of equipment. *Id.* at 3. When fully implemented, the Rule is projected to reduce NOx emissions in Southern California by 5.6 tons per day—the equivalent of nearly half the combined NOx emissions from every car in the region. *Id.* at 118; ECF No. 27-2 at 3, ¶ 6. The Boiler Rule alone will reduce nearly 10 percent of the stationery and area source emissions regulated by the District and move the region closer to ozone attainment. ECF No. 1-2 at 292.

NOx emission reductions from the Boiler Rule translate to significant public health benefits for South Coast communities. In its staff report for the Boiler Rule, the District cited a similar zero-NOx rule covering furnaces and water heaters adopted by the Bay Area Air District in 2023. *Id.* at 225. The health impacts from the Bay Area Air District's rule, including avoided premature deaths and new cases of asthma, "were estimated to be between 400 to 890 million U.S. dollars annually." *Id.* The District determined that "[s]imilar benefits would accrue to communities in the South Coast" from the Boiler Rule. *Id.*

## STANDARD OF REVIEW

Summary judgment may be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Plaintiffs claim that they are entitled to judgment based on the Boiler Rule's facial invalidity under EPCA. Such challenges face "unique burdens," *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016), and are "the most difficult [] to mount successfully, since the challenger must establish that no set of circumstances exists under which the [state law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987). In other words, the challenger "must establish that every possible application of the [state law] would conflict with the [federal statute]." *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021) (citing *Puente Ariz.*, 821 F.3d at 1104).

As the Ninth Circuit has explained:

> Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law. *Id.*; *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152–53 (9th Cir. 2022). Of course, congressional purpose "is the ultimate touchstone in every pre-emption case," *Altria Grp. v. Good*, 555 U.S. 70, 76 (2008) (quotation and citation omitted), and the plain wording of the express preemption clause "necessarily contains the best evidence of Congress'[s] preemptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).

*American Apparel & Footwear Association, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024).

## ARGUMENT

Plaintiffs fail to show that Congress's enactment of EPCA's preemption provision and promulgation of federal standards render the Boiler Rule's emission standards facially invalid. *See* Mem. P. & A. Supp. Pls.' Mot. Summ. J. ("Pls.' Mem."), ECF No. 50-1 at 18. Plaintiffs' motion for summary judgment should therefore be denied.

## I. Congress did not intend EPCA to preempt public health protections like the Boiler Rule, which are critical to meet federal air quality standards.

Plaintiffs' reading of EPCA is fundamentally wrong. The statute's text, structure, and purpose show that Congress did not intend for EPCA to interfere with emissions controls like the Boiler Rule that are necessary to protect public health and satisfy CAA mandates. Indeed, Congress, courts, and federal agencies have consistently distinguished "energy conservation standards," which concern the quantity of energy that goes *into* a piece of equipment, from emission standards, which concern the concentration of emissions that come *out of* the equipment.

Beginning with the statutory text, EPCA's preemption provision applies to state regulations "concerning the energy efficiency [or] energy use" of covered equipment for which federal energy efficiency standards exist. 42 U.S.C. § 6297(c). It does not

mention state emission regulations, much less purport to preempt them. The reason for this is clear: Congress understood that state emission regulations do not implicate EPCA's interest in uniform national efficiency standards, but instead fit into the CAA's comprehensive system of cooperative federalism.

EPCA's structure and the text surrounding the preemptive provision further highlight the implausibility of Plaintiffs' claim that Congress meant for energy-efficiency standard setting to divest states' authority to adopt and enforce needed emission limits. *See Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (internal quotation and citation omitted). Plaintiffs insist that EPCA's statutory exceptions to preemption are useful to "determine Congress's intent as to the scope of preemption," Pls.' Mem. at 13–15, noting that exception for building codes, for example, shows that Congress wanted preemption to extend beyond appliance-specific efficiency standards. But that largely misses the point. None of these exceptions apply to anything resembling emission standards, because Congress did not understand emission standards to fall within EPCA's preemptive scope. Instead, the exceptions apply to building codes, 42 U.S.C. § 6297(f), procurement standards that exceed federal energy conservation standards, *id.* § 6297(e), and state regulations that are granted a waiver from the Department of Energy to help "meet unusual and compelling State or local energy or water interests," *id.* § 6297(d). All of these exempted policy types relate to the amount of energy an appliance consumes, not the quantity of emissions it produces. If the exceptions indicate that EPCA's preemptive scope extends beyond direct state energy efficiency standards, they indicate just as strongly that it does not reach emission standards. *Cf. In re Clean Water Act Rulemaking*, 640 F.4th 583, 595 (9th Cir. 2023) (describing "the basic canon of construction establishing that an explicit listing of some things should be understood as an *exclusion of others* not listed") (internal quotation and citation omitted); *Cal. Rest. Ass'n*, 89 F.4th at 1101 (finding building code exception

