**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RINNAI AMERICA CORPORATION; NORITZ AMERICA CORPORATION; NATIONAL ASSOCIATION OF HOME BUILDERS; CALIFORNIA STATE PIPE TRADES COUNCIL; CALIFORNIA MANUFACTURERS & TECHNOLOGY ASSOCIATION; CALIFORNIA RESTAURANT ASSOCIATION; RESTAURANT LAW CENTER; CALIFORNIANS FOR HOMEOWNERSHIP, INC.; CALIFORNIA HOTEL & LODGING ASSOCIATION; CALIFORNIA APARTMENT ASSOCIATION; PLUMBING-HEATING-COOLING CONTRACTORS OF CALIFORNIA,<br><br>*Plaintiffs - Appellants*,<br><br>v.<br><br>SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,<br><br>*Defendant - Appellee*, | No. 25-5129<br><br>D.C. No. 2:24-cv-10482-PA-PD<br><br>OPINION |

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE; SIERRA CLUB; INDUSTRIOUS LABS,

*Intervenor-Defendants - Appellees*.

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted February 5, 2026
Pasadena, California

Filed July 2, 2026

Before: Kenneth K. Lee, Lucy H. Koh, and Ana de Alba, Circuit Judges.

Opinion by Judge Koh;
Dissent by Judge Lee

## SUMMARY*

### Environmental Law

Affirming the district court's grant of summary judgment to South Coast Air Quality Management District ("District"), the agency responsible for air pollution control in the South Coast Air Basin ("Basin"), the panel held that the Energy Policy and Conservation Act ("EPCA") does not preempt the District's amended Rule 1146.2, which seeks to achieve compliance with federal ozone standards under the Clean Air Act ("CAA"). The Basin has the worst smog (or ground-level ozone) in the country and is in "extreme" nonattainment with all federal ozone standards and thus risks losing its federal highway funding and being assessed substantial penalties. Since its creation in the 1970s, the District has implemented rules regulating oxides of nitrogen emissions from appliances and other stationary sources in an effort to bring itself into compliance with the federal air quality standards. Numerous other jurisdictions, including Texas and Utah, have adopted similar oxides of nitrogen emissions standards for appliances, and the EPA has routinely approved these standards.

In 2022, the District determined that widespread adoption of a zero emissions standard across all stationary sources, including appliances, was the only viable way to bring the Basin into compliance with federal ozone standards. As a result, the District passed Rule 1146.2, which over the next decade phases in zero oxides of nitrogen

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

emission standards on certain appliances. The Bay Area enacted similar appliance standards in March 2023, and to date, no challenge to those standards has been filed.

The panel held that the District's effort to comply with the federal air quality standards under the CAA was not preempted by EPCA, which was designed instead to counteract the patchwork of energy efficiency standards for appliances that existed in the 1980s. The panel held that nothing in the text, structure, or history of EPCA suggested that Congress intended to interfere with states' ability to use these well-established methods to achieve compliance with federal air quality standards under the CAA. The plaintiffs failed to identify any language in EPCA indicating Congress's intent to preempt CAA emissions regulations. The panel held that *California Restaurant Ass'n v. City of Berkeley* ("*CRA*"), 89 F.4th 1094 (9th Cir. 2024), explicitly declined to address whether EPCA preempts state regulations enacted pursuant to another federal statute and repeatedly acknowledged that it was a "very narrow" decision. Moreover, the named plaintiff California Restaurant Association, which is also a plaintiff in the instant case, explicitly conceded in *CRA* that "regulations of nitrogen oxide emissions" do not "concern energy use" and are not "barred by [*CRA*'s] interpretation of the EPCA."

The panel further held that the plaintiffs' facial challenge failed because the District's Rule 1146.2 regulates emissions from process heaters, which are not among the list of covered products under EPCA and for which the Department of Energy has not issued any federal standards. Thus, the plaintiffs failed to show that the Rule is unconstitutional in every application.

Dissenting, Judge Lee wrote that *California Restaurant Ass'n v. City of Berkeley* controls this case. Just like in *California Restaurant Ass'n v. City of Berkeley*, EPCA preempts the District's rule on oxides of nitrogen emissions because it similarly regulates "energy use" of a "covered product."

---

## COUNSEL

Brian C. Baran (argued), Reichman Jorgensen Lehman & Feldberg LLP, Washington, D.C.; Courtland L. Reichman, Reichman Jorgensen Lehman & Feldberg LLP, Redwood Shores, California; Sarah O. Jorgensen, Reichman Jorgensen Lehman & Feldberg LLP, Atlanta, Georgia; Sean M. Kneafsey, Kneafsey Firm, Los Angeles, California; Luke Dowling and John J. Davis Jr., McCracken Stemerman & Holsberry LLP, Oakland, California; Angelo I. Amador, Restaurant Law Center, Washington, D.C.; Matthew P. Gelfand, Californians for Homeownership Inc., Sacramento, California; for Plaintiffs-Appellants.

Matthew D. Zinn (argued), Ryan K. Gallagher, and Lauren M. Tarpey, Shute Mihaly & Weinberger LLP, San Francisco, California; Barbara Baird, Chief Deputy District Counsel; Bayron T. Gilchrist, General Counsel; South Coast Air Quality Management District, Diamond Bar, California; for Defendant-Appellee.

Candice L. Youngblood and Adriano L. Martinez, Earthjustice, Los Angeles, California; James A. Dennison, Sierra Club, Boulder, Colorado; Sean H. Donahue, Donahue Goldberg & Herzog, Washington, D.C.; for Intervenor-Defendants-Appellees.

Edward P. Sangster, Ankur K. Tohan and David Wang, K&L Gates LLP, San Francisco, California, for Amicus Curiae Navien, Inc..

J. Mark Little, Baker Botts LLP, Houston, Texas; Daniel Rankin, Baker Botts LLP, Austin, Texas; Michael Murray, American Gas Association, Washington, D.C.; for Amicus Curiae American Gas Association.

Cara A. Horowitz, Brennon K. Mendez, and Tiffany Deguzman, Frank G. Wells Environmental Law Clinic, UCLA School of Law, Los Angeles, California, for Amicus Curiae Northeast States for Coordinated Air Use Management.

Daniel N. Carpenter-Gold, Esther Agbaje, and Mia M. Hammersley, Public Health Law Center, St. Paul, Minnesota, for Amicus Curiae Public Health Law Center.

Jonathan A. Wiener and Benjamin P. Lempert, Deputy Attorneys General; Myung J. Park, Supervising Deputy Attorney General; Annadel A. Almendras, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Francisco, California; for Amicus Curiae California Air Resources Board.

## OPINION

KOH, Circuit Judge:

Defendant-Appellee South Coast Air Quality Management District (the "District") is the agency responsible for air pollution control in the South Coast Air Basin (the "Basin"), a region that includes large portions of Los Angeles, Orange, Riverside, and San Bernardino counties. The Basin has the worst smog, or ground-level ozone, in the country and is in "extreme" nonattainment with all federal ozone standards under the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq*.

On June 7, 2024, after determining that widespread adoption of zero emissions technology across all stationary sources was the only viable way to bring the Basin into compliance with federal ozone standards, the District adopted amendments to Rule 1146.2 ("Rule 1146.2" or the "Rule"). As amended, Rule 1146.2 phases in prohibitions on the manufacture, sale, or installation of gas-fired water heaters, boilers, and process heaters that emit more than zero oxides of nitrogen ("NOx"). Plaintiffs-Appellants, who include manufacturers of gas appliances and various industry groups, filed suit challenging Rule 1146.2 on the grounds that it is preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201 *et seq*. The district court granted summary judgment in favor of the District. We affirm.