to EPCA preemption to be "[o]f critical importance" to the court's "limited" holding
"that EPCA applies to building codes and that Berkeley's Ordinance falls within the
Act's preemptive scope").

Plaintiffs also contend that the Boiler Rule contributes to "a growing patchwork
of differing State regulations" of the sort Congress intended to avoid when amending
EPCA's preemption provision. S. Rep. No. 100-6, at 4 (1987). But Plaintiffs leave out
an important distinction: Congress intended to avoid a patchwork of differing state
*efficiency* regulations contrary to federal policy. The Boiler Rule, on the other hand,
arises from an exercise of authority under a statute that recognizes that air pollution
problems and nonattainment of health-based standards are nationally non-uniform, as
must be programs addressing them. Moreover, the CAA "*requires* states to address
nonattainment areas" through plans that set emission standards for stationary sources
and demands increasingly stringent regulation for increasingly serious air quality
problems. *Committee for a Better Arvin v. U.S. EPA*, 786 F.3d 1169, 1174 (9th Cir.
2015) (emphasis added).

Plaintiffs insist that their expansive, pollution-control-eviscerating reading
follows from other cases giving sweeping preemptive effect to similarly worded
clauses. Pls.' Mem. at 11 (collecting cases where federal law preempted regulations
"relating to" the covered subject matter). But that argument makes the mistake of
reading words in isolation, without regard to surrounding text and statutory structure.
*See Sturgeon*, 577 U.S. at 438. Cases involving statutes like the Airline Deregulation
Act, *see* Pls.' Mem. at 11 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374
(1992)), are inapposite here. That is because in a deregulatory context, almost *every*
state law impact risks interfering with the core congressional judgment that market
forces should operate freely.

In EPCA, Congress's central judgment, reached in the context of the 1970s
energy supply crisis, was that appliances should operate more efficiently—*i.e.*, that
they should use less fuel in the interest of conserving those resources—and that *more*

regulation was needed. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005) ("EPCA was designed, in part, to reduce the United States' 'domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.'" (quoting S. Rep. No. 94–516, at 117 (1975)). Indeed, as Plaintiffs note, Congress took multiple steps further in that direction, first amending EPCA to replace informational disclosures with efficiency mandates and later prescribing certain standards legislatively while directing the Department of Energy to use its authority to promulgate more rigorous standards, more expeditiously. *See* Pls.' Mem. at 11. In EPCA's regime, the preemption provision plays an important, but subsidiary role, expressing a legislative decision to not pursue the statute's core objective at all costs—*i.e.*, that the additional *energy conservation* savings from allowing more stringent local efficiency standards were not worth the nonuniformity costs.

Accordingly, courts and federal agencies interpreting EPCA have consistently recognized the distinction between regulating emissions and energy use. The Supreme Court found that regulations concerning emissions and efficiency are "wholly independent," even if related. *Mass. v. EPA*, 549 U.S. 497, 532 (2007) (observing that federal agencies' obligations under EPCA and the CAA "may overlap, but there is no reason to think the two agencies [responsible for regulating cars' fuel economy and greenhouse gas emissions] cannot both administer their obligations and yet avoid inconsistency"). Likewise, the Department of Energy has long recognized that its charge to enact efficiency standards under EPCA is unaltered by local emission standards for covered appliances, even if they tangentially affect equipment efficiency. *See* 75 Fed. Reg. 20,112, 20,132–33 (Apr. 16, 2010) (recognizing that local emission standards for water heaters can affect their efficiency but declining to adjust efficiency standards in response). The objectives and design of efficiency and emission standards are fundamentally different, as are the techniques available to comply with them. One can comply with an efficiency standard without impacting

emissions at all, and vice-versa, one can comply with an emission standard without addressing energy use at all.