# I. BACKGROUND AND PROCEDURAL HISTORY

## A. Regulatory Background

### 1. Clean Air Act

The regulation of air pollution has historically been a matter of state authority. *See Exxon Mobil Corp. v. E.P.A.*, 217 F.3d 1246, 1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state."). Beginning in the 1950s, however, Congress began enacting a series of laws gradually increasing federal involvement in the prevention of air pollution. These early federal efforts were focused primarily on funding research and providing technical and financial assistance to the states. *See Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 63-64 (1975) (discussing history of federal involvement). In 1963, Congress passed the first iteration of the CAA, the Clean Air Act of 1963, Pub. L. No. 88-206, 77 Stat. 392, which, in addition to expanding federal research efforts and funding to the states, authorized federal authorities "to intervene directly to abate interstate pollution in limited circumstances." *Train*, 421 U.S. at 64.

The Air Quality Act of 1967, Pub. L. No. 90-148, 81 Stat. 485, marked the beginning of a shift towards greater federal involvement in regulating air pollution. The 1967 Act required the Secretary of the Department of Health, Education and Welfare to promulgate air quality criteria for various regions across the United States. *See* Air Quality Act of 1967 § 107(b). However, the 1967 Act "reiterated the premise . . . 'that the prevention and control of air pollution at its source is the primary responsibility of States and local governments.'" *Train*, 421 U.S. at 64 (quoting Air Quality Act of 1967 § 101(a)(3)). Thus, the states "generally retained

wide latitude to determine both the air quality standards which they would meet and the period of time in which they would do so." *Id.*

The Air Quality Act of 1967 ultimately proved ineffective at addressing the growing problem of air pollution, in part due to the lack of sufficient federal enforcement mechanisms. *See id.* In response, Congress passed the Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676, which created the modern federal air pollution control program. *See Train*, 421 U.S. at 64. The 1970 amendments to the CAA "sharply increased federal authority and responsibility in the continuing effort to combat air pollution," while at the same time preserving the principle that "the primary responsibility for assuring air quality" belonged with the states. *Id.* (quoting Clean Air Amendments of 1970 § 107(a)).

The CAA aims to "promote reasonable Federal, State, and local governmental actions . . . for pollution prevention." 42 U.S.C. § 7401(c).[1] To achieve this goal, the CAA outlines a framework of "federal-state collaboration." *Ohio v. E.P.A.*, 603 U.S. 279, 283 (2024) (quoting *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 124 (D.C. Cir. 2015)). The best known example of this federal-state framework is the CAA's provisions regarding National Ambient Air Quality Standards ("NAAQS"). Under the CAA, the U.S. Environmental Protection Agency ("EPA") is required to set standards for certain air pollutants as necessary to protect the public health. § 7409(a)(1), (b)(1). The EPA must also identify areas that have not attained these federal standards (so-called "nonattainment" areas).

[1] Hereinafter, all references to "§" refer to Title 42 of the United States Code, unless otherwise indicated.

§ 7407(d). States are then required to submit a State Implementation Plan ("SIP") for the "implementation, maintenance, and enforcement" of the NAAQS in their jurisdictions within a specified time period. § 7410(a)(1). In crafting SIPs, states bear the "initial and primary responsibility for deciding what emissions reductions will be required from which sources." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 470 (2001); *see also* § 7401(a)(3) (stating that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments").

Although the CAA gives states latitude in deciding how best to curb emissions, it requires that nonattainment areas implement "all reasonably available control measures as expeditiously as practicable" or face certain penalties. §§ 7502(c)(1), 7413. When prior versions of the CAA proved ineffective at adequately controlling pollutants,[2] Congress amended the CAA in 1990, Pub. L. No. 101-549, 104 Stat. 2399, to provide more comprehensive regulation of specific pollutants, including ozone and particulate matter, and to increase the consequences for nonattainment. *See S. Coast Air Quality Mgmt. Dist. v. E.P.A.*, 472 F.3d 882, 887-88 (D.C. Cir. 2006) (discussing 1990 amendments). The 1990 amendments created a new classification scheme for nonattainment areas—ranked from "marginal" to "extreme," § 7511(a)(1)—and strengthened enforcement measures

[2] For example, in response to "widespread failure by the states to attain NAAQS," Congress amended the Clean Air Act in 1977 to allow the states more time to attain NAAQS. *Coal. for Clean Air v. S. Cal. Edison Co.*, 971 F.2d 219, 222 (9th Cir. 1992).

against the worst nonattainment areas, § 7511d. The potential penalties faced by "extreme" nonattainment areas include the imposition of large annual fees for every ton of pollutant emitted over the baseline and the loss of federal highway funding. §§ 7509(b), 7413, 7511d.

**2. Energy Policy and Conservation Act**

In 1975, five years after the passage of the Clean Air Amendments of 1970, Congress passed EPCA. Enacted in the aftermath of the oil embargo imposed against the United States by certain countries in 1973 and 1974, "EPCA was designed, in part, to reduce the United States' 'domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.'" *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498-99 (9th Cir. 2005) (quoting S. Rep. No. 94-516, at 117 (1975)). When first enacted, EPCA was concerned primarily with labeling on consumer appliances. Because "Congress believed that better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary," EPCA required that manufacturers label appliances with measures of energy efficiency and energy use and "provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Id.* at 499. In keeping with this focus on labeling, EPCA contained a provision expressly preempting state regulations insofar as "they were 'other than' the applicable federal rules for testing and labeling." *Id.* (quoting EPCA, Pub. L. No. 94-163, § 327(a)(1), 89 Stat. 871, 927 (1975)).

In 1978, Congress amended EPCA to improve the procedures for establishing national standards and to "ensure

that efficiency improvements will be made expeditiously." *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362 (D.C. Cir. 1985) (quoting H.R. Rep. No. 496, pt. 4 (1977)). The amended version of EPCA created "a nationwide conservation program for appliances and required the [Department of Energy ("DOE")] to prescribe minimum energy efficiency standards for thirteen covered products." *Air Conditioning*, 410 F.3d at 499.

The DOE, however, declined to promulgate any federal standards and instead adopted a general policy of granting preemption waivers to states. *Id.* This resulted in a patchwork of different minimum energy efficiency standards for the same appliances across the states, which complicated appliance manufacturers' "design, production and marketing plans." *Id.* at 500 (quoting S. Rep. No. 100-6, at 4 (1987)). In response, manufacturer trade associations negotiated with the Natural Resources Defense Council to establish uniform national standards, which Congress later enacted into law through the passage of the National Appliance Energy Conservation Act of 1987. *Id.* at 499-500. This 1987 law amended EPCA and broadened its preemption provision "to counteract the systems of separate state appliance standards that had emerged." *Id.* at 500.

EPCA's current preemption provision[3]—the one at issue in this case—states that, subject to various exceptions, "effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to

[3] The current version of this provision reflects minor amendments made since 1987, none of which are relevant to this appeal.

such product." § 6297(c). EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title," § 6291(4), and defines "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title," § 6291(5). "Energy," in turn, is defined as "electricity, or fossil fuels." § 6291(3). "Covered products" include consumer products such as refrigerators, air conditioners, water heaters, furnaces, and kitchen ovens. §§ 6291(1), 6292.