Courts have also consistently found that state law requirements based on concern with covered appliances' emissions falls outside the sweeping scope of EPCA preemption. *See Bankhurst v. Wolf Appliance, Inc.*, 2024 WL 3273322, at *3 (W.D. Wisc. July 2, 2024) (finding that EPCA preemption did not apply where plaintiffs' claims did not concern energy consumption, but instead "the unsafe levels of hazardous *pollutants*—particularly nitrogen dioxide—that the products allegedly emit, as well as defendants' alleged failure to warn consumers of the associated risks"); *Hendrick v. BSH Home Appliances Corp.*, 2024 WL 2190984, at *8 (C.D. Cal. May 14, 2024) (concluding that allegations relating to emissions and health impacts of gas stoves "do not concern the EPCA and the effect that Plaintiffs' claims would have on energy use, if any, is merely tangential and remote"); *see also Drake v. Haier US Appliance Solutions Inc.*, 2024 WL 590597, at *6 (N.D. Cal. Feb. 13, 2024) (unpublished) (finding that fraud claims relating to failure to disclose emissions risks of gas appliances "do not regulate the amount of gas accessible to appliances, nor do they necessarily impact the quantity of gas consumed by gas appliances at the point of use").

In sum, courts have long recognized what EPCA's plain text proves: that EPCA does not preempt state emission standards like the Boiler Rule.

**II.    The Boiler Rule is an emission standard that Congress intended state and local agencies to pursue, not an "effective ban" on gas consumption.**

Plaintiffs attempt to avoid the problems with their interpretation of EPCA by asserting that the Boiler Rule is effectively the same as a ban on gas consumption, and that the Ninth Circuit's decision in *California Restaurant Association* therefore controls. While nothing in EPCA guarantees the right to operate any particular equipment regardless of local law, this case does not in fact present the "ban" issue.

Because the Boiler Rule is a technology- and fuel-neutral emission performance standard, it neither bans nor concerns energy use. ECF No. 1-2 at 69. It says nothing at all about how equipment may consume energy, as long as any NOx produced during their operation is fully captured or eliminated. *See* Compl. Ex. 1, ECF No. 1-1 at 5–9. By contrast, the ordinance at issue in *California Restaurant Association* prohibited the infrastructure used to deliver gas to appliances, making it physically impossible for those appliances to use energy as contemplated by EPCA. 89 F.4th at 1099, 1102. A zero-emission standard presents no such physical or technical obstacle to an appliance's consumption of gas—indeed, it is not uncommon for pollution sources to comply with a zero-emission standard while still consuming the same fuel or producing the same useful output as the uncontrolled emitting process. *See, e.g.*, 89 Fed. Reg. 55,684, 55,696 (July 5, 2024) (requiring zero emission leaks from certain coke oven doors, without requiring changes to the fuel used or coke produced); 89 Fed. Reg. 40,198 (May 9, 2024) (setting a zero-discharge effluent limitation at coal-fired power plants and other power plants, without requiring changes to the fuel used). Here, the District expressly contemplates compliance with the Boiler Rule by multiple equipment types using a range of fuels and zero-emission technologies, including heat pumps, electric resistance, solar water heating, and gas fuel cell technologies. ECF No. 1-2 at 69–73. The Rule also commits the District's staff to performing a technology assessment in 2027 to assess market availability before the Rule's later compliance dates go into effect. *Id.* at 21.

Plaintiffs repeatedly mischaracterize the Boiler Rule and the District's accompanying Final Staff Report in their effort to conflate the Rule with a ban on gas consumption. The Staff Report does not "acknowledge[] that the rule effectively bans gas appliances," as Plaintiffs claim, Pls.' Mem. at 7, and it in fact directly rejects this characterization. *See* ECF No. 1-2 at 270 (Rule "does not ban natural gas or otherwise regulate the amount of natural gas used by the equipment subject to [the Rule]."). Instead, the Staff Report describes the use of electric equipment as one potential

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

compliance option, without suggesting that it is the only such option, or that gas-consuming equipment with appropriate emissions controls cannot be used to comply now or in the future. Plaintiffs seize on statements like the Staff Report's observation that a range of compliant electric equipment is "available," Pls.' Mem. at 7, while ignoring the observation in the very next sentence that "manufacturers will continue development to improve and expand zero-emission products."[1] ECF No. 1-2 at 70.