### B. Factual Background

The South Coast Air Quality Management District is the agency responsible for air pollution control for the South Coast Air Basin (the "Basin"), an area that includes Orange County and the urban portions of Los Angeles, Riverside, and San Bernardino counties. More than 17 million people live in the Basin. The Basin has the worst smog, or ground-level ozone, in the country and is in "extreme" nonattainment for all federal ozone pollution standards. *See* 40 C.F.R. § 81.305. Ground-level ozone forms when volatile organic compounds interact with NOx in the atmosphere in the presence of sunlight. Exposure to high levels of ozone carries significant health risks, including asthma, chronic bronchitis, emphysema, increased susceptibility to respiratory infection, and premature death. In 2020, nine of the country's top ten locations most frequently exceeding the 2015 federal 8 hour ozone standard[4]—as well as the location

[4] In 2015, the EPA set the NAAQS for ozone at a daily maximum 8 hour average of 70 parts per billion ("2015 federal 8 hour ozone standard"). *See* 40 C.F.R. § 50.19.

with the highest number of days over the 8 hour ozone standard and the location with the single highest recorded maximum 8 hour average ozone concentration—were all located within the Basin.

Recognizing that the Basin faced "the most critical air pollution problem in the nation," the California legislature established the District in 1976 to address the issue. 1976 Cal. Stat. 891, 893. Under California law, the District is required to adopt and amend air quality management plans to achieve and maintain federal and state ambient air quality standards. *See* Cal. Health & Safety Code § 40460(a). These plans are submitted to the EPA and serve as the federally required SIP under the CAA. *See id.* § 40460(d).

Since its creation in the 1970s, the District has implemented rules regulating NOx emissions from appliances and other stationary sources. The District adopted the first iteration of the challenged rule, Rule 1146.2, in 1998. Initially, Rule 1146.2 limited NOx emissions to 30 parts per million ("ppm") on most covered appliances. The Rule was subsequently amended in 2005, 2006, and 2018 to cover a greater number of appliances and to further limit emissions to 20 ppm for most covered appliances. Despite these and other efforts to reduce emissions, the Basin has been unable to attain compliance with federal ozone standards. The District is required to bring the Basin into attainment of the 2015 federal 8 hour ozone standard by the year 2038. To do so, the District must achieve a reduction in NOx emissions of 124 tons per day, which equates to a 67 percent reduction beyond the reductions projected by the previously adopted rules and an 83 percent reduction below current levels.

In December 2022, the District adopted the most recent amendment to the District's air quality management plan (the "2022 Plan"). The 2022 Plan found that "there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technology across all . . . stationary sources, large and small." To address this determination, the 2022 Plan called for the District to require zero NOx emissions from commercial water heaters. According to the District's estimates, emissions from appliances account for nearly 20 percent of the emissions from the residential and commercial combustion stationary sources the District regulates.

The District began rulemaking proceedings to implement the 2022 Plan in April 2023. On June 7, 2024, following fourteen months of deliberation, the District adopted amendments to Rule 1146.2. The stated purpose of the Rule is "to reduce Oxides of Nitrogen (NOx) emissions from Water Heaters, Boilers, and Process Heaters fired with, or designed to be fired with, natural gas." The Rule prohibits the manufacture, sale, or installation of large water heaters, small boilers, and process heaters that emit more than zero NOx. The Rule's implementation is subject to staggered deadlines based on the type of unit and whether it is installed in a new or existing building. The first compliance deadline, which applies to a limited subset of units installed in new buildings, took effect January 1, 2026. Once fully implemented, the Rule will eliminate nearly 10 percent of emissions within the Basin.

### C. Procedural Background

On December 5, 2024, Plaintiffs filed a lawsuit challenging the Rule in the Central District of California. In the operative first amended complaint, Plaintiffs asserted a

single cause of action alleging that the Rule is preempted by EPCA. Plaintiffs brought this claim as a facial challenge and asserted that "[t]here is no set of circumstances under which the rule can be valid under federal law." Plaintiffs requested that the court issue a "declaratory judgment . . . that the District's Rule 1146.2 is preempted by federal law . . . and is therefore void and unenforceable," as well as "a permanent injunction enjoining the District from enforcing or attempting to enforce Rule 1146.2's zero-NOx emissions limits."

On April 14, 2025, Plaintiffs moved for summary judgment. The District filed a cross-motion on May 12, 2025. On July 18, 2025, the district court denied Plaintiffs' motion, granted the District's motion, and entered judgment in favor of the District. On July 22, 2025, the district court made modest modifications to its summary judgment order. As set forth in its amended order, the district court held that the Rule was not preempted because it "does not concern the energy use of appliances under the EPCA." The district court explained that "the Rule regulates appliances' NOx emissions in order to address air pollution issues and the health risks associated with the combustion of natural gas," and "does not implicate any of the issues the EPCA was intended to address."

On August 27, 2025, Plaintiffs moved before the district court for an injunction pending appeal. The district court denied the motion on September 29, 2025. On October 6, 2025, Plaintiffs filed a motion for an injunction pending appeal before this Court, which we denied on December 22, 2025.

## II. STANDARD OF REVIEW

We "review de novo the district court's order granting summary judgment on preemption grounds." *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024).

Where, as here, a statute contains an express preemption clause, we look to the "text, framework, and historical context" of the statute to discern Congress's intent. *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 552 (9th Cir. 2022); *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) ("We focus first on the statutory language, which necessarily contains the best evidence of Congress' pre-emptive intent." (citation modified)). Although we begin with the wording of the preemption clause, we "must also consider the statute as a whole to determine whether the local [regulation] actually conflicts with the overall federal regulatory scheme." *R.J. Reynolds*, 29 F.4th at 553 (internal quotation marks and citation omitted).

## III. DISCUSSION

The question presented in this appeal is whether EPCA preempts the District's efforts to comply with its obligations under the CAA by enacting a zero NOx emissions standard for appliances. We hold that it does not. Under the CAA, states are required to take "all reasonably available control measures" to reduce emissions from existing sources. § 7502(c)(1). Pursuant to the CAA, the District and numerous other states and local regulators have long regulated appliance emissions, and the EPA has routinely approved such regulations. Nothing in the text, structure, or history of EPCA suggests that Congress intended to interfere with states' ability to use these well-established methods to

achieve compliance with federal air quality standards under the CAA.

Plaintiffs' arguments to the contrary rely exclusively on our decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) [hereinafter *CRA*]. But as explained below, Plaintiffs read *CRA* far too broadly. Contrary to Plaintiffs' assertions, our "very narrow" decision in that case did not consider the issue now before us: whether EPCA preempts state regulations enacted pursuant to another federal statute, like the CAA. *Id.* at 1106.

Finally, even if we were to accept Plaintiffs' interpretation of the scope of EPCA's preemption provision, their facial challenge nonetheless fails. Plaintiffs cannot show that the Rule is unconstitutional in every application because the Rule regulates emissions from process heaters, which are not among the list of covered products under EPCA and for which the DOE has not issued any federal standards.

For each of these reasons, addressed in turn below, we affirm the district court's grant of summary judgment in favor of the District.

**A. EPCA's Preemptive Scope Does Not Cover State Appliance Emissions Standards Enacted Pursuant to the CAA**

EPCA's preemption provision states, in relevant part, that "effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." § 6297(c). "Energy use," in

turn, is defined as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." § 6291(4).

As Plaintiffs concede, the text of EPCA contains no mention of emissions regulations. Plaintiffs nonetheless contend that EPCA's preemption provision must be construed as prohibiting state and local regulators like the District from adopting zero NOx emissions standards consistent with the CAA. We find no support for that view in the text, framework, or history of EPCA.