Plaintiffs likewise ignore the District's determination that gas-consuming "fuel cell technology has the potential to replace existing units to meet the zero-emission limits." *Id.* at 73. If EPCA somehow prohibited "bans" this alone would be enough to

---

[1] Plaintiffs similarly claim that the District's consideration of electric control technology to evaluate the Rule's cost-effectiveness amounts to an acknowledgement that the Rule effectively bans gas equipment. Pls.' Mem. at 8. In evaluating the cost-effectiveness of their rules, agencies routinely focus on a particular illustrative compliance option, often the one that the agency determines to be most cost-effective at the time it develops the rule. This does not mean that the evaluated option is the only one available. The District's cost-effectiveness evaluation makes many simplifying assumptions, from the number and type of units subject to the Rule to the rate at which these units are replaced. *See* ECF No. 1-2 at 74. Just like the assumption that electric compliance technology will be used, these represent general expectations based on currently-available information, not inevitable outcomes and certainly not requirements imposed by the Rule itself. To be clear, neither EPCA nor *California Restaurant Association* prevents state regulations that fall outside the scope of EPCA's concern but that have the effect of reducing gas consumption, *see infra* at 27–30.

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

defeat their facial challenge.[2] Because gas fuel cells represent potential compliance options, Plaintiffs have failed to show that "no set of circumstances exists under which the [Boiler Rule] would be valid," as required to prevail on their facial challenge. *See Salerno*, 481 U.S. at 745; *see also MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1122 (9th Cir. 2020).[3]

Because Plaintiffs have failed to meet their burden, their arguments fail.

**III.    EPCA does not disable the core health and safety powers that Congress has affirmed and required the District to exercise under the federal CAA.**

The extreme and perverse consequences for health protections and CAA compliance that would flow from Plaintiffs' reading—extinguishing core police powers that Congress *requires* states to exercise to protect public health, based on energy regulators' setting an efficiency standard—are further evidence that Plaintiffs are wrong.

Notably, Plaintiffs' memorandum does not mention that the District has regulated NOx emissions from boilers, water heaters, and process heaters for decades pursuant to its traditional police powers to control air pollution and its obligations under the federal CAA. *See* ECF No. 1-2 at 3, 56–57. California's traditional police

---

[2] If Plaintiffs believe the District has not adequately supported its determination that a range of compliant zero-NOx technologies, including gas fuel cells, are available or in development, then the appropriate recourse is not a facial EPCA preemption challenge, but a challenge under California's Administrative Procedure Act. *See* Cal. Gov't Code § 11350 (providing for judicial review and invalidation of rules that are not supported by substantial evidence); *cf. Sierra Club v. Costle*, 657 F.2d 298, 364 (D.C. Cir. 1981) (finding the CAA allows regulations "to hold . . . industry to a standard of improved design and operational advances, so long as there is substantial evidence that such improvements are feasible and will produce the improved performance necessary to meet the standard"). The feasibility of any needed developments in compliance technologies is an inherently factual question to be answered in the first instance by agencies applying their judgment and expertise, rather than a legal question whose answer would be the same under any set of factual circumstances.

[3] Plaintiffs similarly fail to show that the Boiler Rule applies only to "covered products," as the District argues, which is a precondition to success on their facial challenge. *See* Def.'s Opp. to Pls.' Mot. Summ. J., ECF No. 53 at 29–31.

1    powers include "the power to protect the health of citizens in the state," including "air

2    pollution prevention." *Exxon Mobil Corp. v. U.S. EPA*, 217 F.3d 1246, 1255 (9th Cir.

3    2000); *see also Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440,

4    442 (1960) ("Legislation designed to free from pollution the very air that people

5    breathe clearly falls within the exercise of even the most traditional concept of . . . the

6    police power."). In 1947, in response to California's severe smog problem, the state

7    legislature authorized creation of the District's predecessor as the nation's first air

8    regulator. 1947 Cal. Stat. ch. 632 at 1641. When creating the District in 1976, the state

9    legislature recognized that the South Coast had "the most critical air pollution problem

10   in the nation." 1976 Cal. Stat. ch. 324, § 5 at 893. California law grants the District

11   "the primary responsibility for control of air pollution" from all stationary sources in

12   its region. *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 782 (9th

13   Cir. 2005) (quoting Cal. Health & Safety Code §§ 39002, 40000).

14          Here, Plaintiffs' preemption theory would mean that EPCA disables traditional

15   police powers. But courts are not to conclude that Congress meant "to significantly

16   alter the balance between federal and state power" absent "exceedingly clear

17   language" to that effect. *Sackett v. EPA*, 598 U.S. 651, 679 (2023). Plaintiffs have not

18   pointed to any language in EPCA expressing Congressional intent to narrow state's

19   powers to regulate air pollution.