Enacted 5 years after the passage of the Clean Air Amendments of 1970, EPCA was initially designed to establish energy usage labeling requirements on appliances in response to the oil crisis of the 1970s. EPCA was then expanded in 1978 to create "a nationwide conservation program for appliances" and to require the DOE to establish "minimum energy efficiency standards for . . . covered products." *Air Conditioning*, 410 F.3d at 499. The DOE, however, failed to do so and instead adopted a general policy of granting preemption waivers to states, which led to a patchwork of different state efficiency standards for the same appliances. *Id.* at 500. Congress responded by amending EPCA again in 1987 and broadening its preemption provision "to counteract the systems of separate state appliance standards that had emerged." *Id.*

The history of EPCA thus makes clear that Congress was concerned with the establishment of uniform conservation standards to remedy the patchwork of different state standards that existed under the previous regime. This focus is reflected in the text of EPCA's preemption provision. That provision provides that once the DOE establishes a national

energy conservation standard for a covered product, state regulations concerning the energy use or energy efficiency of that product are preempted. § 6297(c). The exemptions to EPCA preemption further underscore this focus. The enumerated list of exemptions includes certain building codes, state procurement standards that are more stringent than federal energy conservation standards, and waivers "to meet unusual and compelling State or local energy or water interests." § 6297(d)-(f). Each exemption relates to the energy efficiency and energy use of covered products.

Notably absent from the text and legislative history of EPCA is any mention of appliance emissions standards. Indeed, although EPCA grants the DOE the authority to set *energy conservation* standards for appliances, § 6295, nothing in that grant of authority suggests that the DOE also possesses the authority to dictate state *emissions* standards.[5] That authority instead falls squarely within the framework of "federal-state collaboration" established by the CAA under the purview of the EPA. *Ohio*, 603 U.S. at 283; *see* § 7409(b)(1). As the U.S. Supreme Court has stated in an analogous context, the EPA's statutory duty to protect the public's health and welfare is "wholly independent" of another agency's "mandate to promote energy efficiency." *Massachusetts v. E.P.A.*, 549 U.S. 497, 531-32 (2007) (rejecting the EPA's argument that it lacked the authority to regulate greenhouse gas emissions from motor vehicles "because doing so would require it to tighten mileage

[5] In relevant part, EPCA defines an "energy conservation standard" as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product." 42 U.S.C. § 6291(6).

standards, a job (according to EPA) that Congress has assigned to [the Department of Transportation]").

Under the CAA, the EPA is required to set standards for air pollutants as necessary to protect the public health, *see* § 7409(a)(1), and states are required to take "all reasonably available control measures as expeditiously as practicable" to achieve compliance with those standards, including by reducing "emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology," § 7502(c)(1). States that do not comply with these obligations face substantial penalties. Areas like the Basin, for example, that remain in "extreme" nonattainment with federal standards may be fined large annual fees for every ton of pollutant emitted over the baseline and may lose their federal highway funding. §§ 7509(b), 7413, 7511d.

For decades, state and local regulators have utilized appliance emissions regulations as an important tool to help achieve compliance with the NAAQS. The District is one example. Since its inception in the 1970s, the District has regulated emissions from appliances like furnaces and water heaters. The District enacted the first iteration of Rule 1146.2 in 1998 and has subsequently amended the Rule several times to further restrict appliance emissions. These regulations are a critical part of the District's pollution control efforts, as emissions from appliances account for almost 20 percent of all emissions from the stationary sources the District regulates. Indeed, the District's 2022 Plan found that widespread adoption of a zero emissions standard across all stationary sources, including appliances, was the only viable way to bring the Basin into compliance with federal ozone standards. In other words, the District has

determined that it *cannot* comply with the CAA *unless* it enacts zero emissions standards like Rule 1146.2.[6]

The District is not the only local regulatory agency that has relied on appliance emissions regulations. Amici identify 35 other jurisdictions ranging from Texas to Utah to Washington that have adopted similar low, ultra-low, and zero NOx emissions standards for appliances. Moreover, the Bay Area enacted zero NOx emissions standards for commercial water heaters and furnaces in March 2023, and yet to date, over three years later, no challenge to those standards has been filed. Over 60 other cities and counties in California, as well as states such as Colorado and Maryland, are likewise considering policies for zero emissions appliances.

Critically, the federal government has not sought to prevent states from enacting these appliance emissions regulations but instead has supported the states' efforts. The EPA has approved appliance emissions standards submitted by local regulators, including the District, in State Implementation Plans since at least 1986. *See, e.g.*, 51 Fed. Reg. 600, 602 (Jan. 7, 1986) (approving the Bay Area Air Quality Management District's NOx emissions standards for

[6] Plaintiffs agree. Their reply brief states, "Plaintiffs do not doubt that Congress has put the District between a rock and a hard place by requiring it to meet ambitious air quality targets while denying it control over major emission sources." Nonetheless, the dissent engages in speculation without any basis in the record that "California and the District could reduce NOx in countless ways beyond the rule at issue here." Dissent at 41 n.4. Even Plaintiffs do not engage in such speculation. We note that the District lacks the authority to enact the types of regulations proposed by the dissent. For example, under California law, the District lacks the authority to regulate emissions from motor vehicles. *See* Cal. Health & Safety Code § 39002.

residential central furnaces); 67 Fed. Reg. 16,640 (Apr. 8, 2002) (approving the District's NOx emissions standards for boilers, steam generators, process heaters, and water heaters); 73 Fed. Reg. 73,562, 73,570-71 (Dec. 3, 2008) (approving Texas's NOx emissions standards for water heaters, small boilers, and process heaters); 89 Fed. Reg. 54,358, 54,360 (July 1, 2024) (approving Utah's NOx emissions standards for gas fired water heaters). In fact, in the case of San Joaquin Valley (which, similar to the District, is in "serious" nonattainment with federal standards), the EPA in 2022 expressed concern that San Joaquin Valley's proposed SIP was insufficient because, in part, it *lacked* a zero emissions standard. *See* 87 Fed. Reg. 60,494, 60,512 (Oct. 5, 2022). The EPA's approval of these state appliance emissions standards imbues them with "the force and effect of federal law," which, among other things, makes them enforceable in federal court. *Safe Air for Everyone v. E.P.A.*, 488 F.3d 1088, 1097 (9th Cir. 2007) (quoting *Trs. for Alaska v. Fink,* 17 F.3d 1209, 1210 n.3 (9th Cir. 1994)); *see also* § 7604(a), (f)(4).

Given the extensive history of federal involvement in the regulation of air pollution, Plaintiffs bear a "heavy burden of showing" that Congress intended for EPCA to intrude upon the intricate regulatory scheme established by the CAA. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). Indeed, when faced with a claimed conflict between two federal statutes, "we come armed with the 'strong presumption' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Id.* (quoting *United States v. Fausto*, 484 U.S. 439, 452, 453 (1988) (citation modified)).