20          Plaintiffs' claims of preemptive intent are even more implausible because,

21   unlike other local police powers, the pollution-control responsibilities at issue here are

22   ones federal law *requires* the District to exercise. "[R]epeals by implication are

23   disfavored, and when two statutes are capable of co-existence, it is the duty of the

24   courts, absent a clearly expressed congressional intention to the contrary, to regard

25   each as effective." *Floyd v. American Honda Motor Co., Inc.*, 966 F.3d 1027, 1034

26   (9th Cir. 2020) (internal quotes and citation omitted). The Court should therefore

27   reject Plaintiffs' overbroad interpretation of EPCA's preemption provision as

28   implicitly repealing the CAA provisions that establish the District's authority and

obligation to regulate emissions and meet federal air quality standards.[4] The CAA and EPCA should be read as "capable of co-existence," *see Floyd*, 966 F.3d at 1034, and as parts of a coherent whole.

A "defining feature" of the CAA is its "uniquely important system of cooperative federalism" that makes "the States and the Federal Government partners in the struggle against air pollution." *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 959 F.3d 1201, 1214 (9th Cir. 2020) (internal quotations and citations omitted). The CAA's cooperative federalism scheme demonstrates Congress's intent for state and local governments to maintain control over air pollution. As "[e]nvironmental regulation traditionally has been a matter of state authority," *Exxon*, 217 F.3d at 1255, "Congress itself contemplated that the states would retain leading roles in regulating air quality." *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011).

The CAA requires states to attain federal air quality standards, but it preserves state and local strategies over how to meet them. *See* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."); *id.* §§ 7407(a), 7410(a)(1); *Union Elec. Co.*, 427 U.S. at 267 (noting that the Act gives states "virtually absolute power in allocating emission limitations so long as the national standards are met"). To ensure that states retain the authority needed to meet these and related obligations, the

---

[4] The Ninth Circuit has declined to apply a "harmonization" analysis between measures that have not yet been incorporated into a state implementation plan under the Clean Air Act and the preemption provisions of other federal statutes. *See Ass'n of Am. R.R. v. SCAQMD*, 622 F.3d 1094, 1098 (9th Cir. 2010). Here, however, Defendant-Intervenors do not ask the Court to harmonize EPCA's preemption provision with the Boiler Rule itself (which has not been incorporated into California's state implementation plan). Instead, Defendant-Intervenors urge the Court to reject an interpretation of EPCA preemption that is wholly incompatible with the Clean Air Act provisions that authorize and obligate the District to enact pollution control measures such as the Boiler Rule.

CAA expressly recognizes and preserves states' rights to adopt or enforce "any standard or limitation respecting emissions of air pollutants." 42 U.S.C. § 7416. Here, the District found that it could not meet federal air quality standards without adopting the Boiler Rule. ECF No. 27-2 at 20, 131; ECF No. 1-2 at 123.

Under Plaintiffs' theory, decades of state regulations controlling NOx emissions would have been an impossibility. But Congress did not intend to disrupt decades of state regulations controlling NOx emissions when it enacted EPCA's preemption provision in 1987. At the time, Congress was well aware of states' obligations under the CAA. *See Pit River Tribe v. BLM*, 939 F.3d 962, 971 (9th Cir. 2019) ("[W]e assume Congress is knowledgeable about existing law when it enacts new legislation."). Before 1987, multiple state agencies had already enacted NOx emission standards for EPCA-covered appliances, some of which had become federally enforceable when the EPA approved their incorporation into state implementation plans. *See, e.g.*, 47 Fed. Reg. 29,231 (Jan. 7, 1986) (approving a local air district's emission standards for furnaces into California's State Implementation Plan); *see also Hall v. USDA*, 984 F.3d 825, 840 (9th Cir. 2020) ("Congress is presumed to be aware of an agency's interpretation of a statute."). And in 1990, right after enacting the EPCA preemption provision, Congress continued to strengthen the CAA. In fact, in response to the heightened demands of the 1990 Amendments, *see supra* p. 13, the number of states and air districts adopting emission standards for covered appliances multiplied, creating no apparent conflict with EPCA's preemption provision. *See, e.g.*, 89 Fed. Reg. 54,358 (July 1, 2024) (approving Utah's NOx emission standards for water heaters); 82 Fed. Reg. 17,136 (Apr. 10, 2017) (approving Washington Southwest Clean Air Agency standards including water heater and boiler emission standards); 73 Fed. Reg. 73,562 (Dec. 3, 2008) (approving Texas's NOx emission standards for water heaters). That is because state regulation of emission standards does not disrupt Congress's goal of "counteract[ing] the systems of separate state appliance standards" under EPCA. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at