Plaintiffs have not offered anything to rebut this presumption. As Plaintiffs concede, the text of EPCA makes no mention of emissions regulations. Nor have Plaintiffs pointed to a single piece of EPCA's legislative history mentioning emissions regulations of any kind, let alone indicating that EPCA was intended to preempt states' ability to regulate appliance emissions. At the time of EPCA's initial passage in 1975, Congress was no doubt aware of the obligations it had imposed on the states through the CAA amendments passed just five years prior. *See Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 971 (9th Cir. 2019) ("[W]e assume Congress is knowledgeable about existing law when it enacts new legislation."). When EPCA's preemption provision was later amended in 1987, the District and multiple other state regulators had already promulgated, and the EPA had approved, NOx emissions standards for EPCA-covered appliances. *See Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 840 (9th Cir. 2020) ("Congress is presumed to be aware of an agency's interpretation of a statute."). Yet at no point in crafting or amending EPCA did Congress choose to include language calling into question the states' ability to comply with their obligations under the CAA by enacting appliance emissions regulations.

Moreover, when Congress amended the CAA in 1990 to strengthen its enforcement efforts against nonattainment areas, Congress once again did not address, let alone express concern about, EPCA preemption. Neither Plaintiffs nor the dissent contend otherwise. Instead, Plaintiffs and the dissent rely on a catchall provision in the CAA stating that a state's SIP must include assurances that the state "is not prohibited by any provision of Federal or State law from carrying out such implementation plan." § 7410(a)(2)(E)(i); *see* Dissent

at 40. But such general language is far from the "clear and manifest" expression of Congress's intent needed to show that Congress intended for EPCA to displace the CAA. *Epic Sys.*, 584 U.S. at 510 (citation modified). If Congress wanted to interfere with the system of federal-state collaboration set up by the CAA, impede upon the EPA's statutory authority to protect the public's health and welfare, or restrict states' ability to comply with federal air quality standards, "one would expect Congress to have said so. But Congress said nothing." *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 766 (9th Cir. 2018).

In sum, Congress's silence in EPCA regarding the very same types of regulations that Congress and the EPA "previously sought to foster counsels against pre-emption." *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 332 n.7 (1997). To hold otherwise would amount to an implied repeal of the CAA, and Plaintiffs have not carried "the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys.*, 584 U.S. at 510 (2018) (citation modified).

### B. Plaintiffs' Argument Ignores the Limitations to EPCA Preemption Recognized in *CRA*

Unable to identify anything in EPCA's text, structure, or history indicating a congressional desire to preempt appliance emissions regulations, Plaintiffs and the dissent instead rely exclusively on our decision in *CRA*. According to Plaintiffs, this case "presents essentially the same question" as *CRA*. The dissent likewise asserts that *CRA* addressed "a virtually identical question to the one raised here." Dissent at 37. Respectfully, we disagree.

As an initial matter, Plaintiffs' assertion that *CRA* "squarely controls" our decision in this case is belied by the

California Restaurant Association's own arguments in that case. In *CRA*, the California Restaurant Association (for whom the *CRA* case is named and who is also a plaintiff in this case) conceded before the district court that "all sorts of ordinary local regulations affecting EPCA-covered appliances" including "*regulations of nitrogen oxide emissions*" do not "concern energy use" and are not "barred by [the California Restaurant Association's] interpretation of the EPCA."[7] This concession that EPCA does not reach NOx emissions regulations dispels Plaintiffs' contention in this case that those very same types of regulations are preempted.

Contrary to the dissent's assertions, *see* Dissent at 40 n.3, we mention the California Restaurant Association's position in *CRA* not in order to preclude Plaintiffs from raising new or different arguments in this case, but rather to demonstrate what issues were and were not considered in *CRA*. "Cases are not precedential for propositions not considered, or for matters that are simply assumed." *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) (citation modified). The California Restaurant Association's assurances in *CRA* that its interpretation of EPCA (which the *CRA* panel ultimately adopted) would not call into question the very type of regulation it now challenges—particularly when viewed alongside the *CRA* panel's repeated assurances that its

[7] The District's request for judicial notice (Dkt. 31) of Exhibits A through U, which include the California Restaurant Association's briefing in the *CRA* litigation as well as state and local air pollution regulations, is **GRANTED**. *See* Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."); *Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007) ("Municipal ordinances are proper subjects for judicial notice.").

"holding is very narrow," *CRA*, 89 F.4th at 1106—demonstrate that the panel did not resolve the issue now before us. *See Kirilyuk*, 29 F.4th at 1134 ("[I]f a prior case does not raise or consider the implications of a legal argument, it does not constrain our analysis." (citation modified)).

*CRA* instead concerned a very different type of regulation: a building code ordinance passed by the City of Berkeley ("Berkeley") that "prohibit[ed] natural gas *piping* in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless." *CRA*, 89 F.4th at 1098. The panel held that because Berkeley's ordinance "prohibit[ed] the installation of necessary natural gas infrastructure on premises where covered appliances are used," it was preempted by EPCA. *Id.* at 1102.[8]

Unlike Berkeley's building code ordinance, which operated by physically blocking otherwise available energy from reaching its end destination in newly constructed buildings, the District's Rule does not regulate the "energy use" of covered appliances at all. The Rule presents no physical barrier to the use of natural gas. Nor does the Rule say anything about how much or what type of energy an appliance can consume provided that the emissions requirement is met. Moreover, unlike Berkeley's ordinance, which banned the natural gas infrastructure that supplied gas

[8] Judge O'Scannlain wrote a separate concurrence. Although he ultimately agreed with the panel's analysis, he did so only because the Ninth Circuit had abandoned (in his view, without clear direction from the U.S. Supreme Court) the presumption against preemption in cases involving an express preemption provision. *See id.* at 1111 (O'Scannlain, J., concurring).

*into* appliances, the Rule regulates the *output* of appliances by limiting the harmful NOx pollutants they emit.

Plaintiffs and the dissent brush aside these differences and instead construe *CRA* for the broad proposition that any regulation that directly or indirectly results in consumers being unable to use gas appliances—including those enacted pursuant to a state's authority under another federal statute—must be preempted. Dissent at 38-39. But that reading cannot be squared with the language of the panel opinion in *CRA*, which recognized important limitations to EPCA preemption and declined to take up the issue of a potential conflict with another statute.

In *CRA*, Berkeley attempted to invoke the Natural Gas Act, 15 U.S.C. § 717 *et seq*., in defense of its ordinance. *Id.* at 1106. Berkeley argued that because the Natural Gas Act reserves authority over local distribution of natural gas to the states, a finding that Berkeley's ordinance was preempted by EPCA would amount to an implied repeal of that authority. *Id.* The panel ultimately disagreed with the factual premise of Berkeley's argument because, "[r]ather than interfering with distribution of natural gas, [Berkeley's] Ordinance prevents a building occupant from *using* available gas to run a covered appliance." *Id.* In other words, the panel "s[aw] no implied repeal problem" *only* because Berkeley's ordinance was not an exercise of the state's authority under the Natural Gas Act in the first place. *Id.* But at the same time, the panel made clear that its decision had "nothing to say about a State or local government regulation of a utility's distribution of natural gas" and did not "touch on whether [Berkeley] has any obligation to maintain or expand the availability of a utility's delivery of gas to meters." *Id.* at 1103, 1106. Because the panel had no occasion to consider whether EPCA would preempt a state's exercise of its regulatory

authority under another federal statute, *CRA* does not, as Plaintiffs and the dissent insist, resolve the question presented here.