500. Just as federal agencies have done for decades, this Court should construe EPCA's preemption provision in the way that fits "logically and comfortably into the body of both previously and subsequently enacted law," including amendments to and applications of the CAA from both before and after 1987. *Hall*, 984 F.3d at 838.

Plaintiffs' arguments also ignore the extreme air pollution at issue here. This is exactly the type of rule that Congress intended states to adopt to meet their statutory obligations to reduce air pollution from stationary sources. The Boiler Rule was adopted to meet the District's obligations under section 110, as it was "needed . . . in order to meet the National Ambient Air Quality Standards for ozone." ECF No. 1-2 at 123; *see also id.* at 20 (noting "that staff's proposed control options for [the Boiler Rule] are being adopted because . . . there is no other control options that meet . . . the air quality objectives"). The reductions that will be secured by the Boiler Rule achieve Congress's health protection goals and are essential to the South Coast's attainment of federal air quality standards. *See id.* at 19 (citing promulgation under section 110 of the CAA). As explained above, the South Coast is in "extreme" nonattainment for all federal ozone pollution standards, posing serious public health concerns in the region. 40 C.F.R. § 81.305. Without reductions, the District will face sanctions or other consequences for failure to achieve attainment. *See* 42 U.S.C. § 7511d. It will also have to charge large emitters a significant fee. *Id.* §§ 7511d(a)–(b).

The bottom line is that Plaintiffs' interpretation of EPCA would interfere with the District attaining federal and state air quality standards by preempting traditional state authority that is incorporated into the CAA. It is clear that EPCA was meant to co-exist with the regulatory scheme set by the CAA.

## IV. Plaintiffs' reliance on *California Restaurant Association* is unavailing.

The Ninth Circuit's decision in *California Restaurant Association* is not the talisman that Plaintiffs imagine it to be. To the extent that the fact-specific, avowedly "narrow" decision speaks to the preemption claim Plaintiffs advance here, it cuts against them.

As an initial matter, the EPCA-preempted municipal ordinance in *California Restaurant Association* was not targeted to air quality, let alone to an air pollution problem so "extreme[ly]" dangerous to human health as to put the jurisdiction under threat of onerous federal sanctions. 42 U.S.C. §§ 7511a(e), 7511d. Rather, it effectively barred the use in new buildings of every type of natural-gas appliance, irrespective of which pollutants it emitted in what quantities. In fact, the court highlighted that the ordinance did not resemble *any* familiar exercise of local police powers; it applied exclusively to the construction of buildings but was not placed in the city's building code, and it purported to address earthquake and other safety dangers from a dense network of underground gas lines, but left those lines in place, regulating only connections. *See* 89 F.4th at 1117 (Baker, concurring) ("[T]he challenged Ordinance does not implicate a utility's distribution of natural gas."). The court clarified that its decision had "no impact" on Berkeley's authority to enforce its ordinance against appliances for which no federal energy conservation standard was established, *id.* at 1106 n.7, and it took care to note that its holding did not "touch on" whether, in light of the Natural Gas Act, EPCA imposed on the city "an[] obligation to maintain" the availability of natural gas, *id.* at 1106.

When the court denied en banc rehearing and granted panel rehearing *sua sponte*, its amended opinion added new language more plainly declaring the decision's "limited" and "very narrow" reach. *See id.* at 1103 ("[O]ur holding here has nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used. We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available."); *id.* at 1106 ("This is a narrow opinion about Berkeley's building codes."). In concurrence, Judge Baker elaborated that the court's opinion posed no preemptive threat to "a host of state and local regulations" whose effect is to reduce "the quantity of [natural gas] directly consumed by a [covered] product at point of use," *id.* at 1117 (quoting 42 U.S.C.