Judge Baker further expounded upon the limits to EPCA preemption in a separate concurrence. *See id.* at 1117 (Baker, J., concurring) (noting that "EPCA preemption is unlikely to reach a host of state and local regulations"). Echoing the panel opinion's acknowledgment that its decision had nothing to say about how to resolve a conflict between the Natural Gas Act and EPCA, Judge Baker found no "indication from its text or structure that EPCA speaks to the distribution of natural gas." *Id.* Thus, Judge Baker concluded, "[i]f a state or local government terminates existing gas utility service or declines to extend such service, EPCA likely has no application." *Id.* Judge Baker provided further examples of state regulations that likely fall beyond the scope of EPCA preemption, including "state and local taxes that might reduce consumption of natural gas"; decisions to "terminate[] existing gas utility service"; and "measures curtailing the distribution of . . . electricity due to wildfire risk or grid limitations." *Id.* at 1117 & n.9.

Moreover, the *CRA* panel's determination that Berkeley's building code ordinance was preempted relied heavily on the fact that ECPA explicitly identifies certain "building code requirements," including "local building code[s] for new construction," as one type of regulation that falls within the scope of EPCA preemption. § 6297(f), (f)(1); *see CRA*, 89 F.4th at 1101 ("Of critical importance here is that the structure of the statute indicates that [preempted regulations] can include 'building code requirements.'" (quoting § 6297(f)). Indeed, the panel used the term "building code[s]" nearly 30 times in its opinion and summarized its decision as holding "only that EPCA applies

to building codes and that Berkeley's Ordinance falls with the Act's preemptive scope." *CRA*, 89 F.4th at 1101. Additionally, although the panel construed some of EPCA's terms broadly, it stressed that "the breadth of EPCA's preemption provision 'does not mean the sky is the limit,'" *id.* at 1103 (quoting *Dan's City*, 569 U.S. at 260), and it described its opinion as first "narrow" and then "very narrow." *Id.* at 1106.[9]

Plaintiffs nonetheless argue that a ruling in the District's favor would "gut EPCA's preemption provision by making it trivially easy to evade." According to Plaintiffs, Berkeley could circumvent the effect of the *CRA* decision by simply re-enacting its ban on gas piping under the guise of an emissions regulation. What this argument ignores, however, is that unlike the District, cities like Berkeley are not charged with the authority or obligation under the CAA to attain federal air quality standards by regulating emissions. Rather than "gut EPCA's preemption provision," our holding today

[9] In a dissent from the denial of rehearing en banc, Judge Friedland advocated for an even narrower reading of EPCA's preemption provision. *See CRA*, 89 F.4th at 1120 (Friedland, J., dissenting from denial of rehearing en banc). In Judge Friedland's view, the panel misconstrued the terms "energy use" and "point of use" by employing those terms' "colloquial meanings instead of the technical meanings required by established canons of statutory interpretation." *Id.* at 1120-21. In a recent decision, the Second Circuit likewise rejected the *CRA* panel's broad reading of EPCA and instead adopted Judge Friedland's interpretation of the statute. *See Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, __F.4th__, 2026 WL 1871692, at *13-14 & n.15 (2d Cir. 2026) (noting "a growing consensus amongst district courts outside of the Ninth Circuit that EPCA does not preempt laws that effectively ban gas-powered appliances"). Even the dissent in our case believes that *CRA* presented a close call on statutory interpretation. *See* Dissent at 36, 38 n.1.

merely recognizes that state and local regulators do not necessarily run afoul of EPCA preemption when they exercise their statutory duties under the CAA by enacting emissions standards for covered appliances.[10]

Indeed, even Plaintiffs agree that "ordinary" NOx appliance emissions standards are sufficiently incidental to the purpose of EPCA that they pose no preemption issue. Plaintiffs take issue only with the fact that the limit set by the District's Rule is zero (or more precisely, any quantity that is effectively zero) instead of some other number. But even non-zero emissions standards, like the District's prior 20 ppm limit, equally ban some gas appliances (namely, those that cannot meet that non-zero standard). Put differently, even under non-zero emissions standards, manufacturers already have to design and sell different types of products to meet these varying emissions standards. Plaintiffs fail to square their argument that the District's Rule is preempted with their concession that non-zero emissions standards have only an incidental impact on energy use.

[10] The dissent nevertheless argues that this case presents an "easier call than *CRA*" because EPCA's preemption provision applies to certain state regulations of "covered products," and EPCA elsewhere "mentions 'water heaters.'" Dissent at 39 (quoting § 6292). However, EPCA's preemption provision applies only to "State regulation[s] concerning the energy efficiency, energy use, or water use of . . . covered product[s]," § 6297(c), not any and all state laws and regulations that somehow affect a covered product. For the reasons explained, the District's NOx emission standard enacted pursuant to a different federal statute, the CAA, is not a state regulation covered by EPCA's preemption provision. Moreover, EPCA's preemption provision itself explicitly discusses "building code requirements," so if anything, *CRA* presented the easier call. *See CRA*, 89 F.4th at 1101 (noting that the statute's inclusion of building codes was "[o]f critical importance").

Equally unavailing is Plaintiffs' argument that allowing local regulators like the District to set zero emissions standards for gas appliances would undermine the goals of EPCA by creating a patchwork of standards that EPCA is designed to prevent. Again, this argument ignores the fact that state and local emissions regulations already vary widely. For example, Texas caps NOx emissions at 55 ppm or less, whereas Ventura County Air Pollution Control District limits NOx emissions to 20 ppm (the same limit as existed under the prior iteration of the District's Rule). Plaintiffs do not explain why the patchwork of differing emissions standards that currently exists does not implicate the very same preemption problem they raise with respect to the District's Rule.

### C. Plaintiffs' Facial Challenge Fails

Finally, even if we were to accept Plaintiffs' expansive interpretation of EPCA's preemption provision, Plaintiffs' facial challenge nonetheless fails, which provides an independent basis for affirming the district court.

In Plaintiffs' amended complaint, Plaintiffs asserted that they were "challeng[ing] the facial validity of the District's zero-NOx rule" and that "[t]here is no set of circumstances under which the rule can be valid under federal law." Plaintiffs requested that the district court issue a "declaratory judgment . . . that the District's Rule 1146.2 is preempted by federal law . . . and is therefore void and unenforceable," as well as "a permanent injunction enjoining the District from enforcing or attempting to enforce Rule 1146.2's zero-NOx emissions limits." Plaintiffs' decision to bring a facial challenge "comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Facial challenges are "the most difficult challenge to mount successfully, since the

challenger must establish that no set of circumstances exists under which the Act would be valid." *Am. Apparel*, 107 F.4th at 938 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). This rule applies equally to preemption challenges. *Id.* To succeed on their facial challenge, Plaintiffs must establish "that the [Rule] is unconstitutional in all of its applications" or lacks "a plainly legitimate sweep." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

Plaintiffs cannot show that the Rule is unconstitutional in every application because the Rule regulates emissions from "process heaters," which are not among the list of covered products under EPCA, and for which the DOE has not issued any federal standards. *See* §§ 6292, 6311; 10 C.F.R. Parts 430, 431. Because there is no federal standard in place for process heaters, EPCA preemption does not reach those products. *See CRA*, 89 F.4th at 1104 (noting that where a regulation "concerns the 'energy use' of covered and non-covered products alike, EPCA's preemptive effect is limited to the covered products").

Plaintiffs' challenge is thus similar to that of the plaintiffs in *American Apparel*. There, the plaintiffs brought a facial challenge to Oregon's attempt to regulate 73 chemicals on the grounds that two federal statutes preempted states from imposing requirements different from federal requirements. 107 F.4th at 936. Our Court determined that the plaintiffs' facial challenge failed because the federal Consumer Product Safety Commission had not promulgated regulations that would have triggered the relevant preemption provisions for all 73 chemicals. *See id.* at 940-41. Similarly, here, because the DOE "has not acted to regulate all" products regulated by the District's Rule, EPCA

does not, "at least on a facial challenge, expressly preempt" the Rule. *Id.* at 942-43.