§ 6291(4)), noting specifically that the absence from "EPCA's text or structure" of any evident "concern with state and local taxes that might reduce consumption of natural gas" meant that localities are "likely free to impose carbon taxes designed to discourage such consumption," *id.* For like reasons, he continued, EPCA preemption "likely has no application" to "a state or local government['s decision to] terminate[] existing gas utility service," even though the effect of doing so would be indistinguishable from that which Berkeley's law sought to accomplish.[5] *Id.*

These stated metes and bounds doom Plaintiffs' claim that *California Restaurant Association* supplies authority for preempting the Boiler Rule under EPCA. As explained *supra* in Section I, there is no "indication from its text or structure that EPCA speaks to" emission controls imposed by a state or subdivision charged with ambient air quality management responsibility. *Id.* at 1117. If *California Restaurant Association* does not prohibit states and localities from terminating gas utility service—notwithstanding the sweeping effect on the use of EPCA-approved gas appliances—the decision certainly does not foreclose lawful exercises of historic pollution control powers that are integral to the CAA. Nor is there anything novel about the Boiler Rule; as explained *supra* in Sections II and III, California has regulated ozone pollution in Los Angeles since the mid-twentieth century, and the District has regulated NOx emissions from boilers and water heaters since the end of that century. Thus, unlike the municipal ordinance in *California Restaurant Association*, there is no doubt that the Boiler Rule is a legitimate exercise of the District's state law authority.

---

[5] As Judge Baker explained, this limitation is not specific to any particular type of energy resource. EPCA, he explained, "almost certainly does not affect state or local measures curtailing the distribution of water . . . [or] electricity due to wildfire risk or grid limitations," even though such measures would likewise reduce the "use" of appliances requiring those resources, citing with approval an amicus brief that collected examples of "state and local authority to limit electricity and water distribution for various public purposes." 89 F.4th at 1117 n.9.

Last, the federal law assignment of responsibility for combatting air pollution is fundamentally different from the Natural Gas Act regime found to be compatible with the application of EPCA preemption in *California Restaurant Association*. While the Natural Gas Act simply excludes certain state regulation from its grant of exclusive federal authority over interstate commerce in natural gas, Congress has expressly affirmed in the CAA that state and federal governments share authority over air pollution and that states must regulate emissions to meet federal air quality standards. *Compare* 15 U.S.C. § 717(b), *with* 42 U.S.C. §§ 7416, 7410.

Courts have routinely applied the *California Restaurant Association* decision narrowly, consistent with its multiple, express disavowals of breadth. This Court should follow suit.

## V.    Plaintiffs are not entitled to declaratory or injunctive relief.

Plaintiffs are not entitled to their requested declaratory or injunctive relief. Plaintiffs' EPCA preemption claim fails on the merits, and neither the balance of hardships nor the public interest supports enjoining the Boiler Rule's critical air quality and health benefits.

A claim for declaratory judgment "rises or falls" with the underlying substantive claim. *Agensys, Inc. v. Regents of the Univ. of Cal.*, 2024 WL 5679166, at *8 (C.D. Cal. Oct. 22, 2024) (unpublished). Plaintiffs' underlying EPCA preemption claim fails for the reasons given *supra* in Sections I–IV. Plaintiffs are therefore not entitled to declaratory judgment.

Plaintiffs are also not entitled to a permanent injunction. As explained, Plaintiffs' claim fails on the merits; they therefore have not satisfied the requirement of "actual success on the merits." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019).