Neither Plaintiffs nor the dissent provide any basis for distinguishing *American Apparel*. Instead, relying on *Montana Medical Ass'n v. Knudsen*, 119 F.4th 618 (9th Cir. 2024), the dissent contents that we should narrowly construe Plaintiffs' claims within a particular "setting" or "scope." Dissent at 43. In *Montana Medical*, however, we applied the facial challenge standard within the context of a particular "setting" because the plaintiffs *themselves* limited their claims to that setting. The same is not true here.

*Montana Medical* involved a preemption challenge to a Montana statute, HB 702, which prohibited discrimination based on vaccination or immunity status. *Id.* at 620-61. The plaintiffs brought suit "to invalidate HB 702 *in all health care settings*" on the theory that, "*in health care settings*, the [Americans with Disabilities Act] requires employers to know employee vaccination status and to discriminate on the basis of this status." *Id.* at 622 (emphases added).[11] Given that the plaintiffs sought to "enjoin HB 702 across all health care settings," we applied the ordinary rule governing facial challenges to that specific context and required the plaintiffs to show "'that no set of circumstances exists under which [HB 702] would be valid' in health care settings." *Id.* at 624 (quoting *Salerno*, 481 U.S. at 745) (alteration in original).

Here, unlike in *Montana Medical*, Plaintiffs have not limited their challenge to EPCA covered appliances or to any other particular "setting" or "scope." Rather, Plaintiffs' amended complaint challenged "the facial validity of the

[11] The plaintiffs also asserted that HB 702 was preempted by the Occupational Health and Safety Act based on a similar theory. *See id.*

District's zero-NOx rule" and broadly alleged that "[t]here is no set of circumstances under which the rule can be valid under federal law." Plaintiffs thus requested "a permanent injunction enjoining the District from enforcing or attempting to enforce" the Rule's emissions limits in their entirety. Given the sweeping nature of Plaintiffs' claims and requests for relief, we see no reason to cabin Plaintiffs' challenge to only EPCA covered appliances as the dissent suggests. Dissent at 43.

The dissent asserts that our application of the facial challenge standard in this case effectively enables a state to pass an invalid law so long as the state includes "just one outlier valid provision." Dissent at 42. This concern is misplaced. It is the plaintiff, not the state, who decides the nature of the claims alleged and the scope of the relief sought. *See Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (stating the general rule that the "plaintiff is the master of the complaint" (citation modified)). Here, Plaintiffs chose to challenge the Rule in every application without distinguishing between appliances which are covered by EPCA and appliances which are not. That "decision comes at a cost." *Moody*, 603 U.S. at 723. Given that at least the Rule's regulation of process heaters falls outside the scope of EPCA, Plaintiffs' facial challenge fails.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's amended order denying Plaintiffs' motion for summary judgment and granting summary judgment in favor of the District.

**AFFIRMED.**

LEE, Circuit Judge, dissenting:

Just three years after *California Restaurant Association (CRA) v. City of Berkeley*—a case strikingly similar to ours—the majority opinion effectively makes that precedent vanish like smoke. 65 F.4th 1045 (9th Cir. 2023), *en banc recons. denied and op. amended*, 89 F.4th 1094 (9th Cir. 2024). I respectfully dissent.

In *CRA*, we held that Berkeley's ordinance banning natural gas infrastructure in new buildings was preempted under the Energy Policy and Conservation Act (EPCA) because that statute bans states from regulating "energy use" of a "covered product." 42 U.S.C. § 6297(c). Our binding decision in *CRA* mandates the same result here. The South Coast Air Quality Management District (AQMD) issued a rule banning home appliances that emit nitrogen oxides (NOx), effectively outlawing natural gas water heaters made by Rinnai America and other companies. Just like in *CRA*, EPCA preempts AQMD's rule on NOx emissions because it similarly regulates "energy use" of a "covered product."

Admittedly, *CRA* presented a close call on the scope of the preemption provision, as reflected by a dissental from eight judges and a separate statement from three of our senior colleagues. But this court decided that issue, and we must follow our precedents. Simply put, *CRA* controls this case.

* * * *

Congress enacted EPCA in 1975. Pub. L. No. 94-163, 89 Stat. 871 (1975). While, as the majority notes, it included labeling requirements for consumer appliances, the statute went far beyond that to cover fuel export restrictions, creation of the Strategic Petroleum Reserve, establishment

of automotive fuel efficiency standards, and authorization of a mandatory improvement target for home appliances. *Id.*

A dozen years later, Congress amended the statute to include a broad preemption provision that "no State regulation concerning the energy efficiency, *energy use*, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c) (emphasis added). The statute defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* at § 6291(5). And a "water heater" is included as a "covered product." *Id.* at § 6292.

Around the same time that Congress passed EPCA, California established the AQMD. 1976 Cal. Stat. 324 at 893. That state agency has issued emissions rules from its earliest years. *Id.* A version of the current NOx rule, Rule 1146.2, was first adopted in 1998, limiting NOx to thirty parts per million on most covered appliances. AQMD then repeatedly tightened the emissions limits and covered more appliance types until, in 2022, it adopted the zero NOx rule. Portions of the amended rule took effect on January 1, 2026.

## DISCUSSION

### I. *CRA* controls here, requiring preemption of California's rule.

In *California Restaurant Association v. City of Berkeley*, our court faced a virtually identical question to the one raised here. 89 F.4th 1094 (9th Cir. 2023). There, the California Restaurant Association challenged a city building code banning natural gas infrastructure in new buildings. *Id.* at 1099. The court held that the City of Berkeley code regulated "energy use" by effectively banning new gas

appliances—and thus it ran afoul of EPCA's preemption provision barring states from regulating "energy use" of a "covered product." *Id.* at 1098.

The reasoning behind *CRA* was simple and logical once we accepted the textual interpretation of the preemption provision.[1] The *CRA* court explained that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations." *CRA*, 89 F.4th at 1102 (emphasis original). And "by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses. So EPCA preemption extends to regulations that address the products themselves *and* [state regulations] that concern their *use* of natural gas." *Id.* at 1103 (emphasis original). And because Berkeley's ban on new gas infrastructure will by definition affect "energy use," the ordinance falls within the preemption provision's bar on "State regulation concerning . . . energy use" of a "covered product." *Id.* at 1105.

*CRA*'s reasoning mandates the preemption of AQMD's zero NOx rule. Under *CRA*, ECPA preempts a state/local rule regulating "energy use" if that rule prohibits the use of approved appliances. 89 F.4th at 1101. As the district court found, AQMD's rule undisputedly does that. The whole point of the rule is to prohibit NOx emissions from water

---

[1] To be fair, *CRA* presented a close call on statutory interpretation grounds. If read at face value (as the *CRA* court did), the EPCA preempts Berkeley's ban on new gas infrastructure because such a ban regulates "energy use." On the flip side, if we look at the entire structure and context of the statute, then perhaps "energy use" should be read more narrowly such that it is tailored to energy efficiency. But the *CRA* opinion rejected such a reading, and we are bound by the panel's interpretation of the preemption provision. *CRA*, 89 F.4th at 1101–1103.

heaters and other approved appliances. Under current technology, the zero NOx rule means no natural gas appliances. Be it banning gas piping into the appliance as in *CRA* or necessary emissions from the appliance as here, the situation is the same—state law "rendering the gas appliances useless." *CRA*, 89 F.4th at 1098. As *CRA* noted, these policies "concern[]" the energy use of those products as much as a direct ban on the products themselves." *Id.* at 1103.