Nor have Plaintiffs established "that the balance of hardships justify a remedy in equity." *Edmo*, 935 F.3d at 784. In fact, Plaintiffs make no attempt to evaluate the balance of hardships. Pls.' Mem. at 23. Plaintiffs also ignore the District's interest in

protecting health and air quality for the South Coast's more than 17 million residents,
*see* ECF No. 1-2 at 123, as well as the hardships that an injunction would inflict on
Defendant-Intervenors and their members. Defendant-Intervenors collectively
represent over 36,000 members who live, work, and recreate in the South Coast, and
whose ability to access the benefits of better air quality is jeopardized if the Boiler
Rule is enjoined. Mem. P. & A. Supp. Def.-Intervenors' Mot. to Intervene, ECF No.
27-1 at 15–16. Without these air quality improvements from the Boiler Rule, members
will face serious pollution-related health harms, *see* Decl. of Andrea Vidaurre in Supp.
of Mot. to Intervene, ECF No. 27-3 ¶¶ 7, 10; Decl. of Gem M. Montes in Supp. of
Mot. to Intervene, ECF No. 27-4 ¶ 15; Decl. of Kimberly R. Orbe in Supp. of Mot. to
Intervene, ECF No. 27-5 ¶¶ 8–9, 12; Decl. of Rodney P. Boone in Supp. of Mot. to
Intervene, ECF No. 27-6 ¶ 19, and will be unable to spend time outdoors without
fearing these health harms, *see* ECF No. 27-3 ¶¶ 10–11; ECF No. 27-4 ¶¶ 10–14; ECF
No. 27-5 ¶ 10; ECF No. 27-6 ¶ 15. An injunction would especially harm Defendant-
Intervenors' members who live in the areas hardest hit by pollution from boilers, such
as the Inland Empire. ECF No. 27-4 ¶ 17; ECF No. 27-5 ¶ 5. Plaintiffs do not dispute
the air quality related harms that are mitigated by the Boiler Rule. The Court must
weigh these environmental and health interests in determining whether to grant an
injunction. *League of Wilderness Def./Blue Mountains Biodiversity Project v.
Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). Meanwhile, Plaintiffs' asserted
business interests have only a speculative, attenuated connection to the Boiler Rule.
*See* Pls.' Mem. at 20–22. The interest in improved air quality and public health shared
by the District and Defendant-Intervenors' tens of thousands of members across the
South Coast outweighs Plaintiffs' speculative interests in avoiding regulation.

Finally, the public interest weighs against a permanent injunction. *See Edmo*,
935 F.3d at 784. Plaintiffs argue that an injunction would serve an interest in uniform
national energy policy under EPCA. Any such interest is simply not implicated by the
Boiler Rule. As discussed *supra* in Section I–II, the Rule does not concern energy use,

and it does not place any restrictions on appliances' energy efficiency or fuel consumption. Instead, the Rule advances the long-established public interest in improving air quality, protecting public health, and avoiding CAA penalties for failure to meet standards. The Court's evaluation of the public interest must include environmental and health interests. *See League of Wilderness Def.*, 752 F.3d at 765. Because the Boiler Rule significantly advances the public interest in air quality and public health without detracting from any interest implicated by EPCA, the Court must deny Plaintiffs' request for injunctive relief.

## CONCLUSION

The District's adoption of the Boiler Rule was an entirely proper exercise of the traditional state authority to regulate air pollution that was specifically incorporated into the CAA. It does not concern energy use. Plaintiffs seek to bar any zero-emission standards for covered appliances, even if those standards say nothing about appliances' energy use, and even if compliant gas-fired equipment is available. Such an expansive reading of EPCA's preemption provision is inconsistent with the statutory text. Accordingly, Plaintiffs' motion for summary judgment must be denied, and Defendant's motion for summary judgment must be granted.

Respectfully submitted,

Dated: May 12, 2025        /s/    Candice L. Youngblood

CANDICE L. YOUNGBLOOD (SBN 328843)
ADRIANO L. MARTINEZ (SBN 237152)
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
cyoungblood@earthjustice.org
amartinez@earthjustice.org
Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for Defendant-Intervenors*
*People's Collective for Environmental Justice,*
*Sierra Club, and Industrious Labs*

32

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NIHAL SHRINATH (SBN 327921)
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
nihal.shrinath@sierraclub.org
Tel: (415) 977-5566

JAMES A. DENNISON (*Pro Hac Vice*)
Sierra Club
1650 38th St., Suite 103W
Boulder, CO 80301
jim.dennison@sierraclub.org
Tel: (435) 232-5784

*Counsel for Defendant-Intervenor
Sierra Club*


SEAN H. DONAHUE (SBN 264284)
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
sean@donahuegoldberg.com
Tel: (202) 277-7085

*Counsel for Defendant-Intervenor
Industrious Labs*

DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (Civ. No. 2:24-cv-10482 PA (PDx))