If anything, this case is an easier call than *CRA* because AQMD's anti-NOx rule falls more directly into the heartland of EPCA's preemption provision: EPCA expressly mentions "water heaters" while the statute is silent about the gas infrastructure at issue in Berkeley. 42 U.S.C. § 6292. This case ought to be a straightforward application of our precedent.

Despite the holding of *CRA*, the majority latches onto boilerplate limiting language in the opinion to effectively neuter it. To be sure, there is some perfunctory language saying that the case only addresses the facts presented. *CRA*, 89 F.4th at 1101, 1103, 1106 (limiting holding to the building-code facts at issue).[2] But such language means little. An opinion by its very nature only addresses the facts presented in the case. *See* Antonin Scalia, "Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws," in *A Matter of Interpretation: Federal Courts and the Law* 3, 26 (new ed. 2018).

---

[2] There is also some expansive language in the *CRA* opinion. 89 F.4th at 1100–01 (holding that preemption applies to rules beyond "direct or facial regulations of covered products").

We, however, look at the reasoning of the opinion and even the logic "germane" to the case's resolution. *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003); *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (Kozinski, J., plurality opinion). Courts then apply these binding legal principles to new facts. That is precisely why certain judges on this court fretted about the effect of the *CRA* panel opinion in future cases and tried to rehear the case en banc. *CRA*, 89 F.4th at 1119, 1126 (Friedland, J., dissenting from the denial of rehearing en banc) (urging "any future court that interprets the Energy Policy and Conservation Act not to repeat the panel opinion's mistakes" and hoping for that result). But that en banc call failed—and the reasoning of the *CRA* panel opinion should still stand today.[3]

The majority also relies on the Clean Air Act (CAA) to say that the AQMD's rule furthers the CAA and therefore abrogates preemption. But the CAA does not micromanage *how* the states can meet the goal of cleaner air. In fact, "States bear 'primary responsibility' for developing plans to achieve air-quality goals." *Ohio v. E.P.A.*, 603 U.S. 279, 283 (2024) (quoting 42 U.S.C. § 7401(a)(3)). And the CAA mandates that States' implementation comply with other federal laws—like EPCA. 42 U.S.C. § 7410(a)(2)(E)(i). There are many potential ways the AQMD and California can try to improve air quality in the South Coast region—without violating federal law through the imposition of a

[3] The majority also tries to tie the plaintiffs in this case to arguments made by the California Restaurant Association in *CRA*. While the Association was a party in that case, Rinnai and other plaintiffs here were not. These plaintiffs can rightly assert new arguments.

zero NOx rule.[4] Put another way, there is no inherent tension between the CAA and EPCA. The only tension here is between federal law and state law. And when faced with this conflict, federal law preempts state law under the EPCA.

## II. The plaintiffs can rightfully make a facial challenge.

The majority alternatively argues that the plaintiffs are making a facial preemption challenge and that such a claim fails because AQMD's rule applies to "process heaters" (which are not covered under the EPCA's preemption provision). Admittedly, our case law distinguishing between facial and as-applied challenges is complicated, confusing, and contradictory.[5] But the key question we ask is whether

---

[4] The majority believes the District when it claims "it cannot comply with the CAA unless it enacts zero emissions standards like" the rule here. But California and the District are not so limited. The District acknowledges that it regulates "a panoply of emission sources." Stricter regulation of non-covered appliances is therefore possible. What's more, "air pollution knows no political boundaries," so California could require reductions in other regions. Cal. Health & Safety Code § 39001. Additionally, California may under the CAA set stricter limits on vehicular emissions than general federal standards. *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 782 (9th Cir. 2005) (quoting Cal. Health & Safety Code §§ 39002, 40000); 42 U.S.C. § 7507. California and the District could reduce NOx in countless ways beyond the rule at issue here.

[5] One key factor is the *Salerno* principle, which states a facial "challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As one panel of our court noted, its "applicability in preemption cases is not entirely clear." *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016). Some of our recent cases hold fast to the *Salerno* principle. *See, e.g.*, *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938–39 (9th Cir. 2024). But some other cases, including some published after *American Apparel*, place the challenge in

a provision in the law can be constitutional under some factual circumstances or is always unconstitutional, no matter the facts. *United States v. Rahimi*, 602 U.S. 680, 708 (2024) (Gorsuch, J., concurring). The majority argues that because EPCA does not mention or regulate "process heaters," no one can invoke a facial challenge against all the *other* appliances that are directly mentioned, regulated, and preempted by the EPCA.

But if we accept the majority's characterization of a facial challenge, any state can evade a federal preemption facial challenge by just adding an extra item in the statute (an appliance in this case) that is not covered by federal law. Just as "States and localities can't skirt the text of broad preemption provisions by doing indirectly what Congress says they can't do directly" they cannot append statutory codas to avoid this form of judicial review. *Cf. CRA*, 89 F.4th at 1106–07 (collecting cases for the proposition that preemption cannot be avoided by shifting the regulatory focus). Such an understanding of facial challenges would allow states to pass facially invalid laws—and add just one outlier valid provision—to deflect facial challenges.

Consider the following analogy: Suppose Congress passes a law making it unlawful to (i) criticize the President or members of Congress, (ii) parody them, (iii) humiliate them, or (iv) threaten them. Everyone will agree that sections (i)–(iii) are facially unconstitutional (*i.e.*, unconstitutional no matter the facts) but that section (iv) depends on the facts (*e.g.*, is it a "true threat" that falls outside the First Amendment?). Under the majority's reasoning, there can be no facial challenges to sections (i)–

---

a specific context and examine its application within that frame. *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 625–27 (9th Cir. 2024).

(iii) because the statute could be constitutional under section (iv) in some circumstances. Such an artifice is not and should not be our law.

Rather, we should address this case in the appropriate "setting" or scope of the challenge. *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 624–25 (9th Cir. 2024). Just as in *Montana Medical*, where the challengers sought an injunction in "all health care settings," *id.*, the challengers here seek to prohibit the rule's application to "certain categories of natural gas appliances covered by" EPCA.[6] Viewed from that proper lens, a facial challenge is appropriate here because a zero NOx rule for water heaters will always be preempted under federal law, no matter the facts. *Id.* Facial challenges allow a party "to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chi. v. Morales*, 527 U.S. 41, 55 n.22 (1999). The Supreme Court has blessed their use in foundational cases defending our constitutional order. *See, e.g., Sorrell* v. *IMS Health Inc.*, 564 U. S. 552 (2011) (First Amendment); *District of Columbia* v. *Heller*, 554 U. S. 570 (2008) (Second Amendment); *City of L.A. v. Patel*, 576 U.S. 409 (2015) (Fourth Amendment); *Morales*, 527 U. S. 41 (1999) (Due Process Clause of the Fourteenth Amendment); *Kraft Gen. Foods, Inc.* v. *Iowa Dept. of Revenue and Finance*, 505 U.S. 71 (1992) (Foreign Commerce Clause).

I respectfully dissent.

---

[6] The majority claims that Plaintiffs have not limited their challenge to EPCA covered appliances. Maj. Op. at 34. The complaint and prayer for relief indicate otherwise. Our precedent requires that we treat this challenge in its appropriate scope. *Montana Medical*, 119 F.4th at 624–25.